FILED
2011 Aug-05 PM 02:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

Dale M. Schwartz
Dale M. Schwartz & Associates
St. 450 RiverEdge One
5500 Interstate North Parkway, NW
Atlanta, GA 30328
Telephone: (770) 951-1100
Facsimile: (770) 951-1113
dale@immlawfirm.com

Of Counsel:

Anti-Defamation League
605 Third Avenue
New York, NY 10158-3560
Telephone: (212) 885-7700
Facsimile: (212) 885-5882

Steven M. Freeman
sfreeman@adl.org
Steven C. Sheinberg
ssheinberg@adl.org
Deborah Bensinger
dbensinger@adl.org
David L. Barkey
dbarkey@adl.org

Attorneys for Anti-Defamation League

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

Hispanic Interest Coalition of Alabama, et al.,

      Plaintiffs,

v.

Governor Robert Bentley, et al.,

      Defendants.

Case No.: 5:11-cv-02484-SLB

**BRIEF OF *AMICUS CURIAE
ANTI-DEFAMATION LEAGUE
IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION***

1

<div align="center">Statement of Interest</div>

2

3    The Anti-Defamation League ("ADL") is the leading nongovernmental
organization in the United States that trains law enforcement officers on issues of hate

4    crimes and extremism. ADL provides training through a national network of regional

5    offices to thousands of law enforcement officers to ensure that they know how to

6    recognize and identify hate crimes and investigate them properly and sensitively. ADL

7    has trained law enforcement leaders at its *Advanced Training School: Course on*

8    *Extremist and Terrorist Threats* in Washington, D.C.  With the United States Holocaust

9    Memorial Museum, ADL has also trained more than 45,000 law enforcement
professionals in *Law Enforcement and Society: Lessons of the Holocaust*, a program that

10    examines how law enforcement became co-opted by the Nazi regime during the

11    Holocaust, and that provides law enforcement professionals with an increased

12    understanding of the importance of their relationship to the communities they serve and

13    their role as protectors of civil rights guaranteed by the United States Constitution.

14    ADL also has unmatched expertise concerning the development of federal and

15    state hate crimes legislation. In 1981, ADL drafted a model state hate crime law, and the

16    District of Columbia and 45 states, including Alabama, have enacted statutes based on or

17    similar to ADL's model.  ADL was a leading advocate for the Matthew Shepard and
James Byrd, Jr. Hate Crimes Prevention Act of 2009 ("HCPA"), 18 U.S.C. § 249. ADL

18    also has advocated for laws mandating the collection of statistics about hate crimes.

19    Through its work with law enforcement and expertise in hate crime, ADL is

20    uniquely situated to assist the Court in evaluating the public consequences of Alabama

21    House Bill 56, as amended ("HB 56"), particularly in connection with the reporting and

22    prevention of hate crimes. While the principal issue before the Court is preemption, and

23    while ADL agrees with Plaintiff- Appellee's argument on that issue, ADL submits this

24    brief to address a specific area of public safety that will be harmed if the Preliminary

25    Injunction is not granted. As shown below, unless the court issues a Preliminary

26    Injunction, enjoining the enforcement of HB 56, this law will undermine the enforcement

27

28

Doc. #603242 v.1

1  of hate crimes laws in Alabama by driving a sharp wedge between law enforcement and
2  communities whom such laws were designed to protect.

3  <center>Argument</center>

4  <center>Preliminary Statement</center>

5      If well-ordered liberty means anything, it must mean that all persons should be
6  afforded access to police protection if they become victims of hate crimes. The Beason-
7  Hammon Alabama Taxpayer and Citizen Protection Act ("HB 56"), impedes that access
8  for *all* Latino and Hispanic Alabama residents whether United States citizens, lawful
9  residents or undocumented immigrants.[1]  HB 56 poses a substantial threat of deterring
10 Latinos and Hispanics from reporting crimes or serving as witnesses in criminal
11 investigations. More directly than laws passed in other states, HB 56 targets victims of
12 crimes for deportation and reporting to Immigration Services, effectively eliminating
13 police protection for undocumented persons, or those who fear for their undocumented
14 family members or friends.  This *amicus* brief provides additional context and
15 information about a particular and devastating consequence of the rupture in police-
16 community trust that HB 56 will inevitably cause – the creation of an underclass uniquely
17 vulnerable to increased hate crimes and violence.

18     As shown below, unless its enforcement is enjoined, HB 56 is substantially likely
19 to cause irreparable harm to the enforcement of Alabama and federal hate crimes statutes
20 by driving a wedge between law enforcement and Latino and Hispanic communities.
21 That breach in trust will render the State's Latino and Hispanic community uniquely
22 vulnerable to the commission of hate crimes – an outcome fundamentally at odds with the
23 strong public policies embodied in federal and state anti-hate crimes legislation. Granting

24

---

25 [1]While this *amicus* brief focuses on the relationship between law enforcement and the
   Latino and Hispanic communities, ADL understands and supports the position that there
26 are additional immigrant communities that will be similarly affected by HB 56, including
   Alabama's Asian community.

27

28

1   the preliminary injunctive relief that Plaintiffs seek will avert irreparable harm that HB

2   56 will otherwise inflict on the policing of hate crimes in Alabama, and will advance the

3   vital public interest in ensuring that federal and Alabama anti-hate crimes statutes are

4   enforced to the fullest extent of the law. *See Winter v. Natural Res. Def. Council, Inc.*,

5   129 S. Ct. 365, 376 (2008).

6   <div align="center">Argument</div>

7
8   **I.**   **HB 56 Will Undermine the Latino and Hispanic Communities' Trust in Law Enforcement Eviscerating the Police's Ability to Enforce Criminal Law, Including Federal and State Hate Crime Laws.**

9
10      **A.**   **Hate Crimes Targeting Latinos and Hispanics Are a Significant Issue which HB 56 will Exacerbate by Further Obstructing Enforcement of Federal and Alabama Prohibitions Against Hate Crimes Based on National Origin and Color.**

11

12       Alabama's criminal statutes include strong prohibitions against the commission of

13   hate crimes. Code of Ala. § 13A-5-13 imposes additional penalties "where it is shown

14   that the perpetrator committing the underlying offense was motivated by the victim's

15   actual or perceived race, color, religion, national origin, ethnicity, or physical or mental

16   disability." The federal Hate Crimes Prevention Act of 2009, which gives the United

17   States Department of Justice the power to investigate and prosecute violent crimes where

18   the perpetrator selects the victim because, *inter alia*, of the person's actual or perceived

19   race, color or national origin, evinces an equally strong federal policy against the

20   commission of hate crimes. 18 U.S.C. § 249.[2]

21       The issue of hate crimes in our nation and specifically bias crimes targeting

22   Latinos or Hispanics is far from theoretical. According to statistics gathered by the

23   Federal Bureau of Investigation documenting hate crimes through 2008, hate crimes that

24

25

26   ―――――――――――――
   [2] *See* http://www.justice.gov/crt/crim/249fin.php (last visited June 21, 2010) (discussing

27   the HCPA and other federal anti-hate crimes statutes).

28

Doc. #603242 v.1

year reached their highest level since 2001.[3] In 2008, 7,783 hate crimes were reported nation-wide.[4] Of those, 561 were motivated by the actual or perceived Hispanic ethnicity of the victim.[5] In 2009, we saw a slight decrease in incidents of hate crimes reported, with 6,604 reported nationwide.[6] Of those, 483 were motivated by the actual or perceived Hispanic identity of the victim.[7] While this was a decline from the 2008 number, it represented an increase in the percentage of reported hate crimes motivated by perceived Hispanic heritage.[8] In the past 10 years, between 400 and 600 hate crimes against Hispanics have been reported each year.[9]

While these figures are deeply disturbing, they do not reflect the full scope of hate crimes committed in the United States. Rather, they only represent hate crimes reported by local law enforcement agencies to the FBI, which is voluntary under the federal Hate Crimes Statistics Act ("HCSA").[10]    Indeed, a June 2011 federal Bureau of Justice Statistics ("BJS") report estimates that 148,400 hate crimes actually occurred in 2009 - 87% of which involved bias-motivated violent acts.[11] Of these crimes, 17%, or

---

[3] See ADL table, "Ten Year Comparison of FBI Hate Crime Statistics (2008-1999), available at http://www.adl.org/combating_hate/HCSA_10year.asp (last visited June 21, 2010).

[4] Uniform Crime Report, Hate Crime Statistics, 2008. U.S. Department of Justice Federal Bureau of Investigation, table 1, available at http://www.fbi.gov/ucr/hc2008/data/table_01.html   (last visited June 21, 2010).

[5] Id.

[6] Hate Crime Statistics: Incidents, Victims and Known Offenders by Bias Motivation, 2009, Federal Bureau of Investigation, http://www2.fbi.gov/ucr/hc2009/data/table_01.html (last visited June 10, 2011)

[7] Id.

[8] Hate Crime Statistics: Incidents, Victims and Known Offenders by Bias Motivation, 2008, Federal Bureau of Investigation, http://www2.fbi.gov/ucr/hc2008/data/table_01.html (last visited June 10, 2011)

[9] ADL table, "Ten Year Comparison of FBI Hate Crime Statistics (2008-1999), available at http://www.adl.org/combating_hate/HCSA_10year.asp (last visited June 21, 2010).

[10] Hate Crime Data Collection Guidelines, Uniform Crime Reporting; U.S. Department of Justice, Federal Bureau of Investigation (Revised October 1999) - http://www.fbi.gov/about-us/cjis/ucr/hate-crime/hcguidelinesdc99.pdf

[11] Special Report: Hate Crime, 2003-2009, U.S. Department of Justice Bureau of Justice Statistics (June 2011), http://www.bjs.gov/content/pub/pdf/hc0309.pdf

Doc. #603242 v.1

approximately 25,200, targeted persons who identify as Latino or Hispanic.[12] Furthermore, 64% of those crimes, approximately 16,100, were reported as being based on the ethnicity of the victim.[13]

The BJS report reflects the significant gaps in systematic and comprehensive national collection of hate crimes data.[14] One of the causes of these gaps is victims underreporting hate crimes to law enforcement.[15] Victims fail to report for multiple reasons, including immigrant communities' fear of deportation.[16]

Underreporting of hate crimes is a serious issue in Alabama. For example, in 2009 law enforcement only reported a total of nine hate crimes incidents to the FBI. Even for HCSA purposes this number appears to be quite low as the comparably populated states of Colorado and South Carolina reported 208 and 124 hate crimes incidents, respectively, for the same year.[17] Moreover, while in 2009 a total of 218 Alabama law enforcement agencies participated in the HCSA program, a mere six agencies reported hate crimes incidents to the FBI.[18]

The very purpose and protections of hate crimes laws are undermined when victims fail to report. Undoubtedly, fear of immigration-violation detention or deportation among Latino or Hispanic immigrants residing in Alabama already undermines the enforcement of the Alabama and federal hate crimes laws. HB 56 will only serve to exacerbate this problem. Its enactment will greatly increase this fear among Alabama's Latino and Hispanic communities. Consequently, HB 56 will inevitably

---

[12] Id.

[13] Id.

[14] See Hate Crimes in America: The Nature and Magnitude of the Problem, The Leadership Conference http://www.civilrights.org/publications/hatecrimes/nature-and-magnitude.html (Last Visited July 7, 2011).

[15] Id.

[16] Id.

[17] Hate Crime Statistics: Agency Hate Crime Reporting by State, 2009, http://www2.fbi.gov/ucr/hc2009/data/table_12.html  (Last Visited July 11, 2011)

[18] Id.

Doc. #603242 v.1

1    further undermine enforcement of the federal and Alabama hate crimes laws by

2    increasing the underreporting of bias crimes targeting Latinos or Hispanics.

3        **B.      Police Cannot Enforce the Law If Victims and Witnesses Are Unwilling
             to Come Forward.**

4        The Police Foundation, the International Association of Chiefs of Police, and the

5    Major Chiefs Association have all expressed grave concerns that deputizing local law

6    enforcement officers to enforce immigration law undermines the trust and cooperation of

7    immigrant communities.[19] For example, a 2009 report by the Police Foundation states

8    that "[i]mmigration enforcement by local police undermines their core public safety

9    mission, diverts scarce resources, increases their exposure to liability and litigation, and

10   exacerbates fear in communities already distrustful of police."[20] According to Police

11   Foundation President Hubert Williams:

12
13              Police executives have felt torn between a desire to be helpful
                and cooperative with federal immigration authorities and a
                concern that their participation in immigration enforcement
14              efforts will undo the gains they have achieved through
                community-oriented policing practices directed at gaining the
15              trust and cooperation of immigrant communities. As one
                police chief pointed out during the project, "How do you
16              police a community that will not talk to you?"[21]

17   The Major Cities Chiefs Association agrees. According to its 2006 Position Statement:

18
                Local agencies have worked very hard to build trust and a
19              spirit of cooperation with immigrant groups through
                community based policing and outreach programs and
20              specialized officers who work with immigrant groups. Local
                agencies have a clear need to foster trust and cooperation with
21              everyone in these immigrant communities. Assistance and
                cooperation from immigrant communities is especially
22              important when an immigrant, whether documented or
                undocumented, is the victim of or witness to a crime. These
23              persons must be encouraged to file reports and come forward
                with information. Their cooperation is needed to prevent and

24   _____
     [19] *See* Arizona Association of Chiefs of Police Statement on Senate Bill 1070, available at
25   http://www.leei.us/main/media/AACOP_STATEMENT_ON_SENATE_BILL_1070.pdf
     (last visited June 21, 2010).

26   [20] http://www.policefoundation.org/pdf/strikingRelease.pdf (last visited June 21, 2010).

27   [21] Id.

28

                                          - 7 -

1    solve crimes and maintain public order, safety, and security in
     the whole community. . . .

2    Immigration enforcement by local police would likely
3    negatively effect and undermine the level of trust and
     cooperation between local police and immigrant
     communities. . . . Undoubtedly legal immigrants would avoid
4    contact with the police for fear that they themselves or
     undocumented family members or friends may become
5    subject to immigration enforcement. **Without assurances**
     **that contact with the police would not result in purely civil**
6    **immigration enforcement action, the hard won trust,**
     **communication and cooperation from the immigrant**
7    **community would disappear. Such a divide between the**
     **local police and immigrant groups would result in**
8    **increased crime against immigrants and in the broader**
     **community, create a class of silent victims and eliminate**
9    **the potential for assistance from immigrants in solving**
     **crimes or preventing future terroristic acts.**[22] [emphasis
10   added]

11   Indeed, members of Alabama law enforcement similarly expressed
12   significant concerns about the potential detrimental impact of HB 56 on
     Latinos and Hispanics reporting criminal activity. According to an April
13   2011 news report:

14        If the law passes the Senate as it is now written and is signed
          into law, it also could have a chilling effect on a populace that
15        is already afraid of law enforcement, officials said.

16        **Northport Police Chief Robert W. Green said he suspects**
17        **the Hispanic community of Northport already reports far**
          **fewer crimes than actually occur, out of fear of being**
18        **deported.**

19        **'I think ... (that) would probably increase significantly**
20        **with the passage of this bill,' Green said.**

21        [Tuscaloosa County Sheriff Ted] Sexton, [Tuscaloosa County
22        Sheriff Ted] Anderson and Green said the number of
          Hispanic or Latino suspects whom they already encounter is
23        relatively low.

24

25   _____
     [22] Major Cities Chiefs Immigration Committee Recommendations, June 2006, available
26   at
     http://www.majorcitieschiefs.org/pdfpublic/MCC_Position_Statement_REVISED_CEF_
27   2009.pdf (emphasis added) (last visited June 21, 2010).

28

> In fact, Sexton said it was too low, compared to arrests of other races, despite the growing number of Hispanic and Latin American residents that were reflected in the 2010 Census. The recent census data counted 5,949 Hispanics in the county, nearly triple the 2,130 Hispanics counted 10 years prior.[23]  [emphasis added]

### C.    HB 56 Will Prevent Police From Effectively Enforcing the Laws Prohibiting Hate Crimes

Unless its enforcement is enjoined, HB 56 will create an underclass of people who have no meaningful access to police services out of fear that their perceived immigration status will subject them to heightened law enforcement scrutiny whenever they come into contact with police, or will result in their incarnation or deportation for reporting a crime whether as a victim or witness.

In its aim to deal with the issue of undocumented persons living in Alabama, HB 56 grants local law enforcement officers the authority to investigate the immigration status of any person lawfully stopped based on "reasonable suspicion" that they may be in the country unlawfully. Furthermore, Section 13 of HB 56 provides greater justification for unauthorized stops by making it a crime to "conceal, harbor, transport, house, or induce or encourage entrance into the state by any alien person."[24]

Indeed, the provisions of HB 56 not only remove assurances that contact with law enforcement will not result in civil immigration enforcement, they seem to guarantee it. The law will essentially deputize a sector of local law enforcement to act as immigration agents. Specifically, HB 56, in part, authorizes Alabama Homeland Security to designate a specialized sector of the police force to enforce the provisions of HB 56, to work with

---

[23] See Jason Morton, *Top local law officials uneasy over proposed immigration law,* TuscaloosaNews.com (April 7, 2011), http://www.tuscaloosanews.com/article/20110407/NEWS/110409726?p=2&tc=pg

[24] HB 56 Section 13

Doc. #603242 v.1

1   national immigration officials in reporting and prosecuting violators of the law, and to

2   "promulgate rules for the enforcement of this act."[25]

3       Furthermore, HB 56 essentially provides no protection from immigration

4   enforcement for victims of or "critical witnesses" to hate-based or other crimes, or their

5   children. In relevant part HB 56 states:

7          "If a person is an alien who is unlawfully present in the
           United States and is a victim of a criminal act, is the child of a
8          victim of a criminal act, is a critical witness in any
           prosecution, or is the child of a critical witness in any
9          prosecution of a state or federal crime, all provisions of this
10         act shall be stayed until all of the related legal proceedings are
           concluded. However, the relevant state, county, or local law
11         enforcement agency shall comply with any request by federal
           immigration officers to take custody of the person."[26]
12

13  Thus, application of HB 56 is merely stayed pending final resolution of a

14  criminal complaint or complaint. Moreover, this stay provision does not

15  apply where federal immigration authorities seek to take a victim of crime,

16  a witness or their children into custody.

17      As a result of these provisions, Latinos and Hispanics – whether documented or

18  undocumented - likely will be deterred from reporting or serving as witnesses to criminal

19  activities in the community, including hate crimes. The most severe consequences of HB

20  56 will likely fall upon Latinos and Hispanics who are undocumented or have

21  undocumented family members. For all practical purposes, the law will preclude such

22  individuals from reporting hate crimes and other criminal activities to law enforcement.

23      ADL knows from long experience advocating for and training law enforcement on

24  the implementation of hate crime laws that close cooperation between local law

25  enforcement and minority communities is essential. If crime and immigration

26  [25] HB 56 sections 22-24

27  [26] HB 56 Section 21

28

Doc. #603242 v.1

1   enforcement become intertwined, police may find out-of-status persons and their family
2   members hesitant to seek protection, to report crimes committed against them or to serve
3   as witnesses in other crimes – compromising the police's ability to keep the community
4   safe. *See* Part II.A, *supra*.

5       Moreover, when a bias-motivated crime is committed, the victim's entire
6   community may be left feeling victimized, vulnerable, fearful, isolated and unprotected
7   by the law. The impact of the crime spreads far beyond the already terrible consequences
8   for the individual victim. Yet hate crimes will go unreported or underreported even more
9   so than they currently are if HB 56 is permitted take effect, because victims and witnesses
10  will hesitate to contact law enforcement if doing so will subject them heightened law
11  enforcement scrutiny and possible detention, arrest or deportation. Rather than making
12  protecting the Latino, Hispanic and other minority citizens of Alabama, the "Taxpayers
13  and Citizens Protection Act" – as the bill's sponsors titled the statute – will have exactly
14  the opposite effect.

15  **II.    Victims, Their Communities and the Public Will Be Irreparably Harmed by**
16          **the Underreporting of Hate Crimes that Will Inevitably Result from HB 56,**
17          **and the Public Interest Strongly Supports Enjoining the Statute's**
        **Enforcement.**

18      ADL has monitored and exposed the increasingly hateful anti-immigrant, anti-
19  Latino and anti-Hispanic rhetoric that has surrounded the national debate on immigration
20  reform.[27] HB 56 was passed against this backdrop of anger and frustration in Alabama.
21  Indeed, the sponsor of HB 56, Representative Micky Hammon, explained the bill came
22  from the report produced by the Joint Interim Patriotic Immigration Commission, which
23  was created by the Alabama legislature to address the "unprecedented influx of non-
24  English speaking immigrants."[28] The sponsor of the Senate version of the bill, Senator

25  _____

26  [27] ADL Report: "Immigrants Targeted: Extremist Rhetoric Moves into the Mainstream,"
    available at http://www.adl.org/civil_rights/anti_immigrant/ (last visited June 21, 2010).
27  [28] SPLC Complaint.

28

1   Scott Beason, has reportedly said such statements as, "The reality is that if you allow

2   illegal immigration to continue in your area you will destroy yourself eventually."[29]

3   In this climate, it is critically important that law enforcement be fully able to police the

    laws against the commission of hate crimes directed at the Latino community. Yet, as

4   discussed above, HB 56 effectively requires local law enforcement to investigate the

5   immigration status of persons with whom they come into contact if "reasonable

6   suspicion" exists – setting up an inherent conflict that threatens to result in the loss of

7   access to police protection for hundreds of thousands of persons in Alabama. Many legal

8   residents have relatives or friends who are undocumented, or fear that they will be subject

9   to "reasonable suspicion" merely because they "look" or "sound" like "illegal aliens." By

10  putting police and large segments of the community potentially at odds with one another,

11  HB 56 is likely to create a large population that lacks access to the type of basic police

12  services that the rest of the community takes for granted.  This lack of protection –

13  combined with the atmosphere of hateful rhetoric that has marked much of the

14  immigration debate – will create a law enforcement underclass that is vulnerable to the

15  commission of bias-motivated violence and crime.  Such a result risks institutionalizing

16  precisely the kinds of harms that the anti-hate crimes laws were designed to prevent.  It is

17  contrary to the strong public policies against hate crime embodied in federal and

18  Alabama law, and is inimical to the public's interest in advancing public safety and

    security.

19

20

21                                  Conclusion

22      For the foregoing reasons, HB 56 will inflict irreparable harm if its enforcement is

23  not enjoined, and the public interest strongly supports entry of a preliminary injunction.

24

25

26  ──────────────
    [29] http://www.cullmantimes.com/local/x2072622472/Beason-Dems-don-t-want-to-solve-
27  illegal-immigration-problem.

28

Doc. #603242 v.1

1

2          RESPECTFULLY SUBMITTED this 5th day of August, 2011.

3

4

5          _____
           Dale Schwartz
6          Dale M. Schwartz & Associates., LLP
           Suite 450 RiverEdge One
7          5500 Interstate N. Pkwy. NW
           Atlanta, GA 30328
8              GA.BAR: 631000

9          Steven M. Freeman
           Steven C. Sheinberg
10         Deborah Bensinger
           David L. Barkey
11         Anti-Defamation League
           605 Third Avenue
12         New York, NY 10158-3560

13

14

15         _____
           David I. Schoen
16         Attorney at Law
           2800 Zelda Road, Suite 100-6
17         Montgomery, AL 36106
           (334) 395-6611 (o)
18         (917) 591-7586 (f)
           dschoen@aol.com
19         _____

20         Attorneys for Anti-Defamation League

21

22

23

24

25

26

27

28

                              Doc. #603242 v.1

1
2                        CERTIFICATE OF SERVICE
3
4        I HEREBY CERTIFY THAT ON August 5, 2011, I caused the attached document
5   To be electronically transmitted to the Clerk's Office using the CM/ECF System for
6   Filing and transmittal of a Notice of Electronic Filing to each of the CM/ECF Registrants
7   in the subject case matter.
8        This 5th day of August, 2011.
9
10
11                                            _____
                                             DALE M SCHWARTZ
12                                           Attorney for Anti-Defamation League
13
14
    Suite 450 RiverEdge One
15  5500 Interstate North Parkway, NW
    Atlanta, GA 30328
16  (770) 951-1100 (Telephone)
    (770) 951-1113 (Facsimile)
17  Email: dale@immlawfirm.com
18
19
20
21
22
23
24
25
26
27
28

                                    - 14 -                        Doc. #603242 v.1