FILED
2011 Sep-16  PM 04:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| HISPANIC INTEREST COALITION OF ALABAMA; AIDS ACTION COALITION; HUNTSVILLE INTERNATIONAL HELP CENTER; INTERPRETERS AND TRANSLATORS ASSOCIATION OF ALABAMA; ALABAMA APPLESEED CENTER FOR LAW & JUSTICE, INC.; SERVICE EMPLOYEES INTERNATIONAL UNION; SOUTHERN REGIONAL JOINT BOARD OF WORKERS UNITED; UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION; UNITED FOOD AND COMMERCIAL WORKERS UNION LOCAL 1657; DREAMACTIVIST.ORG; GREATER BIRMINGHAM MINISTRIES; BOAT PEOPLE SOS; MATT WEBSTER; MARIA D. CEJA ZAMORA; PAMELA LONG; JUAN PABLO BLACK ROMERO; CHRISTOPHER BARTON THAU; ELLIN JIMMERSON; ROBERT BARBER; DANIEL UPTON; JEFFREY ALLEN BECK; MICHELLE CUMMINGS; ESAYAS HAILE; FISEHA TESFAMARIAM; JANE DOE #1; JANE DOE #2; JANE DOE #3; JANE DOE #4; JANE DOE #5; JANE DOE #6; JOHN DOE #1, a minor, by his legal guardian MATT WEBSTER; JOHN DOE #2; JOHN DOE #3; JOHN DOE #4; JOHN DOE #5; and JOHN DOE #6; | Case No. 5:11-CV-02484-SLB |
| Plaintiffs, | |
| v. | |
| ROBERT BENTLEY, in his official capacity as Governor of the State of Alabama; LUTHER STRANGE, in his official capacity as Attorney General of the State of Alabama; LARRY E. CRAVEN, in his official capacity as Interim State | **FIRST AMENDED COMPLAINT**<br><br><br>**CLASS ACTION** |

1

Superintendent of Education; FREIDA HILL, in her
official capacity as Chancellor of Postsecondary
Education; E. CASEY WARDYNSKI, in his official
capacity as Superintendent of the Huntsville City
School System; JAMIE BLAIR, in his official
capacity as Superintendent of the Vestavia Hills City
School System; RANDY FULLER, in his official
capacity as Superintendent of the Shelby County
Public School System; CHARLES D. WARREN, in
his official capacity as Superintendent of the DeKalb
County Public School System; BARBARA W.
THOMPSON, in her official capacity as
Superintendent of the Montgomery County Public
School System; JEFFERY E. LANGHAM, in his
official capacity as Superintendent of the Elmore
County Public School System; and ROBERT L.
BROUSSARD, in his official capacity as District
Attorney for Madison County;

        Defendants.

     1.    This action challenges Alabama's comprehensive immigration law,

House Bill 56 / Act 2011-535 ("HB 56") on constitutional and statutory grounds

and seeks injunctive and declaratory relief to prevent serious harm that Plaintiffs

and putative class members will suffer if the law goes into effect.  Governor Robert

Bentley touted HB 56 as "the strongest immigration bill in the country" and the

author of the bill boasted that it regulates "every aspect of a person's life."  Indeed,

HB 56 is a state immigration law of unprecedented reach—going well beyond

recent state immigration laws in Arizona, Utah, Indiana, and Georgia, which

themselves have been suspended in whole or in part by the federal courts.

## JURISDICTION AND VENUE

2.       This Court has subject matter jurisdiction over this action pursuant to

28 U.S.C. § 1331 because this action arises under the U.S. Constitution and laws of

the United States, and pursuant to 28 U.S.C. § 1343 because this action seeks to

redress the deprivation, under color of state law, of Plaintiffs' civil rights and to

secure equitable or other relief for the violation of those rights.

3.       This Court has jurisdiction to grant declaratory relief pursuant to 28

U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure Rule 57.

4.       Venue is proper in this District and Division under 28 U.S.C.

§ 1391(b).  Defendants are sued in their official capacity.  Each Defendant resides

within the State of Alabama and two Defendants reside within this Division.

## PARTIES

### Organizational Plaintiffs

5.       Plaintiff **Hispanic Interest Coalition of Alabama** ("HICA") is a non-

profit membership organization formed to facilitate the social, civic, and economic

integration of Hispanics into Alabama as well as to help Alabamians understand

the diverse Latino culture.  HICA was founded in 1999 and has grown significantly

since that time.  Today, HICA provides a wide range of services, including court

advocacy for immigrant survivors of domestic violence, a 24/7 Spanish hotline for

immigrant victims of crime, immigration legal services, classes on financial

literacy, English, and civics, workforce development, volunteer income tax assistance, advocacy and community education, and leadership development and training to the host community.

6.     HICA has over 50 formal members and provides services to more than 15,000 constituents in any given year.  HICA does not inquire into the immigration status of its members or constituents, but is aware that some lack immigration status, and some are the parents of children born abroad.

7.     If HB 56 is implemented, HICA will be in violation of state-created criminal immigration offenses, including transporting and encouraging undocumented immigrants to remain in the state in violation of Section 13.  HICA provides the services identified above in Paragraph 5 without regard to immigration status, but it is aware that some of the recipients are undocumented, and HICA periodically transports constituents whom it has reason to believe are undocumented, to facilitate their participation in hearings or other community trainings or events.

8.     HICA is already being harmed by HB 56, and it reasonably expects this harm will worsen if HB 56 goes into effect.  Participation in its programming has declined because of HB 56, and it has been forced to cancel and postpone the programming identified above in Paragraph 5 to instead address the concerns of its constituents about what HB 56 will mean for them—particularly the school

provisions of Section 28 and the stop-and-verify provisions of Section 12.  HICA

is also at risk of losing or failing to fulfill its grant obligations because of HB 56.

For example, it is funded to help immigrants apply for T and U visas, which are

available to immigrant crime victims who assist law enforcement officials in the

prosecution of crime, but crime victims have been less willing to come forward to

assist law enforcement officials since HB 56 has passed.  HICA has been required

to expend additional resources to fulfill its objectives as it now has to have

additional seminars on HB 56, it has had to expend administrative costs to cancel

and/or postpone its existing programming and has had to combat funding

challenges—all in frustration of its mission.

      9.     Plaintiff **AIDS Action Coalition** ("AAC") is based in Huntsville.  It

was established in 1986 as a non-profit agency providing critically needed health

care, education, psycho-social services, and emergency financial assistance to men,

women and children infected or affected by HIV/AIDS.  AAC provides a broad

range of direct services, ranging from screening for sexually transmitted diseases

and primary medical care to transportation and housing assistance.  AAC currently

serves more than 550 clients, many of them residents of Madison County.

      10.    Due to the critical need to control the spread of infectious disease and

because human suffering does not disappear with the expiration of a visa, AAC

provides services to its clients without regard to their immigration status.  AAC

necessarily learns its clients' immigration statuses in the course of registering for prescription drug assistance programs.  Seventeen of AAC's current clients are undocumented immigrants.  AAC transports these clients, provides medical care, and provides financial assistance for them to secure housing.  If HB 56 goes into effect, these activities in which AAC regularly engages will be criminal.  Nevertheless, AAC does not now, nor does it intend to, deny care or services to these clients.

11.     Preventative HIV education is among the central objectives and purposes of AAC.  AAC employs a Spanish-speaking outreach worker specifically to conduct preventive education in the immigrant community.  Since the passage of HB 56, approximately half of the Spanish-speaking outreach worker's time has been spent answering questions about the new law, rather than addressing matters related to health services and HIV education.  The community's demand for information has overwhelmed the Spanish-speaking outreach worker, requiring a diversion of resources to address HB 56.  As such, HB 56 has frustrated AAC's Education and Outreach program in the Spanish-speaking community.

12.     Since passage of HB 56, numerous Hispanic clients have expressed fear and reluctance to travel to AAC's clinics.  AAC reasonably expects the Hispanic community will be less likely to interact with AAC staff conducting HIV testing in their communities if HB 56 is implemented.  HB 56 will frustrate AAC's

efforts to identify new infections in that community and stop the spread of HIV.

13.    Plaintiff **Huntsville International Help Center** ("HIHC") is a volunteer-based organization in Huntsville.  HIHC provides services to the Latino community in Huntsville, including prayer and bible study groups; support groups for women who are victims of domestic violence; interpretation and translation services for individuals who have medical or legal appointments or who need to go to a domestic violence shelter; Know Your Rights trainings; and health fairs in churches.  HIHC staff regularly drives individuals, including undocumented individuals, to appointments of various types around Huntsville and will continue to do so if HB 56 is implemented.  HIHC provides these services without regard to immigration status and is aware that a large share of its constituents is undocumented.  HIHC's activities will therefore be criminalized by HB 56.

14.    HB 56 has adversely impacted HIHC because it has deterred many of HIHC's all-volunteer staff from working with undocumented immigrants.  This directly threatens HIHC's ability to continue its work and fulfill its mission.  It has had to divert resources to continue its work using fewer volunteers.  Moreover, since the passage of HB 56, HIHC has had great difficulty securing space to hold its meetings and events.  Churches and others who normally would provide meeting space are now afraid of being affiliated with the Latino community, which they believe is generally undocumented, as it would subject them to criminal

liability.  HIHC reasonably anticipates these problems in fulfilling its mission will worsen if HB 56 went into effect.

15.   Plaintiff **Interpreters and Translators Association of Alabama** ("ITAA") is a professional membership organization of interpreters and translators, and others who aspire to those careers in the state of Alabama.  ITAA has members across the state, including in Huntsville, who provide translation and interpretation in a variety of foreign languages.  ITAA's mission is to promote, advance, and create industry standards for interpreters and translators; to educate the community on the importance of using qualified interpreters; to support continuing education opportunities for professional interpreters and translators; and to further the interests of those employed in or interested in these professions.

16.   One of ITAA's current organizational priorities is to assist its members in obtaining court certification to act as translators and/or interpreters. To promote this organizational priority, ITAA conducts trainings to help its members prepare for the certification examination.  One such training was held in Birmingham and another is planned for Huntsville.  Since HB 56 passed, however, ITAA has had to delay planning such trainings in order to respond to its members' concerns and requests for information on the new law and its consequences for them.  ITAA's most recent meeting should have involved planning for interpreter and translator trainings, but instead focused exclusively on HB 56 and what it will

mean for ITAA's work and its members.  Thus, HB 56 has undermined the ability

of ITAA to move ahead with other organizational priorities such as

professionalizing the practice of interpretation and translation across the state, and

some members have questioned if they can continue to provide interpretation and

translation services if HB 56 goes into effect.

17.     In addition, HB 56's possible implementation poses a direct threat of

harm to ITAA's members.  Some ITAA members provide transportation for their

clients to medical appointments or to courts where their clients need interpretation

or translation assistance.  If HB 56 is implemented, these ITAA members risk

criminal prosecution for harboring or assisting undocumented immigrants by

transporting them to these appointments or otherwise providing assistance to them.

18.     In addition, if HB 56 were to take effect, ITAA members would not

be able to enforce contracts with undocumented clients because HB 56 bars

enforcement of a contract in court if one of the contracting parties had direct or

constructive knowledge that one of the parties was an alien who was unlawfully

present in the United States.  In those circumstances ITAA members would have

no legal recourse even if they were not paid for their work.

19.     Finally, ITAA members who regularly provide interpretation in courts

could be forced to disclose information about their client's immigration status.

Disclosing this confidential information would undermine their professional duties

to provide competent and confidential services, yet failure to disclose would expose them to monetary damages and civil lawsuits under Sections 5 and 6 of HB 56.

20.     Some ITAA members also reasonably expect that they will lose clients if HB 56 takes effect because some immigrants will be afraid to access the courts if officers of the court are mandated to report their immigration status to federal officials.

21.     Plaintiff **Alabama Appleseed Center for Law & Justice, Inc**. ("Appleseed") is a non-profit public interest advocacy organization that was founded in 1999.  Its mission is to identify root causes of injustice and inequality in Alabama and to develop and advocate for solutions that will improve the lives of all Alabamians.  To fulfill its mission, Appleseed undertakes network/coalition organizing and development, research, education, advocacy, and policy development.  Appleseed's current Immigration Policy Project was started in 2007 and is dedicated to promoting policies that advance fundamental fairness, due process, and respect for the human rights of new arrivals to the state, and opposing anti-immigrant policies and laws.

22.     HB 56's passage has already substantially diverted scarce organizational resources away from Appleseed's immigrant policy work.  For example, since the passage of HB 56, Appleseed has been inundated with calls

from the community about the law and its impact.  In addition, since HB 56's

passage, virtually any community event or training that Appleseed puts on as part

of its immigrant policy or immigrant welcoming projects turns into a forum on HB

56 and its impact on the community, and particularly the impact that Section 28

and Section 12 will have on the community.  This takes time away from existing

priorities for its work with immigrant populations in Alabama, including

investigation of working conditions in Alabama's poultry plants, and frustrates its

mission.  Before the passage of HB 56, interviews with poultry workers (many of

whom are immigrants) under this project were conducted in approximately 45

minutes.  Since HB 56 passed, however, staff members have had to spend an

additional 20 to 30 minutes with each interviewee to allay concerns about HB 56.

      23.     Plaintiff Appleseed will also be subject to criminal prosecution under

Sections 13 and 25 of HB 56 because it has arranged transportation for immigrants

to attend rallies, sometimes through its Welcoming Alabama program, which

encourages Alabamians to welcome immigrants and support their integration into

local communities.  All these activities could be construed as encouraging

undocumented immigrants to remain in the state.  For this reason, if HB 56 is

implemented Appleseed will have to substantially curtail or stop its immigrant

policy, immigrant welcoming, and poultry plant investigation work in order to

avoid criminal liability.

24.     Plaintiff **Service Employees International Union** ("SEIU") is one of the largest labor organizations in the world, representing 2.2 million men and women who work primarily in the public sector and in the janitorial, health services, long-term care, and security industries.  Many of SEIU's members are recent immigrants to the United States and many of its members come from racial minority groups.  SEIU has long called for and worked toward comprehensive reform of U.S. immigration laws.  Another priority for SEIU is fighting discrimination against minorities, women, and other groups in the workplace and the broader community.  HB 56 has required SEIU to divert its resources to address its members' concerns and has frustrated its mission to ensure its members work in a discrimination-free environment.

25.     Plaintiff **Southern Regional Joint Board of Workers United** ("Joint Board") is a labor union and an affiliate of Plaintiff SEIU.  The primary mission of the Joint Board is to organize, represent, and empower employees in Alabama.  In addition, the Joint Board works in partnership with SEIU and other groups to combat discrimination and mobilize for immigration reform at the national level. Members of the Joint Board are also members of SEIU.  The Joint Board represents approximately 1,105 members in Alabama.  They have a significant number of members in Huntsville.  Approximately 10 percent of the Joint Board's Alabama membership is Latino.

26.    The implementation of HB 56 will have a severe impact on the organizational mission of SEIU and the Joint Board.  Some of their Latino members and their families have already been subjected to stops by local law enforcement where they have been asked to produce proof of immigration status.  SEIU and the Joint Board will be harmed if HB 56 is implemented because their minority members will be even more likely to be stopped, detained, arrested, and questioned by state and local police.  This will cause hardship for members of SEIU and the Joint Board.  In addition, SEIU and the Joint Board will be harmed if HB 56 is implemented because many of their members and potential members, regardless of nationality and immigration status, will refrain from exercising their rights to attend rallies, demonstrations, and union meetings or to engage in leafleting or other traditional labor activities because of the possibility of being stopped by police under HB 56.  This will significantly affect the ability of SEIU and the Joint Board to protect their existing members.  Finally, HB 56 has created a fear of government officials and has already led to reluctance on the part of members of this community to join the union and to take the perceived risk of supporting new organizing in unorganized workplaces where the National Labor Relations Board is often involved.

27.    Members already have told the Joint Board that they have faced additional police scrutiny and questioning since HB 56 was passed.  They believe

that this additional police scrutiny was based solely on their ethnic appearance and/or English speaking ability.  This discriminatory treatment by law enforcement will significantly impede the ability of the Joint Board and SEIU to protect their current members and to organize new members.  Some members of SEIU and the Joint Board lack the identity documents approved by HB 56 to establish a presumption of lawful status or do not regularly carry these documents when traveling through the state, and are therefore at risk of lengthy detention and investigation under the new law.

28.     SEIU and the Joint Board will also be harmed if HB 56 is implemented because employers in the state will refrain from hiring members and potential members of the Joint Board that they believe look or sound "foreign" based on a fear that they will be subject to increased liability under HB 56.  This will have a serious impact on the ability of SEIU and the Joint Board to recruit new members.

29.     In addition, SEIU and the Joint Board will be harmed if HB 56 takes effect because of the provision criminalizing the transporting of undocumented immigrants.  This provision will have a chilling effect on the Joint Board's efforts to give rides to people attending union meetings and other events.  The Joint Board will have a more difficult time organizing transportation to these key union activities because people will be afraid to associate with someone whose

racial/ethnic appearance will increase the risk that the driver will be stopped for a minor traffic offense, leading to further police scrutiny and possible criminal prosecution under the law.

30. In addition, if HB 56 is implemented, the Joint Board will need to spend significant new time educating members and potential members about the law. This will divert the Joint Board's resources from other core organizational priorities such as organizing new members. The Joint Board joins this lawsuit to preserve its ability to organize new members and to protect the rights and interests of its members and prospective members—which is fundamental to the Joint Board's existence.

31. Finally, Joint Board members would be harmed if HB 56 takes effect because of its provision barring enforcement of certain contracts. If implemented, this provision would prohibit Joint Board members from enforcing a broad range of contracts from insurance contracts, to marriage contracts, to settlement agreements. In addition, the Joint Board itself could be prohibited from enforcing a wide range of contracts on behalf of its members such as grievance settlements and contractually mandated payments and, as a result, would risk having complaints filed against it with the National Labor Relations Board for failure to properly represent its members.

32. Plaintiff **United Food and Commercial Workers International**

**Union** ("UFCW International") represents more than 1.3 million workers across the United States in various industries, including poultry and meat packing and other food processing; supermarket and other retail; and hospitals, nursing homes, and other healthcare.  All workers represented by local unions of the UFCW are also represented by UFCW International.

33.    Plaintiff **United Food and Commercial Workers Union Local 1657** ("UFCW Local 1657") is a local union of UFCW International that represents more than 3600 workers in various industries, including catfish processing, nursing homes, retail food markets, non-food retail, and military bases in Alabama, Florida, and Mississippi.  In these industries, UFCW-represented workers are cashiers, stockers, pharmacy technicians, licensed practical nurses, certified nursing assistants, housekeeping employees, barbers and beauticians, production workers, restaurant workers, and auto mechanics.

34.    UFCW Local 1657 represents workers who comprise a wide range of races and ethnicities, with varying degrees of English proficiency.  Nearly five percent of the workers represented by Local 1657 are of Latino heritage.  In addition, Local 1657 represents African American, Caucasian, and Asian workers. Both UFCW International and Local 1657 (the "UFCW Unions") have a manifest interest in advocating and maintaining discrimination-free workplaces and communities.

16

35.     The UFCW Unions' missions are to better the terms and conditions of employment of all workers they represent and thereby better the lives of their families and communities.  The UFCW Unions work to achieve these objectives through collective bargaining, and representation of existing bargaining unit employees as well as by organizing new employees.  These core activities require freedom of association and freedom of speech and communication between the unions and the employees they represent and organize to represent, activities protected by the U.S. Constitution and various federal labor laws.  The UFCW Unions also engage in speech, assembly, and petition activities protected by the Constitution and labor laws in conveying their message throughout the communities which surround represented worksites and worksites that the Unions endeavor to organize.  These First Amendment speech, assembly, and petition activities include meetings with other employees, the employer, and community members, demonstrations, and petitioning local, state, and national political representatives in the various communities where employees work and reside.

36.     If HB 56 is allowed to go into effect, it will impose direct harm to the UFCW Unions' core missions and representational obligations by restricting their ability to effectively advocate on behalf of the employees they represent and endeavor to represent; subjecting members to unlawful questioning, arrest, and detention by state and local law enforcement officers; and chilling freedom of

assembly of UFCW-represented workers by deterring their attendance and participation in UFCW activities. Specifically, the UFCW Unions fear that HB 56, including the provision that criminalizes the transportation of undocumented immigrants, will deter employees from attending UFCW activities, from joining in concerted activities with other employees to protect their labor rights, and from soliciting other employees to join the Unions for fear that when engaging in such activities they will be stopped and questioned because they appear to be Latino or are in the company of workers who appear to be Latino. This frustrates its mission.

37.    Additionally, as part of their core activities, the UFCW Unions provide lawyers to educate workers about their rights under federal and state employment and labor laws. If HB 56 is implemented, the UFCW Unions will need to divert these resources towards educating members and potential members about the law, to the detriment of this core organizational function

38.    Plaintiff **DreamActivist.org** ("DreamActivist") is a multi-cultural, migrant-led membership organization dedicated to passing the federal DREAM Act and providing for the educational betterment of youth. The DREAM Act is a bipartisan congressional bill that would address the situation of young students brought to the United States as children by providing a path to legal status for students who graduate from high school, obtain a GED, enroll in college, or serve

in the armed forces.  DreamActivist is comprised of students who would be eligible for relief if the DREAM Act passes.  DreamActivist has members all over the country, including in Alabama.

39.     Some of DreamActivist's Alabama members lack a federal immigrant or nonimmigrant visa and would not be able to obtain the identity documents specified by HB 56, such as a driver's license.  If HB 56 is implemented, these members will be subject to interrogation and detention by law enforcement officers because they will be unable to provide a document proving lawful status in the United States.

40.     In addition, if HB 56 takes effect, members of DreamActivist will be prohibited from attending public post-secondary institutions in Alabama because they do not have lawful permanent residence or a nonimmigrant visa.  As a result, these members will be unable to pursue their educational goals and also will be unable to achieve one of the key pieces of DREAM Act eligibility by enrolling in post-secondary school.

41.     If HB 56 is implemented, many DreamActivist members will also be at risk of criminal prosecution under various provisions of the law creating new state crimes for seeking work or for lacking a federal alien registration document.

42.     In addition, younger members will be afraid to enroll in public elementary or secondary school because they will have to disclose their or their

parents' immigration status to enroll.

43.     Finally, the organization itself will suffer direct harm if HB 56 is implemented because its members will leave the state, fearing prosecution under the law; those members who remain will be too afraid to attend DreamActivist events, fearing that they will be identified as undocumented immigrants by local law enforcement officials who may be present at or near the events.  HB 56 frustrates the mission of DreamActivist and will force it to divert its resources to counter the negative impact HB 56 will have on its members, and DreamActivist's purpose.

44.     Plaintiff **Greater Birmingham Ministries** ("GBM") is a multi-faith, multi-racial, multi-member organization that provides emergency assistance to low-income families in need while working on public policies that can better the quality of life for all.  GBM counts Christian, Muslim, and Jewish faith communities among its members, including the Roman Catholic Diocese of Birmingham and the North Alabama Conference of the United Methodist Church, as well as individual temples, churches, and mosques.

45.     GBM's low-income clients include Latino, African, and other immigrant families, including undocumented individuals and school-age children. GBM has three main program areas:  Economic Justice, Direct Services, and Faith & Community.  Its Direct Services program provides services in the form of food,

clothing, and financial assistance to immigrant and other communities based only on their level of need.

46.     In its Direct Services program, GBM serves approximately 3,000 families per year, which averages 7,000 people, by providing free non-perishable foods and fresh vegetables and fruits; free clothes, including clothes for school-age children; and financial support in the form of rental payments, utility bill payments, bus passes, and prescription drug payments.  Although GBM does not have the need or capacity to ask for immigration status from its clients before offering them services, it is reasonably certain some clients are undocumented. Providing services to these clients after HB 56 goes into effect will expose GBM to criminal prosecution for encouraging undocumented immigrants to remain in Alabama or for harboring and transporting them through paying for their rent, utilities, and bus passes.

47.     Additionally, GBM's members fear prosecution since they often directly provide transportation to undocumented members of their congregations for vacation Bible school for school-age children and for healthcare and childcare.

48.     GBM has also been forced to divert its scarce resources to address fears of its member congregations regarding the impact of Section 28, the K-12 enrollment provisions of HB 56, on mixed-status families.  GBM and its constituent congregations routinely have new members with children coming into

and leaving the state, which will continue to be the case if Section 28 goes into effect. GBM will have to continue to address these families' fears and questions over Section 28 if it were to go into effect.

49.     GBM is also concerned that it will soon have to divert organizational and financial resources because immigrants from their congregations are already leaving Alabama due to HB 56. GBM relies on members for volunteers, and if its congregations no longer have as many members, GBM will have to decrease the number of services it provides due to the decreasing volunteer base that GBM draws from.

50.     Because GBM is publicly opposed to HB 56, it is likely that member congregations that do not agree with GBM will limit, or cease, their support of GBM, which will directly harm the organization. In the past, GBM has suffered when it has taken controversial positions that led to various member congregations withdrawing or reducing their support for GBM. Nevertheless, GBM will remain opposed to HB 56 because HB 56 conflicts with GBM's core mission to serve people, build community, and pursue justice.

51.     Plaintiff **Boat People SOS** ("BPSOS") is a national non-profit Vietnamese-American community-based organization with the mission to "empower, organize, and equip Vietnamese individuals and communities in their pursuit of liberty and dignity." Formed in 1980 to assist Vietnamese refugees and

immigrants who were fleeing Vietnam, BPSOS has evolved from performing rescue-at-sea operations, to asylum work in refugee camps, to community empowerment work through its network of 11 offices across the United States and four offices in Asia.  BPSOS fulfills its mission through direct services, advocacy, community organizing and development, research, and media outreach, aimed at addressing the intertwining and compounding effects of unmet needs on refugee and immigrant families and communities.

52.    BPSOS has a robust presence serving isolated, limited English proficient communities along the Gulf Coast, including maintaining an office in Bayou La Batre, Alabama.  BPSOS established emergency relief in the Gulf Coast immediately after Hurricane Katrina and set up branch offices shortly thereafter to provide long-term recovery case management.  Today, BPSOS's services in the Gulf Coast equip Vietnamese community members with the tools and skills they need to access services, benefits and opportunities as well as to build community infrastructure for self-help and self-sufficiency.

53.    The implementation of HB 56 will have a serious impact on BPSOS's work with the Vietnamese- and other Southeast Asian-American communities in Alabama and will frustrate its mission.  BPSOS's small staff in Bayou La Batre will need to spend significant time educating community members about the law, answering questions, and calming people's fears about HB 56.  Staff will need to

be trained on HB 56 so they can accurately convey information to the community. This will divert BPSOS's limited resources from their core organizational priorities of direct services, community development, and organizing.

54.     Plaintiffs HICA, AAC, HIHC, ITAA, Appleseed, SEIU, Joint Board, UFCW International, UFCW Local 1657, DreamActivist, GBM, and BPSOS are collectively referred to herein as "Organizational Plaintiffs."

## **Individual Plaintiffs**

55.     Plaintiff **Matt Webster** was born in Alabama, where he has lived most of his life.  He is an engineer by training.

56.     He and his wife decided that they would like to adopt a child, to make life better for someone who needed a supportive and loving environment.  Through a friend, he learned of two young boys from Mexico who were in the United States whose mother had passed away, and who were in need of a stable home.  Plaintiff Webster and his wife met the children several times, and grew to love them as their own sons.

57.     Plaintiff Webster and his wife obtained guardianship over the children, and are currently in the process of finalizing adoption paperwork. However, the two children do not have current federal immigration status, and Plaintiff Webster and his wife will not be able to obtain lawful status for the children until two years after the adoption process has been completed.

24

58.     If HB 56 goes into effect, Plaintiff Webster fears how the law will affect his two sons, whom the law criminalizes until he is able to obtain federal immigration status for them.  In the interim, neither child can obtain an alien registration document or even a state identification card.

59.     Plaintiff Webster also fears what will happen to his children at school when he is required to enroll them and disclose their immigration status.

60.     Furthermore, Plaintiff Webster's own actions in adopting the children, providing for them, and transporting them, would be illegal under HB 56.  Plaintiff Webster believes immigration reform is necessary, but that laws like HB 56 are counterproductive and incredibly punitive to immigrants and people like himself, who are simply trying to provide for loved ones who are in need.

61.     Plaintiff **Maria D. Ceja Zamora** is originally from Mexico and has been a resident of Athens, Alabama for over 17 years.  Plaintiff Zamora is presently waiting for a visa to become available to her for permanent residence through her naturalized U.S. citizen mother, and she is permitted to remain in the United States under the federal government's Family Unity Program.

62.     Under the program, Plaintiff Zamora is granted voluntary departure and work authorization, with an employment authorization document ("EAD"), for two-year periods.  She is able to extend the benefits under the program every two years until a visa becomes available, which she has done since 1988.  She does not

currently have a visa.

63.     Plaintiff Zamora had a valid Alabama driver's license that recently expired.  When she attempted to renew her driver's license, she presented her EAD and Social Security number as she has done before, but was told by a state official that she was ineligible for a driver's license.  If HB 56 is implemented and Plaintiff Zamora is stopped by police without a valid state identification, she will be considered a criminal, for although the federal immigration agency is aware of her presence in the country and she is permitted to remain in the United States, she cannot apply to adjust her status until a visa becomes available.

64.     If HB 56 is implemented, Plaintiff Zamora also fears racial profiling because of her Latina appearance.  If HB 56 takes effect, Plaintiff Zamora will limit her travel through the state to reduce the chance of being stopped, interrogated, and detained by local law enforcement.

65.     Plaintiff **Pamela Long**, a native of Montgomery, Alabama, is an Associate Professor at Auburn University Montgomery and a lay minister in the Hispanic Ministry for the Montgomery-area Episcopal churches.  The Hispanic Ministry is a project of the eight Montgomery-area Episcopal churches to provide outreach and spiritual support to meet the needs of immigrants and Latinos in Montgomery.

66.     As a part of her ministry, Plaintiff Long often serves as an interpreter

in court proceedings, as well as at medical appointments for members of the community.  Plaintiff Long also assists English-language learners with government applications.

67.    Plaintiff Long also transports Latino community members to and from church, to doctor's appointments, to court appearances, or other places as a part of her ministry.

68.    Plaintiff Long does not ask the immigration status of people she is ministering to or providing assistance to, but they often disclose this information to her.  A considerable number of the individuals she has ministered to over the years are undocumented immigrants.  She will continue to provide rides, interpretation, and other support to undocumented members as a part of her faith work if HB 56 is implemented.

69.    Plaintiff Long is concerned that HB 56 will require her to disclose information that she receives on individual's immigration status when she interprets for them in court proceedings, or else she will be in violation of Sections 5 and 6 of HB 56.

70.    If HB 56 is implemented, Long and the undocumented immigrants whom she serves as a part of her ministry will be subject to criminal prosecution. Plaintiff Long will, however, continue to engage in these activities because doing her ministry work is central to her religious beliefs and part of what she believes it

means to act in a humane and Christian manner.  She refuses to be forced to act against her Christian morals and religious beliefs.

71.    Plaintiff **Juan Pablo Black Romero** is an Alabama resident who is originally from Ecuador.  He came to the United States on an F-1 student visa in 2003.  Plaintiff Romero is currently a graduate student at the University of Alabama at Tuscaloosa.  He completed his master's degree in Political Science in 2007 and is currently working on his Ph.D. in Political Theory.

72.    As an F-1 visa holder, Plaintiff Romero is allowed to study in the United States and to get practical work experience (Optional Practical Training or "OPT") directly related to his field of study.  He must apply for an OPT after the completion of the requirements of his Ph.D. program but before graduation.  He therefore must apply for an Employment Authorization Document ("EAD") from the federal immigration agency, which can take up to three months to receive. Federal authorities do not forbid an applicant for an EAD to *apply* for jobs prior to receiving the EAD.  Plaintiff Romero will begin searching for employment in Alabama for his OPT so that he may start it as soon as he receives his EAD from federal authorities.  If HB 56 is implemented, however, Plaintiff Romero will be subject to criminal prosecution for being an "unauthorized alien" who applies for or solicits work.

73.    Plaintiff **Christopher Barton Thau** ("Pastor Thau") is a U.S. citizen

and has lived in Pelham, Alabama since 1996. He has a wife who is a lawful permanent resident ("LPR"), and a six-year-old child who is attending Alabama public schools.

74.     Pastor Thau has been an Associate Pastor of the Pleasant Hill United Methodist Church for two years. Pleasant Hill Church is located in Bessemer, Alabama, and was founded in 1832. Pastor Thau is responsible for the Spanish-speaking bilingual congregation, which consists of mostly Latino members. Pastor Thau is aware that many members of his congregation do not have any immigration status.

75.     In addition to facilitating spiritual growth, Pastor Thau provides the congregation with food assistance, work for members, monetary assistance, counseling, support with Medicaid applications, and any other social services that members may need. While providing these services, he often transports members to and from doctors' offices, work assignments, benefits appointments, and other appointments. He also performs marriage ceremonies for individuals who do not have current immigration status.

76.     Pastor Thau's wife, who was undocumented until she became an LPR recently, has an extended family that includes undocumented persons. Pastor Thau supports his wife and her family, both financially and occasionally by providing space for them in his home. He will continue to do this, even though it would be a

29

crime under Section 13.

77.     Pastor Thau intends to continue these activities, even though they will be criminalized under HB 56, and he is fearful of being prosecuted.

78.     Plaintiff **Ellin Jimmerson** was born in Atmore, Alabama.  She lived in Birmingham during her high school and college years, and currently lives in Huntsville, Alabama.

79.     Plaintiff Jimmerson was ordained to the gospel ministry by Weatherly Heights Baptist Church in Huntsville.  She is Minister to the Community at Weatherly Heights Baptist Church.  Her ministry includes making a documentary film about the root causes of unlawful immigration, and in other ways serving the needs of the immigrant community in Huntsville, including those immigrants without lawful status.

80.     As a part of her ministry, Plaintiff Jimmerson performs marriages, preaches at various events, and provides spiritual counseling and other services and assistance.  Plaintiff Jimmerson routinely provides these services to undocumented immigrants and will continue to do so if HB 56 is implemented.  This will put her at risk for criminal prosecution under HB 56's provisions for encouraging undocumented immigrants to remain in the state.

81.     Plaintiff **Robert Barber** is a resident of Birmingham, Alabama and an active member of the Alabama state bar.  He practices law primarily in the areas of

employment law, including wage and hour law, as well as immigration and family law matters and general civil litigation.  A core part of his practice involves providing for the legal needs of the Latino community in Birmingham.  Approximately 95 percent of his Latino clients are currently undocumented.  Plaintiff Barber represents these undocumented individuals in applications to regularize their status with the federal government, family law disputes, and suits for lost wages.

82.     Because many of his Latino clients do not have cars, Plaintiff Barber routinely drives his clients to court hearings and other legal proceedings.

83.     If HB 56 is implemented, Plaintiff Barber will be subject to criminal prosecution for concealing, harboring, or encouraging undocumented immigrants to reside or remain in the state of Alabama.  HB 56 will interfere fundamentally with Plaintiff Barber's ability to practice his profession.

84.     Since HB 56 was proposed, Plaintiff Barber has already suffered a decrease in his Latino clientele.  He is aware that Latinos and immigrants are increasingly afraid to access the courts to protect their rights, and some families are preparing to leave the state if the law takes effect.  If the law is implemented, Plaintiff Barber is not sure that he can continue his law practice, as he will lose even more clients and suffer significant financial losses.

85.     In addition, if HB 56 is implemented, Plaintiff Barber would risk civil

prosecution and monetary damages for failing to disclose confidential and privileged information on his client's immigration status since he is an "officer of the court."  Disclosing this information would be in violation of his ethical duty as an attorney to his clients, however, and would undermine his ability to practice his profession.  Plaintiff Barber could also face liability on account of his office policy of keeping clients' information confidential.

86.    If HB 56 is implemented, Plaintiff Barber will not be able to enforce contracts against his undocumented clients who fail to pay for his services.  In the past, Barber has relied on the Alabama court system to ensure payment of fees owed to him.  His inability to enforce basic contracts under HB 56 would severely undermine Plaintiff Barber's business and economic livelihood.

87.    Plaintiff **Daniel Upton** is an immigration attorney residing in Madison County, Alabama.  He works for Justice for Our Neighbors ("JFON"), a program of the United Methodist Committee on Relief, and he provides free, professional legal services to immigrants through clinics operated in local Methodist congregations across the country.  The mission of JFON includes fulfilling the biblical mandate of hospitality to all people, and advocating for just and compassionate immigration laws and public policy.

88.    Plaintiff Upton regularly represents individuals in a range of immigration matters including representing undocumented immigrants who are

applying for adjustment of status or family-based immigration visas; long-term community members who are eligible for immigration relief; and immigrants applying for visas because they were victims of crimes or domestic violence at the hands of U.S. citizen spouses.  Because of the nature of his work, Plaintiff Upton is often aware that the individuals he represents lack valid immigration status.

89.     Plaintiff Upton routinely drives clients to immigration hearings or other related appointments.  If HB 56 is implemented, Plaintiff Upton would risk criminal prosecution for harboring or transporting undocumented immigrants or for encouraging them to remain in the state under Section 13 of the law.

90.     Finally, Plaintiff Upton regularly enters into retainer agreements with his clients with full knowledge that the client lacks immigration status.  HB 56 would make these agreements unenforceable, which would severely undermine his ability to conduct his legal practice within the bounds of professional responsibility.  HB 56 could also impact his malpractice insurance coverage, which requires an enforceable retainer specifying the scope of his representation.

91.     Plaintiff **Jeffrey Allen Beck** is a resident of Guntersville, Alabama. He has owned rental properties throughout Northern Alabama for the past 18 years. The majority of Plaintiff Beck's tenants are immigrants.  Beck does not verify or investigate the immigration status of his tenants.  He does not intend to change that practice.  He has reason to believe that some of his tenants are undocumented.

Plaintiff Beck rents accommodations to some individuals who cannot provide a
Social Security number with their rental application.  In the past, some of Beck's
tenants were taken into federal immigration custody.  Beck did not and would not
move to evict those residents or their remaining family members from their units
and would not do so in the future.

92.     Plaintiff Beck believes that hardworking people deserve a place to live
regardless of their immigration status.  Beck and his business entities enter into
rental agreements with people they believe may be undocumented.

93.     Plaintiff Beck fears he will lose a major portion of his livelihood if
HB 56 is implemented because he will be forced to evict many of his tenants to
avoid committing the crime of renting to people he has reason to believe are
undocumented immigrants.  Local police often place driver's license checkpoints
in front of Plaintiff Beck's properties.  Beck's business operations would be
disrupted by the arrest and detention of a substantial share of his tenants if HB 56
goes into effect.

94.     If implemented, HB 56 will render Plaintiff Beck's rental agreements
with any undocumented person unenforceable.  His livelihood depends upon
renters being compelled to pay for the accommodations they rent from him.

95.     Plaintiff **Michelle Cummings** is a resident of Huntsville, Alabama.
Cummings is a part-owner of a property management business, and she derives

most of her income from this business.  She owns approximately 140 rental units in the Huntsville area.

96.    Plaintiff Cummings has reason to believe that she currently rents properties to approximately 30 undocumented immigrants.  She does not verify immigration status when renting and does not intend to change that practice.  Plaintiff Cummings does not plan to deny housing to renters merely because they may lack proper immigration documents.  She believes it would be inhumane to do so.

97.    If HB 56 is implemented, Plaintiff Cummings will be subject to criminal prosecution for concealing, harboring, or encouraging undocumented immigrants to reside or remain in the state of Alabama.  In addition, if HB 56 is implemented, Plaintiff Cummings believes that it will deter individuals from renting her properties and cause her business to suffer.

98.    Plaintiff **Esayas Haile** resides in Boaz, Alabama, and is a native of Eritrea.  Plaintiff Haile came to the United States as a refugee in 2010.  As a refugee, Plaintiff Haile is allowed to remain in the United States, but he is not a lawful permanent resident and does not possess a nonimmigrant visa.  Plaintiff Haile is fluent in Tigrina and Amharic, but wishes to learn the English language to ease his transition into the United States.  Plaintiff Haile recently finished taking an English class at a local school.  Plaintiff Haile plans to enroll in English as a

Secondary Language (ESL) classes at Gadsden State Community College, this fall. Section 8 of HB 56 will prohibit Plaintiff Haile from studying at Gadsden State or any similar public postsecondary institution because he is not a lawful permanent resident or a holder of a nonimmigrant visa.

99.     Plaintiff **Fiseha Tesfamariam** resides in Boaz, Alabama, and is a native of Eritrea.  Plaintiff Tesfamariam came to the United States as a refugee in 2010.  As a refugee, Plaintiff Tesfamariam is allowed to remain in the United States, but he is not a lawful permanent resident and does not possess a nonimmigrant visa.  Plaintiff Tesfamariam wishes to learn the English language to ease his transition into the United States.  Plaintiff Tesfamariam recently finished taking an English class at a local school.  Plaintiff Tesfamariam plans to enroll in ESL classes at Gadsden State Community College this fall.  Section 8 of HB 56 will prohibit Plaintiff Tesfamariam from studying at Gadsden State or any similar public postsecondary institution because he is not a lawful permanent resident or a holder of a nonimmigrant visa.

100.    Plaintiff **Jane Doe #1** is a Mexican national who currently lives in Crossville, Alabama, with her husband and two children.  Her daughter, who is nine years old, is a U.S. citizen.  Her son, who is 17, was born in Mexico and is undocumented.

101.    Plaintiff Jane Doe #1 does not have lawful immigration status in this

36

country, although she is currently in the process of getting a visa.  Her petition for

an Alien Relative Visa (I-130) has been approved, but pursuant to usual federal

procedures, she must now wait for a visa to become available.

102.   Plaintiff Jane Doe #1 does not have an Alabama driver's license and is

not eligible to get one.  The only document she possesses that reflects her status is

a notice acknowledging that her Alien Relative petition was approved.  The notice

is a simple piece of paper, not an identification document, and it does not have any

indication of its durational validity.  Jane Doe #1 is reasonably concerned a police

officer would not accept it as proof of lawful immigration status, because although

the federal immigration agency has not chosen to put her in removal proceedings,

technically she remains without status until the visa becomes available.

103.   If HB 56 is implemented, Jane Doe #1 will be in violation of HB 56's

alien registration scheme and at risk of prolonged detention if she is stopped by

police for any reason.  As a result, she will reduce her travel in the state—including

travel to attend church each week—to try to avoid the possibility of contact with

law enforcement.

104.   Jane Doe #1 is concerned that if HB 56 is implemented it will tear her

family apart.  She worries that her husband or son, who are both undocumented,

could be identified by police and would be deported under the law.  Her nine-year-

old daughter, who is a U.S. citizen, is traumatized by what she hears about the new

law at school.  She has been asking if the family will be arrested by immigration

officials or stopped at police checkpoints.

105.   Plaintiff **Jane Doe #2** lives in Birmingham, Alabama, and is the single

mother of three children.  Jane Doe #2 has lived in Alabama for 12 years and

considers it her home.  She immigrated to the United States from her native

country in 1999.

106.   Plaintiff Jane Doe #2 currently lacks federal immigration status, but

she has applied to the federal government for a U visa (a form of federal

immigration status for crime victims and witnesses that provides a pathway to

permanent residence) based on the fact that she and her child cooperated in the

criminal prosecution of a school official who sexually assaulted her child.

Although the federal government is aware that Jane Doe #2 is undocumented, they

have not elected to initiate immigration proceedings against her, and her

application for a U visa is pending.

107.   Plaintiff Jane Doe #2 does not have a federal alien registration

document; nor does she have any document that can easily establish to Alabama

law enforcement officials that her presence in the country is known to the federal

government.  As a result, if HB 56 is implemented, Jane Doe #2 will be subject to

unlawful interrogation and detention by law enforcement officials based on her

Latina appearance and lack of state-approved identity documents, and to criminal

prosecution under the alien registration scheme of Section 11.

108.   If HB 56 takes effect, Plaintiff Jane Doe #2 will curtail her travel to reduce the chance that she will be stopped, interrogated, and detained by local law enforcement based on her Latina appearance.

109.   Plaintiff Jane Doe #2 is considering homeschooling her children because she is afraid school officials will report her undocumented status to federal immigration officials.  If she has to home-school her children, her ability to provide for her family financially will suffer.

110.   If HB 56 takes effect, Jane Doe #2 will also be committing a crime by renting her home, and she will not be able to enforce contracts for her work or her lease in state court.  If her employer or landlord violates the terms of any agreement, she will be left without a remedy.

111.   Plaintiff **Jane Doe #3** is a U.S. citizen who was born and raised in Alabama.  She lives in Montgomery, Alabama, with her husband, who is an undocumented immigrant, and their three U.S. citizen children who are all under the age of six.

112.   If HB 56 is implemented, Jane Doe #3 will be subject to criminal prosecution under Section 13 for living with and supporting her husband, since she would be considered harboring or encouraging an undocumented immigrant to remain in the United States.  She is offended that the law would criminalize her

family life.

113.   Jane Doe #3 is also fearful that if HB 56 takes effect, school officials will report her husband's immigration status to federal officials because Section 28 requires schools to collect information on his immigration status when enrolling their children in public school.

114.   Jane Doe #3 will be harmed if Section 27 of HB 56 is implemented because she will not be able to enforce contracts that she enters into along with her husband who is undocumented.  For example, she worries that if she dies her husband will not be able to enforce the terms of her life insurance policy, which lists him as the principal beneficiary and successor in interest.  This would cause tremendous harm to her U.S. citizen children.

115.   Plaintiff **Jane Doe #4** is a resident of Pelham, Alabama, and has lived in Alabama for approximately 11 years.  She and her husband are undocumented. She is the mother of three children, including one U.S. citizen child.  Jane Doe #4 considers Alabama her home.  She lives in a rented trailer home in Pelham with her husband and three children.

116.   Jane Doe #4 routinely seeks work cleaning houses even though she does not have work authorization.  If implemented, Section 11 of HB 56 will criminalize her work and open her up to prosecution simply for working to support her family.

117.   If HB 56 takes effect, Jane Doe #4 will be subject to unlawful interrogation and detention by police.  There are regular police roadblocks in front of the trailer park where Jane Doe #4 lives.  She fears that she will be detained when stopped at one of these roadblocks because she lacks the identity documents listed in HB 56.

118.   Further, because Jane Doe #4 lacks a federal alien registration document, she will be subject to criminal prosecution under Section 10.

119.   Jane Doe #4 fears that under HB 56, her landlord will evict her and her family because they cannot prove they are here legally, and she will be subject to criminal prosecution for soliciting the rental agreement.  Eviction and difficulty finding another home to rent due to Section 13's renting provisions would cause a substantial disruption to Jane Doe #4's life, and it would be damaging to her children and their sense of security.

120.   Plaintiff **Jane Doe #5** lives in Wetumpka, Alabama.  She has a 13-year-old son.  She has lived in Alabama since she left her native country in 2005.  She does not have valid immigration status in the United States.  She also lacks a driver's license or any other form of government-issued photo ID from the United States.

121.   Jane Doe #5 seeks jobs in Alabama even though she does not have work authorization, because she must provide for herself and her son.  If

implemented, Section 11 will criminalize her attempts to find work and make her vulnerable to criminal prosecution because of her efforts to take care of her family.

122.   Because Jane Doe #5 lacks a federal alien registration document, she will be subject to criminal prosecution under Section 10.

123.   Jane Doe #5 is renting property, which will make her subject to criminal prosecution under Sections 13 and 25.

124.   Jane Doe #5 fears that if HB 56 is implemented, Section 27 will make the contracts she enters into for basic necessities unenforceable.  This will affect her rental contract, as well as contracts to buy a car or pay her cell phone bill.  This will impair her ability to find a place to live and to travel, and to reach her son in an emergency.

125.   HB 56 will also interrupt Jane Doe #5's son's education.  If implemented, HB 56 will require her son's school to determine Jane Doe #5's immigration status.  Fearing that those school officials may report her as an undocumented immigrant, Jane Doe #5 will not enroll her son in school if Section 28 and the rest of HB 56 goes into effect.

126.   If HB 56 is implemented, Jane Doe #5 will curtail her activities outside of the house for fear of interacting with the police.  She will be hesitant to report any crimes of which she is a victim or a witness. Jane Doe #5 will also have difficulty finding friends who are documented who are willing to help her family,

as HB 56 will make it state crime to do so.  As a result, Jane Doe #5 will stop

attending events, traveling about in public, and going places that she would

otherwise go.

127.   Plaintiff **Jane Doe #6** lives in Huntsville, Alabama, and is the mother

of three children.  Jane Doe #6 immigrated to the United States in 1996 and has

spent most of the last 17 years in Huntsville.  She and her three children are

undocumented.

128.   Jane Doe #6's youngest son, who is 18 years old, is developmentally

disabled.  He is unable to care for himself, so he lives with Jane Doe #6, and she

expects that he always will.

129.   Her son is in a vocational training program through his high school

special education program.  One requirement of the program is that he work a

certain number of hours per week next year.  He is not eligible for a work permit,

however.  If HB 56 is implemented, his attempts to find work will be criminalized,

and he will not be able to complete his program.

130.   Jane Doe #6 is also fearful that her son will be unable to complete

school because of HB 56's requirement that the school determine whether he and

Jane Doe #6 are undocumented.  She will be forced to comply with the registration

requirements because obtaining an education is so important to her son and his

future.  Jane Doe #6 fears, however, that revealing her son's undocumented status

to school officials will cause him harm and mistreatment.

131.   Jane Doe #6 also worries that under HB 56, her son will be detained because he lacks immigration papers.  She believes that he will not be able to care for himself if he is detained or deported to Mexico, a country he does not know and does not consider his home.  The only place he considers home is Alabama.

132.   Jane Doe #6 supports herself and her family by cleaning houses.  She must drive herself to various work sites, and she must also regularly drive her son to school.  Because she lacks a driver's license, Jane Doe #6 is fearful that she will be stopped and arrested by the police and put into deportation proceedings.  If this happens, she worries that her son will be abandoned and unable to care for himself.

133.   Plaintiff **John Doe #1**, a minor, by his legal guardian Matt Webster, is a 16-year old who came to the United States with his younger brother several years ago.  His mother passed away when he was 8 or 9 years old, and his elderly grandparents sent him to United States to live with extended family.

134.   John Doe #1 learned English and excelled in school, but his younger brother struggled.  Plaintiff Matt Webster and his wife, both U.S. citizens, learned of John Doe #1 and his brother's plight, and after becoming acquainted, the boys' extended relatives agreed that Plaintiff Webster and his wife could provide a more stable environment for the boys.  Plaintiff Webster and his wife are now in the process of adopting the brothers.

135.   John Doe #1 is still without any current immigration status, and he does not have an alien registration card or any U.S. identification.  His new parents will be eligible under federal law to apply for immigration relief for him after the adoption has been completed and two years have passed.  If HB 56 were to go into effect, however, John Doe #1 would be a criminal until that two-year period passes.

136.   John Doe #1 has done very well in school and has been a leader in the ROTC.  He plans to go to college.  But right now he is fearful of what will happen to him in school if he is forced to disclose his immigration status, and what will happen to him if he is ever stopped by a police officer.

137.   Plaintiff **John Doe #2** was born in Mexico and came to the United States in 1995.  He has mostly lived in Alabama since that time.  He now resides in Crossville, Alabama, with his wife and two children—a daughter who is 9 years old and a son who is 17 years old.  John Doe #2 does not have lawful immigration status, nor does his 17-year-old son.  His daughter, however, is a U.S. citizen.

138.   This fall, his daughter will be entering the fourth grade at Crossville Public Elementary School and his son will be a senior at Crossville Public High School.  If HB 56 is implemented, John Doe #2 may make the very tough choice to keep his children out of school.  He would do so to reduce the risk that his family will be identified as undocumented to immigration officials by the school.

139.   Plaintiff John Doe #2 also fears prosecution under Section 10 of HB 56, if it is implemented, because he lacks a federal alien registration document. Since HB 56 passed, John Doe #2 has been afraid to leave the house for any non-essential purpose because he wants to avoid any possibility of encountering law enforcement.

140.   Plaintiff **John Doe #3** is an 18-year-old who has grown up in the United States and considers Alabama his home.  John Doe #3 does not have a green card or other lawful status in the United States.  He recently graduated with honors from Wetumpka High School and was accepted to three different public universities in Alabama.

141.   Because he considers Alabama his home and because his family lives here, John Doe #3 plans to attend college in Alabama.  John Doe #3 does not have the funds to enroll in college currently, but he intends to enroll as soon as possible and to study aerospace and robotics technology.  If HB 56 is implemented, however, it will prohibit him from enrolling in a public college or university in Alabama and thwart his plans to pursue further education.

142.   John Doe #3 has suffered racial profiling in the past by Alabama law enforcement officers.  A couple years ago, he was stopped while riding in a car with other passengers for the ostensible reason that the registration tag was not properly displayed.  However, when the police officers stopped the car, they only

asked John Doe #3 to step out of the car and to show a driver's license or other form of identification, even though he was not the driver.  The other passengers, who were all Caucasian, were not asked to get out of the car or to show any documents.  John Doe #3 believes he was treated differently because of his Latino appearance.

143.   If HB 56 is implemented, John Doe #3 is afraid that he will be subject to increased racial profiling, discrimination, and arbitrary interrogation and detention by law enforcement based on his Latino appearance.  As a result, John Doe #3 will curtail his activities if HB 56 takes effect to try to avoid any contact with law enforcement.

144.   Plaintiff **John Doe #4** is a resident of Auburn, Alabama, and has lived in Auburn for approximately three years.  He has been enrolled at a community college in Alabama where he is taking classes to prepare for the GED exam, and he will continue his GED courses this fall.  He plans to take his GED exam late this year or next year, and he intends to study welding or mechanics at a community college in Alabama to better himself.

145.   If HB 56 is implemented, it will thwart his educational and professional plans.  John Doe #4 will not be able to continue his GED program, or his studies after passing the GED exam because he does not have the documentation required by Section 8 to enroll in any public post-secondary

educational institution in Alabama, as he does not have lawful permanent resident status or a non-immigrant visa.

146.   John Doe #4 currently rents his apartment.  If Sections 13, 25, and the remainder of HB 56 takes effect, John Doe #4 will be committing a crime by renting his home, and may be evicted.  He fears he will have great difficulty finding any place to rent because he does not have the documents required under the law to allow a landlord to rent to him, and both he and any landlord would be considered a criminal for renting to him.

147.   If HB 56 is implemented, John Doe #4 will be subject to unlawful interrogation and detention by police officers inquiring into his immigration status if he is stopped by police for any reason.  John Doe #4 fears detention and deportation under HB 56 because he lacks a federal alien registration document.

148.   Plaintiff **John Doe #5** lives in Hoover, Alabama, and has frequently performed day labor work in the nearly nine years since he arrived in the United States.  He does not have work authorization from the U.S. government, but he works to sustain himself and to send money to cover basic living expenses for his parents, grandparents, and sister who live in Mexico.

149.   While looking for work as a day laborer, John Doe #5 tries to make it obvious to people who are hiring that he is available for work.  He may cross a street to approach a car whose driver has indicated they want to hire, and he has

stood on sidewalks to seek work from people who drive by in their cars looking to hire day laborers.

150.   If Section 11 and the remainder of HB 56 goes into effect, John Doe #5 is worried that he will be targeted and harassed, and he will be exposed to criminal liability for soliciting work in public and for working without federal work authorization.  He worries that he may be detained and possibly deported and will no longer be able to support his family.

151.   Plaintiff **John Doe #6** lives in Hoover, Alabama, and works as a day laborer.  He does not have work authorization from the U.S. government, but he works about four days per week.

152.   As a day laborer, he cuts lawns, prunes trees, cleans gutters, and performs other landscaping tasks at the homes of the people who hire him.  He waits on a corner and potential employers who drive by stop and pick him up if they need help with landscaping tasks at their homes.  From this work, he sends money to Guatemala to help his wife and his 10-year-old son meet basic living expenses.

153.   If HB 56 goes into effect, John Doe #6 fears that police will target him for trying to earn a living through day labor, and that he will be subject to arrest under Section 11.

## Defendants

154.   Defendant **Robert Bentley** is the Governor of Alabama.  Defendant

Bentley exercises "[t]he supreme executive power of" Alabama, Ala. Const. art.

V., § 113, and is constitutionally required to "take care that the laws be faithfully

executed," Ala. Const. art. V, § 120.  As such, Defendant Bentley is responsible for

the enforcement of HB 56 in the State of Alabama and is an appropriate defendant

in this case.  Defendant Bentley is sued in his official capacity.

155.   Defendant **Luther Strange** is the Attorney General of Alabama.

Defendant Strange is the chief law enforcement officer of the state, and has

supervisory authority over every district attorney in Alabama.  Ala. Code § 36-15-

14.  The Alabama Constitution provides that "[t]he legislature may require the

[A]ttorney [G]eneral to defend any or all suits brought against the state," Ala.

Const. art. V, § 137, and state statute requires that the Attorney General "shall

appear in the courts . . . of the United States[] in any case in which the state may be

interested in the result."  Ala. Code § 36-15-1(2).  Defendant Strange is responsible

for the enforcement of HB 56 in the State of Alabama and is an appropriate

defendant in this case.  Defendant Strange is sued in his official capacity.

156.   Defendant **Robert L. Broussard** is the District Attorney for Madison

County.  In that capacity, Defendant Broussard is charged with the duty of

enforcing the criminal provisions of HB 56 within Madison County.  Defendant

Broussard is sued in his official capacity.

157.   Defendant **Freida Hill** is Chancellor of Postsecondary Education. In that capacity, Defendant Hill is the Chief Executive Officer of the Postsecondary Education Department of the State Board of Education, and is responsible for directing all matters involving the junior colleges and trade schools pursuant to the policies of the State Board of Education.  She is responsible for interpreting, executing, and enforcing the rules and regulations of the State Board of Education governing junior colleges and trade schools.  Defendant Hill is authorized to take any and all actions to administer policies, rules and regulations of the State Board of Education in carrying out its responsibility for the management and operation of the junior colleges and trade schools. Ala. Code § 16-60-111.5.  Accordingly, Defendant Hill has a key role in the implementing and enforcing the provisions of HB 56 related to postsecondary education.  Defendant Hill is sued in her official capacity.

158.   Defendant **Larry E. Craven** is the Interim State Superintendent of Education.[1]  In that capacity, Defendant Craven is the Chief School Officer in the State of Alabama, responsible for explaining the meaning and intent of laws relating to public schools; deciding all controversies and disputes involving the proper administration of the public school system; and reviewing actions and

---

[1] Plaintiffs originally named State Superintendent Joseph B. Morton as a defendant in his official capacity.  Superintendent Morton retired on August 31, 2011, and has been replaced by Interim Superintendent Craven.

orders of county and city boards of education, county superintendents of education, and city superintendents of schools in matters seriously affecting the educational interest. *See* Ala. Code §§ 16-4-4, 16-4-8. Pursuant to these responsibilities, Defendant Craven has stated publicly that he is developing guidelines for local schools regarding how to enforce HB 56. Defendant Craven has a key role in implementing and enforcing the provisions of HB 56. Defendant Craven is sued in his official capacity.

159. Defendant **E. Casey Wardynski** is the Superintendent of the Huntsville City School System. Defendant **Jamie Blair** is the Superintendent of the Vestavia Hills City School System. In these capacities, Defendant Wardynski and Blair are the chief executive officers for their respective city boards of education, and are responsible (a) for seeing that all laws relating to the schools and the rules and regulations of their city boards of education are carried into effect; (b) for explaining the true intent and meaning of school laws, of rules and regulations of their city boards of education, and of rules and regulations of the State Board of Education; and (c) for deciding all controversies and disputes involving the rules and regulations of their city boards of education and the proper administration of the public schools. Ala. Code § 16-12-3. They are responsible for enforcing school attendance laws. § 16-12-18. They are also responsible for preparing reports required by the State Board of Education. § 16-12-14. Pursuant

to these responsibilities, Defendant Wardynski and Blair will be required to interpret the meaning of HB 56 and the meaning of any guidance received from the State Board of Education, and to see that HB 56 is carried into effect. They have a key role in enforcing the provisions of HB 56. Defendant Wardynski and Blair are sued in their official capacities.

160.   Defendant **Randy Fuller** is the Superintendent of the Shelby County Public School System. Defendant **Charles D. Warren** is the Superintendent of the DeKalb County Public School System. Defendant **Barbara W. Thompson** is the Superintendent of the Montgomery County Public School System. Defendant **Jeffery E. Langham** is the Superintendent of the Elmore County Public School System. In these capacities, Defendants Fuller, Warren, Thompson, and Langham are the chief executive officers of their respective county boards of education, and are responsible for seeing that the laws relating to the schools, the rules and regulations of the state and county boards of education are carried into effect. Ala. Code § 16-9-13. They are responsible for preparing rules and regulations governing the conditions under which children may be admitted to junior and senior high schools of the county. § 16-9-19. They are responsible for enforcing school attendance laws. § 16-9-30. They are also responsible for preparing reports to be forwarded to the State Board of Education. § 16-9-31. Pursuant to these responsibilities, Defendants Fuller, Warren, Thompson, and Langham will be

required to interpret the meaning of HB 56 and the meaning of any guidance received from the State Board of Education, and to see that HB 56 is carried into effect.  They have a key role in enforcing the provisions of HB 56.  Defendants Fuller, Warren, Thompson, and Langham are sued in their official capacities.

## FACTS

### History and Purpose of HB 56

161.   Governor Bentley signed HB 56 on June 9, 2011.  The law is scheduled to take effect on September 1, 2011, except for Sections 22 and 23 (related to state law enforcement staffing and coordination) which went into effect immediately, and Sections 9 and 15 (related to employment verification) which will go into effect in 2012.

162.   HB 56 was introduced in the State House of Representatives by Representative Micky Hammon.  Senator Scott Beason introduced a similar omnibus immigration bill, Senate Bill 256, in the Senate.  The final bill was a combination of these two measures.

163.   In enacting HB 56, Alabama legislated in an area committed exclusively to the federal government under the U.S. Constitution.  Indeed, by passing HB 56, Alabama expressly intended not only to intrude into an area of exclusive federal control, but to supplant the federal government in key respects.

164.   A primary motivating factor in passing HB 56 was the Alabama

legislature's disagreement with federal immigration policy.

165.   When Representative Hammon introduced HB 56, he explained that "much of what is in this legislation" came from the report produced by the Joint Interim Patriotic Immigration Commission ("Commission"), on which he and Senator Beason served.  The Commission was created in 2007 by the legislature to address the "unprecedented influx of non-English speaking immigrants."  S.J. Res. 22, Reg. Sess. 2007 (Ala. 2007).  In 2008 the Commission issued its report to the legislature, concluding: "We recommend illegal immigrants be discouraged from coming to Alabama."  State of Ala., Commission Report (Feb. 13, 2008).

166.   Alabama held elections in 2010, and during that election cycle Representative Hammon and Senator Beason campaigned on a "Handshake with Alabama" pledge which, among other things, would address "illegal immigration" because "[p]oliticians in Washington refuse to act, so we must bring the fight to the home front."  Mike Hubbard, *Press Release: GOP Legislative Leaders Unveil 2010 "Republican Handshake with Alabama,"* Aug. 16, 2010 (hereinafter referred to as "Handshake with Alabama").  The pledge promised to "push an illegal immigration bill similar to the recently approved Arizona law.  The Alabama bill will create a new state criminal trespass statute that allows local law enforcement to arrest illegal immigrants for simply setting foot in Alabama.  Another provision will make it a crime to provide an illegal immigrant transportation anywhere in

Alabama, whether it is a trip across the state or simply to the corner store." *Id.*

167.   During the debates over HB 56, legislators stated that the intent of the law was to deport undocumented immigrants and to deter them from living in Alabama.  Representative Hammon explained: "This [bill] attacks every aspect of an illegal immigrant's life.  They will not stay in Alabama . . . . [T]his bill is designed to make it difficult for them to live here so they will deport themselves." He also noted, "[W]e do want to affect every aspect of someone's life and make it a little more difficult for them to live here."  In no uncertain terms, Representative Hammon stated: "[T]he intent of this bill is to slow illegal immigration in Alabama through attrition."  He emphasized:  "We are going to deter illegal immigrants from the State of Alabama."

168.   HB 56 allows Alabama to take control of immigration enforcement where the federal government has not acted to its satisfaction.  Representative Hammon remarked when he introduced the bill, "[I]t appears that the federal government has defaulted on their responsibility of enforcing federal immigration law.  And they have forfeited that right to the States."  He continued: "[T]he federal process is not working. . . .  They are ignoring the problem."  Hammon went on to explain that "it is the State's responsibility to handle this issue and not the federal government."  Hammon further acknowledged that the bill's "purpose is to put pressure on the federal government to solve the illegal immigration

problem we have."

169.   Senator Beason concurred:  "If the federal government would enforce their laws that they have on the books, the states would not be required to begin to do things to help enforce those laws."  Senator Jimmy Holley echoed this position: "We have a—a challenge before us, and that is to take the unwillingness of the federal government to protect our borders and individual states rising up to the occasion of—of the belief that they have to do it themselves if it is going to get done."  Senator Clay Scofield likewise remarked: "[T]he federal government is not coming to our aid on this.  It is going to come down to the states doing their part and passing a good legislation such as this that will give the states the ability to— enforce the—the federal law."  Representative Rich, who represents the Sand Mountain area, was more emphatic:

> Some people say, "Well, the federal government ought to take care of this.  This is a federal government problem."  Well, the federal government should take care of this, but the federal government is not taking care of this.  The federal government is derelict in their duty. And, the simple fact is, our house is on fire on Sand Mountain.  Some people say, "Well, call the fire department.  Let them come and put it out.  Call the federal government, let them take care of this." Well, what we have and what this bill provides here today, we have got a water hose and we have got a fire extinguisher and we have got neighbors standing by with buckets of water to help us put out the fire. If we wait for the fire department, or if we wait for the federal government, to come and put this fire out, our house is going to burn down.

170.   After HB 56 passed the House on April 5, 2011, Representative

Hammon explained by video, "Today we passed HB 56, which is our caucus's immigration legislation that is a part of the Handshake with Alabama. . . . . This immigration bill is designed to deter illegal immigration in the state of Alabama. It is patterned after the Arizona law, but it also has an Alabama flavor. We have added every aspect of a person's life." When HB 56 was later adopted by the Legislature, Hammon again stated, "This is an Arizona bill with an Alabama twist." *Alabama Lawmakers Approve Arizona-Style Immigration Bill*, Associated Press, June 5, 2011.

171.   After signing HB 56 into law, the Governor of Alabama opined, "We have a real problem with illegal immigration in this country," and lauded Alabama's enactment of "the strongest immigration bill in the country." Bob Johnson, *Alabama Governor Signs Tough Illegal Immigration Law*, Associated Press, June 9, 2011.

172.   In short, the legislature enacted HB 56 as a comprehensive state solution to the perceived problem of the federal government's failure to regulate immigration to Alabama's liking as well as based on an attempt to drive immigrants, particularly Mexican and other Latino immigrants, out of the state.

## Key Provisions of HB 56

173.   The full text of HB 56 as enacted is appended to this Complaint as Exhibit 1 and incorporated herein.

**Mandatory Investigation of Immigration Status by State and Local Law Enforcement (Sections 12 & 18-20)**

174.   HB 56 fundamentally changes the primary role and day-to-day operations of state, county, and municipal law enforcement officers in Alabama. Alabama law currently requires these officers "to give full time to the preservation of public order and the protection of life or property or the detection of crime in the state."  Ala. Code § 36-21-60(11).  HB 56 undermines these state priorities by converting routine police encounters into prolonged detention solely for the purpose of investigating immigration status and implementing Alabama's own immigration policies and rules.

175.   Section 12 of HB 56 requires every state, county, and municipal law enforcement officer in Alabama to investigate the immigration status of any person the officer stops, arrests or detains, if the officer has "reasonable suspicion" to believe the person is unlawfully present in the United States.  Sec. 12(a).  Under Section 12, an officer may demand that any person subject to "*any* lawful stop, detention or arrest" produce one of six state-approved identity documents. Secs. 12(a), (d) (emphasis added).  Only individuals who can produce a state-approved document receive a presumption of lawful status.  Sec. 12(d). Individuals who cannot produce such a document—which includes many persons who are U.S. citizens or lawfully admitted non-citizens—are subject to a lengthy and intrusive immigration verification process.

59

176.   Section 12 requires that an officer contact the federal government in the process of investigating immigration status.

177.   The federal government does not respond to immigration status queries instantaneously.  Federal authorities take over 80 minutes on average to respond to immigration status queries from state and local police under the best case scenarios—when they are given sufficient biographical information and they are readily able to locate the target in the immigration databases that they search.  However, the databases searched for immigration status queries often will not contain any information whatsoever.  For example, there is no centralized database of U.S. citizens.  In these circumstances, the federal government will report that there is "no match" for the suspect, and will have to engage in a lengthy and manual file review by immigration officers.  If a manual file review is required in response to an inquiry on an individual, this process can take over two days.

178.   Section 12 will unreasonably prolong police encounters, such as traffic stops that would ordinary result in no action or a citation that would take only minutes absent HB 56's mandates.  Many citable traffic violations and other minor offenses, such as jaywalking or littering, are deemed criminal violations under Alabama law; under Section 12, officers are mandated to prolong such stops in order to investigate immigration status.

179.   Immigration status queries mandated by HB 56 impose a substantial

burden on federal authorities, who will be required to respond to an enormous increase in the number of immigration status inquiries and will have less ability to prioritize among their tasks according to federal regulations and policies.

180.   Section 12 welcomes racial profiling.  The law requires an officer to investigate immigration status where the officer has "reasonable suspicion" "that the person is an alien who is unlawfully present in the United States."  Sec. 12(a).  But the law fails to enumerate any criteria for what "reasonable suspicion" of an individual's unlawful status might be.  That determination is left entirely to an officer's discretion and increases the likelihood that an officer will engage in discrimination based on an individual's appearance, language choice, or English-language ability.

181.   Section 12 is designed to and will have the effect of requiring everyone in Alabama, particularly those who might be perceived as foreign, to carry identification papers reflecting their immigration status with them at all times to avoid unreasonably prolonged law enforcement encounters while their immigration status is being investigated.

182.   Section 12 suffers from the same constitutional defects as provisions in the recent Arizona, Utah, Indiana, and Georgia immigration laws—all of which have been preliminarily enjoined or subjected to a temporary restraining order.  *United States v. Arizona*, 703 F. Supp. 2d 980, 1006 (D. Ariz. 2010), *aff'd*, 641

F.3d 339 (9th Cir. 2011); *Utah Coalition of La Raza v. Herbert*, No. 11-401, slip

op. (D. Utah May 11, 2011); *Buquer v. City of Indianapolis*, No. 11-708, 2011 WL

2532935 (S.D. Ind. June 24, 2011); *Ga. Latino Alliance for Human Rights*

*("GLAHR") v. Deal*, Case No. 11-1804, 2011 WL 2520752 (N.D. Ga. June 27,

2011).

183.   Similarly, Section 18 of HB 56 requires that state, local, and

municipal law enforcement officers verify the citizenship or immigration status of

those found to be driving without a valid driver's license, and allows individuals to

be detained for up to 48 hours solely to verify their immigration status, and longer

to secure their transfer to federal authorities.  Sec. 18(d).

184.   Section 18 subjects anyone who lacks a current driver's license during

a routine encounter with the police—including U.S. citizens and those lawfully

present in the United States—to prolonged detention for the purpose of an

immigration status investigation.

185.   Sections 12, 18, 19, and 20 further require an officer to detain

individuals solely on the basis of alleged unlawful presence in various contexts,

even when there is no other basis for their continued detention.

186.   Law enforcement officials across the country and in Alabama have

stated that HB 56 cannot be implemented in a race-neutral fashion and will

inevitably lead law enforcement officers to rely inappropriately on race, ethnicity,

and English-language ability in making decisions about whom to subject to additional scrutiny with questions regarding their immigration status.

187.   Implementation of HB 56 will have a significant negative impact on the ability of local law enforcement officers to protect immigrant communities and mixed-immigration status communities and families, *i.e.*, those that include individuals with and without lawful status.  Because immigrants will avoid the police out of fear that any interaction with law enforcement could lead to immigration status inquiries, Alabama law enforcement officers will not get the assistance they need to investigate, prosecute, and prevent crimes.  For example, Plaintiff HICA provides substantial victim assistance and courtroom advocacy services to victims of crime, and the organization anticipates that HB 56 will substantially limit the willingness of victims to seek those services and protections.

**State-Specific Alien Registration Scheme (Section 10)**

188.   Section 10 of HB 56 enacts a state alien registration regime by creating a new state criminal offense of "willful failure to complete or carry an alien registration document."  Sec. 10.  One element of the offense is that the person "is in violation of 8 U.S.C. § 1304(e) or 8 U.S.C. § 1306(a)," federal statutes that impose certain requirements that non-citizens register with the federal government and carry registration documents.  Another element is that the person be "an alien unlawfully present in the United States."  Under HB 56, violations of

this new state crime are deemed a Class C misdemeanor, punishable by a fine of up to $100 and up to 30 days of jail time.  Sec. 10(f).

189.   The purpose of the state registration provision is to allow the state to identify and imprison individuals it regards as "unlawfully present."

190.   This provision supplants federal alien registration laws (and the federal officers who administer and enforce those laws), federal removal procedures and priorities, and congressional judgments regarding the appropriate penalties for unlawful presence in the United States.

191.   The provision criminalizes certain immigrants for "simply setting foot in Alabama."  Mike Hubbard, *Handshake with Alabama*, Aug. 16, 2010.  A similar provision in Arizona's Senate Bill 1070 has been preliminary enjoined.  *See United States v. Arizona*, 703 F. Supp. 2d 980, 1006 (D. Ariz. 2010), *aff'd*, 641 F.3d 339.

**Postsecondary and K-12 Education Provisions (Sections 8 and 28)**

192.   HB 56 also contains provisions aimed at blocking children and young people from attending Alabama public schools, from kindergarten through colleges and universities.

193.   Section 8 of HB 56 impermissibly discriminates among groups of lawfully residing non-citizens.

194.   Section 8 restricts access to postsecondary education by excluding a host of lawfully present non-citizens from attending any public college or

university in Alabama.  It provides that only U.S. citizens, lawful permanent

residents (LPRs), and individuals who hold a "nonimmigrant visa under 8 U.S.C.

§ 1101 *et seq*." can enroll in or attend an Alabama public postsecondary institution,

such as a college or university.

195.   Section 8 therefore excludes certain non-citizens whom the federal

government has authorized to remain in the United States indefinitely, but who do

not hold lawful permanent resident status or a "nonimmigrant visa"—including

those whom the federal government has granted asylum, refugee status, Family

Unity status, and Temporary Protected Status because of environmental disaster or

armed conflict in their home countries, or deferred action.

196.   People who are granted asylum or refugee status are authorized to

reside in the United States indefinitely, *see* 8 U.S.C. §§ 1157-1158, and after

residing in the United States for one year, they may adjust to lawful permanent

resident status and eventually apply to become naturalized citizens.  *See* 8 U.S.C.

§ 1159.  They are given this pathway to citizenship because they face persecution

in their home countries.  The conferral of asylum or refugee status does not make

them LPRs, however, nor does it provide them with a nonimmigrant visa.  As such,

they would be ineligible to attend postsecondary school in the state of Alabama.

197.   Section 28 of HB 56 blocks access to K-12 public education by

requiring public schools to inquire into children's and parents' immigration status,

and permits school officials to share their conclusions regarding immigration status with the federal government.

198.   HB 56 is expressly designed to deter undocumented children and the U.S. citizen children of undocumented parents from attending public schools in Alabama.  HB 56's sponsor, Representative Micky Hammon, described the bill as motivated by the costs of "educat[ing] the children of illegal immigrants" (though he cited no data on such costs), and he predicted that HB 56 will result in "cost savings for this state."  David White, *Alabama Legislative Panel Delays Voting on Illegal Immigration Bill*, The Birmingham News, Mar. 3, 2011.[2]  Likewise, Senator Beason, the bill's sponsor in the Senate, stated that educating immigrant children "is where one of our largest costs come from . . . . It's part of the cost factor. Are the parents here illegally, and if they were not here at all, would there be a cost?"  Brian Lyman, *Immigration Law Makes School Officials Uneasy*, The Montgomery Advertiser, June 8, 2011.

199.   Section 28(a) requires that "[e]very public elementary and secondary school . . . , at the time of enrollment in kindergarten or any grade in such school, shall determine whether the student enrolling in public school was born outside the jurisdiction of the United States or is the child of an alien not lawfully present in the United States[.]"  Sec. 28(a)(1).  To make this determination, schools must

---

[2] *Available at* http://blog.al.com/spotnews/2011/03/alabama_legislative_panel_dela.html.

require that each child produce his or her birth certificate.  Sec. 28(a)(2).

200.   If "upon review of the student's birth certificate it is determined that the student was born outside the jurisdiction of the United States or is the child of an alien not lawfully present in the United States," or if the child's birth certificate is unavailable, the child's parents must prove the child's citizenship or immigration status within 30 days.  Sec. 28(a)(3).  Otherwise, the school "shall presume . . . that the student is an alien unlawfully present in the United States."  Sec. 28(a)(5).

201.   Section 28(e) further authorizes school officials to report both children and parents whom they presume to be "unlawfully present" to the Department of Homeland Security (DHS).  Section 28 specifically authorizes school officials to disclose information that personally identifies a student to federal immigration authorities upon obtaining a waiver from the Attorney General, in violation of federal law including the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g.  Section 28 also authorizes school officials to report to DHS every *parent* who is presumed to be "unlawfully present," without limitation.  Indeed, under HB 56, school officials, like other state or local officials, are forbidden to limit communications with federal and state immigration officials.  Secs. 5(a), 6(a).  Further, school officials are required, on pain of criminal liability, to report any failure to enforce HB 56 to its fullest extent or to communicate with federal officials about individuals they believe to be

undocumented. Secs. 5(f), 6(f).

**State-Based Harboring-Related Immigration Crimes (Section 13)**

202. In Section 13, HB 56 creates four new state law immigration crimes punishable by fines and/or imprisonment. The express intent of these provisions is to implement an Alabama state policy of "attrition through enforcement"—at odds with federal policy.

203. Section 13 criminalizes those who "[c]onceal, harbor or shield" an alien "from detection in any place in this state" if that alien "has come to, has entered, or remains in the United States in violation of federal law." Sec. 13(a)(1). This section applies with equal force to an immigrant who entered the United States years ago and subsequently regularized her status as it does to an immigrant who currently lacks valid immigration status.

204. Section 13 makes it a crime to "[e]ncourage or induce an alien" without legal status "to come to or reside in this state." Sec. 13(a)(2).

205. Section 13 makes it illegal to "[t]ransport" an alien if that alien who "has come to, has entered, or remains in the United States in violation of federal law." Sec. 13(a)(3). This section applies with equal force to an immigrant who entered the United States years ago and subsequently regularized her status as it does to an immigrant who currently lacks valid immigration status.

206. Section 13 makes it a crime to "harbor an alien unlawfully present . . .

by entering into a rental agreement." Sec. 13(a)(4).

207.   Section 25 makes a solicitation or conspiracy to violate any of HB 56's criminal provisions a crime with the same penalty as the underlying violation. Thus both the actor and recipient of the conduct targeted by Section 13 are committing a state crime under HB 56.

208.   Alabama enacted these provisions in Section 13 precisely to bypass the federal government's definitions and prosecutorial and adjudicatory processes under the federal harboring statute, 8 U.S.C. § 1324.

209.   Alabama intended (and achieved) an extraordinarily broad criminal prohibition in Section 13.  For example, the transportation provision was specifically written to apply to "transportation anywhere in Alabama, whether it is a trip across the state or simply to the corner store."  Mike Hubbard, *Handshake with Alabama*, Aug. 16, 2010.

210.   The new state immigration crimes created by Section 13 criminalize routine behavior undertaken on a daily basis by U.S. citizens and those with legal status in Alabama.  Because of HB 56, Alabamians—including Plaintiffs Thau, Long, Jimmerson, Barber, Upton, Beck, Cummings, or Jane Doe #3—who give a lift to a neighbor, a client, or fellow congregant, who invite a family member to visit from out of state or rent out a room to a friend, or who marry someone despite knowing or in "reckless disregard" of the fact that the person could be considered

"unlawfully present in the United States" within the meaning of HB 56, are subject to prosecution, fines, and incarceration.

211.   Section 13 suffers from the same constitutional infirmities as a similar provision in Georgia's HB 87, which has been preliminarily enjoined.  *GLAHR v. Deal*, Case No. 1:11-1804, 2011 WL 2520752 (N.D. Ga. June 27, 2011).

**State-Based Crimes for Solicitation and Performance of Work (Section 11)**

212.   Section 11(a) of HB 56 makes it unlawful for an "unauthorized alien" to "apply for work, solicit work in a public or private place, or perform work as an employee or independent contractor in this state."

213.   Section 11(a)'s prohibition on work suffers from the same fatal flaw as an identical provision in Arizona's Senate Bill 1070 that has been preliminarily enjoined—it is preempted by federal employer regulations.  *See Arizona*, 703 F. Supp. 2d at 1000-02, *aff'd*, 641 F.3d at 357-360.

214.   Section 11(a) also creates an absolute prohibition on work-related solicitation speech, and applies irrespective of the time, place, or manner in which the speech occurs.  It applies even in traditional public fora, such as sidewalks and parks.

215.   Furthermore, HB 56 fails to define what constitutes "work," rendering the scope of the conduct and speech criminalized by Section 11(a) impermissibly vague in violation of the First Amendment.  Unlike the terms "Contractor,"

"Employee," "Employer," and "Employment," which are all defined at Section 3, "work" is left undefined.  On its face, therefore, Section 11(a) prohibits activities such as artists painting portraits in a park and students conducting a fundraiser—and even solicitation speech about those activities.

216.   Section 11(f) makes it unlawful for "an occupant of a motor vehicle that is stopped on a street . . . to hire and pick up passengers for work at a different location if the motor vehicle blocks or impedes the normal movement of traffic." This prohibition applies regardless of immigration status or work authorization.

217.   Section 11(g) makes it unlawful for any person "to enter a motor vehicle that is stopped on a street . . . in order to be hired by an occupant of the motor vehicle and to be transported to work at a different location if the motor vehicle blocks or impedes the normal movement of traffic."  This prohibition, too, applies regardless of immigration status or work authorization.

218.   Sections 11(f) and (g) criminalize work-related solicitation speech while leaving other types of speech unregulated.  The prohibition is triggered only by communication *about work* that occurs in public rights of way between a potential employer and a potential employee.  HB 56 thus singles out one content-specific category of expression for criminal sanctions, while leaving other communication that occurs in the same time, place, and manner unregulated.

219.   Day laborers and the contractors who hire them cannot find each other

through conventional means of signaling availability.  Rather, the only effective manner for day laborers to communicate their ability to work is by gathering in areas easily accessible to potential employers.

220.   Many Alabamians, including Plaintiffs John Doe #5 and John Doe #6, have previously expressed their availability for employment to people in vehicles on the street, while peacefully standing on a public way.  They wish to continue engaging in such expressive activity to communicate their availability to work. Indeed, for many, day labor is a critical means—and often the only available means—to obtain work.  However, HB 56 now criminalizes the act of seeking day labor work.

**Contract Provision (Section 27)**

221.   With limited exceptions, Section 27 prohibits Alabama state courts from recognizing or enforcing contracts between an alien unlawfully present in the United States and any other party, provided that the other party had direct or constructive knowledge that the alien was unlawfully present in the United States, and provided that the contract "requires the alien to remain unlawfully present in the United States for more than 24 hours after the time the contract was entered into or performance could not reasonably be expected to occur without such remaining."  Sec. 27(a).

222.   Section 27 effectively excludes undocumented immigrants—and

parties who contract with them—from participating in a wide array of civil and commercial affairs.  For example, Section 27 facially prohibits Alabama state courts from recognizing or enforcing: marriage contracts, settlement agreements (including divorce and custody agreements), waiver and release agreements, plea agreements, mortgage agreements, insurance contracts, contracts for wages (including minimum wages and overtime wages required by federal law), confidentiality and non-disclosure agreements, contracts for the provision of childcare, contracts for lodging (for more than one night), arbitration agreements, contracts for transportation (other than transportation intended to facilitate an immigrant's return to his or her country of origin), warranty agreements, contracts for the purchase of medicine, contracts for the provision of utilities, loan agreements and promissory notes, and all other manner of contracts relating to the conduct of commerce.  Both undocumented immigrants and the parties with whom they contract would be free to breach these and various other types of contracts with impunity.

223.   Section 27 excludes only an extremely narrow range of contracts from its scope: "a contract for lodging for one night, a contract for the purchase of food to be consumed by the alien, a contract for medical services, or a contract for transportation of the alien that is intended to facilitate the alien's return to his or her country of origin."  Sec. 27(b).

224.   Section 27 is not limited to contracts entered into after the effective date of HB 56.  Section 27 also nullifies the enforcement of contracts entered into before HB 56's enactment or effective date.

225.   The effect of Section 27 will be to discourage parties from conducting any business with individuals whom they assume or suspect are "illegal immigrants."

**Transaction Provision (Section 30)**

226.   Section 30 makes it a felony for an "unlawfully present alien" to enter or attempt to enter any "transaction" with the state or local government agency. Sec. 30(b).  Section 30 also prohibits a third party from entering or attempting to enter into a transaction on behalf of an alien not lawfully present in the United States.  *Id.*

227.   The term "transaction" is not defined in HB 56.  Section 30 does provide examples of prohibited transactions or attempted transactions—applying for or renewing a motor vehicle license plate, driver's license, nondriver identification card, or business license—but this list is expressly made nonexclusive.

228.   By criminalizing "*any transaction* [or attempted transaction] between a person and the state or a political subdivision," Section 30 reaches conduct that is protected by the First Amendment, the due process clause, and other constitutional

provisions, such as accessing or using the courts, public hospitals, public
highways, or other public accommodations or services in circumstances that
require "transactions."  It also reaches such basic, everyday conduct as applying
for a public library card, paying municipal property taxes, applying and paying for
water, sewer, and garbage service, paying for a parking permit on a municipal
street, or applying for a fishing license.  Indeed, these problems were realized
earlier this month.  On September 1, 2011, the Montgomery Water Works and
Sanitary Sewer Board ("MWWSSB") started requiring any new applicants for
water or sewer services to prove their immigration status before services would be
connected, and this policy continued until MWWSSB was informed that HB 56
had been temporarily enjoined, at which point they agreed to rescind the policy
pending a ruling from this Court.  The Allgood, Alabama Water Works company
has also posted a sign in its office stating that "to be compliant with new laws
concerning immigration, [water customers] must have an Alabama driver's license
or an Alabama picture ID card on file at this office before September 29, 2011, or
you may lose water service."

229.   Under Section 30, any person entering or attempting to enter into a
transaction with the state or a political subdivision of the state shall be required to
demonstrate his or her U.S. citizenship or, if he or she is an alien, his or her lawful
presence in the United States.  An alien's lawful presence shall be demonstrated by

the state's/political subdivision's verification of the alien's lawful presence through the Systematic Alien Verification for Entitlements ("SAVE") program operated by DHS, or by other verification with DHS pursuant to 8 U.S.C. § 1373(c).

230.   Neither the federal SAVE system nor any federal system for status inquiries under § 1373(c) were intended by the federal government to serve such a purpose and they are not designed to do so.

231.   Section 30 is a strict liability statute—*i.e.*, there is no *mens rea* requirement.  Thus, for example, an individual who does not know that she is "unlawfully present" in the United States within the meaning of HB 56 at the time she applies to have her car's license plate renewed is guilty of a felony.  Moreover, if her parent or child submits the application on her behalf, that person also would be guilty of a felony, even if that family member did not know that the applicant was not "lawfully present."

**<u>Limitations on Ability to Present Criminal Defense (Sections 10, 11, & 13)</u>**

232.   As described above, Sections 10, 11, and 13 create crimes for which immigration status is a central element.  *See supra* ¶¶ 188-191 (Sec. 10); 212-220 (Sec. 11); 202-211 (Sec. 13).

233.   Sections 10(e) and 13(h) provide that "[a] verification of an alien's immigration status received from the federal government pursuant to 8 U.S.C. § 1373(c) shall constitute proof of that alien's status."  Secs. 10(e), 13(h).  HB 56

76

prohibits state courts from considering any evidence regarding whether an individual is "lawfully present" other than the federal government's verification. *Id.* ("A court of this state shall consider *only* the federal government's verification in determining whether an alien is lawfully present in the United States.") (emphasis added).

234.   Section 11(e) creates an identical mandatory scheme to prove that a person lacks work authorization.  Sec. 11(e) ("A verification of an alien's immigration status received from the federal government . . . shall constitute proof of the alien's status.  A court of this state shall consider *only* the federal government's verification in determining whether a person is an unauthorized alien.") (emphasis added).

**General Interpretive Provisions (Sections 5, 6, and 25)**

**Section 5**

235.   Section 5 tasks all state and local agencies and officials with the enforcement of federal immigration law and HB 56, under threat of personal civil liability, steep monetary penalties, and the loss of state funding.

236.   Section 5 states that "[n]o official or agency of this state or any political subdivision thereof, including . . . an officer of a court . . . , may adopt a policy or practice that limits . . . communication between its officers and federal immigration officials in violation of 8 U.S.C. § 1373 or . . . § 1644."  Sec. 5(a).

Section 5 also requires all such officials to "fully comply with and, to the full extent permitted by law, support the enforcement of federal law prohibiting the entry into, presence, or residence in the United States of aliens in violation of federal immigration law."  Sec. 5(b).

237.   Section 5 creates a private cause of action for any U.S. citizen or "lawfully present" immigrant to sue any official who either "adopts or implements a policy or practice that is in violation of 8 U.S.C. § 1373 or . . . § 1644."  Sec. 5(d).  Officials found guilty of such violations face monetary fines of no less than $1,000 per day, and up to $5,000 per day.  Sec. 5(d).

238.   Section 5 directs the state Attorney General to "report any violation of [either subsection] . . . to the Governor and the state Comptroller."  Upon such action by the state Attorney General, "that agency or political subdivision shall not be eligible to receive any funds, grants, or appropriations from the State of Alabama until such violation has ceased and the Attorney General has so certified."  Sec. 5(a).

239.   Section 5 also provides that "[e]very person working for the State of Alabama or a political subdivision thereof . . . ha[s] a duty to report violations of this act."  § 5(f).  Failure to report a violation amounts to "obstructing governmental operations" as defined in Alabama Code § 13A-10-2, which is punishable by imprisonment for up to 1 year, and fines up to $6,000.  *See* Ala.

Code §§ 13A-5-7, 13A-5-12.

**Section 6**

240.   Section 6 prohibits any agency of the state or any political subdivision thereof from adopting a policy or practice that limits or restricts the enforcement of HB 56.  Sec. 6(a).

241.   If the Attorney General determines that any agency violates Section 6(a), the Attorney General must report this to the Governor and Comptroller, and the agency will no longer be eligible to receive any state funding.  *Id.*

242.   Section 6 also requires all state officials, agencies, and personnel to fully comply with and, to the full extent permitted by law, support the enforcement of HB 56.  Sec. 6(b).

243.   Under Alabama state law, sheriffs are state officers and thus bound by Section 6(b).

244.   Section 6 creates a private right of action for private citizens to enforce the provisions of Section 6.  Sec. 6(d).

245.   Section 6 creates a new state crime for any person working for the State of Alabama, or any political subdivision thereof, from failing to report a violation of Section 6 or HB 56.  Sec. 6(f).

246.   Together, Sections 5 and 6 operate to ensure that Alabama officials and agencies maximally enforce each of the provisions of HB 56, and the

provisions of federal immigration law as interpreted by the state Attorney General.

**Section 25**

247.   Section 25 imposes penalties for solicitation, attempt, or conspiracy to violate any criminal provision of HB 56.  Thus under Section 25, individuals who are "harbored," "transported," "induced," or allowed to rent are criminally liable along with the individuals whose conduct is directly prohibited under Section 13, on the theory that they have conspired or solicited such activity.

## Comprehensive Federal Immigration System

248.   The federal government has exclusive power over immigration matters.  The U.S. Constitution grants the federal government the power to "establish a uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3.  In addition, the Supreme Court has held that the federal government's power to control immigration is inherent in the nation's sovereignty.

249.   Congress has created a comprehensive system of federal laws, agencies, and procedures regulating immigration.  *See generally* Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*

250.   The extensive statutory scheme created by the INA leaves no room for supplemental state immigration laws.

251.   In addition, the federal government has issued numerous regulations,

policies, and procedures interpreting the provisions of the INA and has established large and complex administrative apparatuses to carry out their mandates.

252.   The INA carefully calibrates the nature—criminal or civil—and the degree of penalties applicable to each possible violation of its terms.

253.   The INA contains complex and exclusive procedures for determining an individual's immigration and citizenship status, deciding whether the civil provisions of the immigration laws have been violated, and determining whether an individual may lawfully be removed from the United States.

254.   Under the INA, a non-citizen's immigration status may be fluid and subject to change over time.  A non-citizen who enters the United States with authorization, for example with a student visa, may remain in the country past the period of authorized stay and thus no longer be in status.  (Alternatively, the same person is eligible to change into a different visa classification, then he or she may overstay the original period of the visa and remain in status.)  Conversely, a non-citizen who enters the United States without authorization, for example by crossing into the country by foot while evading border authorities, may subsequently gain lawful status, such as through a successful asylum application or U visa application.

255.   The fluidity of immigration status is a fundamental feature of federal immigration law.  It is a direct and unavoidable consequence of the system of

immigration regulation that Congress has prescribed and accommodates many important national interests including, for example, the nation's humanitarian and international law obligations regarding asylum seekers and people fleeing torture.

256.   HB 56 presumes that immigration status is definite, not subject to nuance, and readily and quickly ascertained.  But those presumptions are not accurate.

257.   Under federal law, there is no single, readily ascertainable category or characteristic that establishes whether a particular person may or may not remain in the United States.  The answer to that question is a legal conclusion that can only be reached through the processes set forth in the INA, and which may depend on the discretionary determinations of federal officials.

258.   There are many non-citizens who are present in the United States without formal immigration status who would not be removed if placed in federal removal proceedings, or who actually have temporary permission from the federal government to be in the United States.  For example, an individual without federal immigration status may be eligible for a form of immigration relief, such as asylum, adjustment of status, or withholding of removal.  Some of these individuals are known to the federal government, often because they have applied for immigration relief; others will not be identified until they are actually placed in proceedings by the federal government and their cases are adjudicated.

259.   In addition, some individuals like those granted Temporary Protected Status due to turmoil or natural disasters in their native countries have permission to be in the United States, but are unlikely to have one of the enumerated qualifying identity documents under HB 56.

260.   The fact that some persons have permission to remain in the United States without having a formal immigration status, or despite being technically removable, is also a fundamental feature of federal immigration law and the system of immigration regulation that Congress has prescribed.  This system accommodates many important national interests including, for example, Congress's desire to allow certain individuals to obtain relief from removal, and statutory limits on the detention of individuals ordered removed, *see Zadvydas v. Davis*, 533 U.S. 678 (2001).

261.   Federal agencies do not and cannot determine definitively, in response to a demand from a state or local official, whether an individual is subject to removal.  It is impossible to make a determination of whether an individual is lawfully in the United States based upon a search of the federal databases that are checked for an immigration status query.  Such determinations involve complex questions of fact and law and are made through a federal administrative and judicial process that may take years.

262.   Moreover, the federal government has established certain priorities

that determine where resources for immigration enforcement are focused.  For

example, the federal government prioritizes the apprehension and removal of the

most dangerous aliens.  The federal Law Enforcement Support Center ("LESC"),

which is responsible for responding to immigration status queries from law

enforcement agencies, has experienced continuous and dramatic increases in

immigration status determination queries over the past four years.  The verification

process at the LESC is time-intensive and can take between 80 minutes and two

days.  Following congressional guidance, the LESC has prioritized its efforts to

focus on those aliens most likely to pose a threat to their communities.

263.   In addition, the federal government often exercises its prosecutorial

discretion to prioritize certain cases for action over others.  The federal

government's decision to exercise such discretion may be based upon a wide range

of equitable factors, and its exercise in any given case cannot be predicted in

advance.

264.   As a result, the question whether any given non-citizen may remain in

the United States depends upon a host of complicated and time-consuming legal

and discretionary determinations by a variety of federal officials.  It cannot be

conclusively determined by a status verification query to the federal government.

Inquiries made by law enforcement officers to the LESC or by state agencies to the

federal SAVE database yield, at best, a snapshot of what a federal agency believes

to be an individual's current immigration status or eligibility for benefits,

respectively, which may not correspond to the ultimate finding of whether she is

subject to removal.  *See* Department of Justice Office of the Inspector General,

*Follow-up Review of the Status of IDENT/IAFIS Integration* at 41 (2004)[3] (noting

that, according to DHS officials, DHS's immigration "databases cannot be relied

upon to accurately determine immigration status [at any given time] because

immigration status is dynamic[,]" and database entries may be outdated).

265.   Thus, not all inquiries to the federal government regarding

immigration status yield a clear response.  *See* David C. Palmatier Decl. (attached

as Ex. A to Exhibit 42 to Pls.' Mot. for Prelim. Inj.) (Doc. 37-42 at *6-*15).

266.   Whether a person is a citizen of the United States is not easily

ascertained in the contexts demanded by HB 56.  U.S. citizens are not required to

carry documentary proof of their citizenship.  There is no national database that

contains information about every U.S. citizen.  Some people are actually unaware

of their U.S. citizenship because they may have acquired U.S. citizenship at birth

by operation of law due to their parents' citizenship, despite not being born in the

United States.  *See, e.g.*, 8 U.S.C. § 1433.  Others automatically obtain citizenship

when their parents become naturalized U.S. citizens.  *See, e.g.*, 8 U.S.C. § 1431.

267.   Moreover, HB 56 conflicts with and is preempted by provisions of the

---

[3] *Available at* http://www.justice.gov/oig/reports/plus/e0501/final.pdf.

INA that set forth comprehensive federal schemes addressing: (1) alien

registration; (2) transportation and harboring; (3) work authorization and sanctions

for unauthorized work; and (4) arrest authority for immigration violations.

**Federal registration system**

268.   The INA includes a national alien registration system that displaces

and preempts state alien registration laws.

269.   The federal registration scheme has been in place since 1940 and was

designed to create a single, uniform, national scheme.

270.   The preemptive effect of the federal alien registration scheme was

expressly recognized by the President of the United States when the scheme was

created and has been upheld by the Supreme Court.

271.   The federal regulation implementing 8 U.S.C. §§ 1302, 1304, and

1306 prescribes as "evidence of registration" specific forms for compliance.  *See* 8

C.F.R. § 264.1.  The list, however, has not been updated to include some of the

current federal forms that are commonly used.  For example, there is no

corresponding registration form available for recipients of U visas (given to

victims of crime who assist in the prosecution of the case) or T visas (given to

victims of human trafficking).  As a result, there are categories of non-citizens who

have applied for immigration benefits or whose presence in the United States is

otherwise known to federal immigration agencies but who do not have registration

documents that are valid under the regulations.

272.   Many of the changes that have been made to the INA since the enactment of the registration provisions reflect Congress's decision to focus on and prioritize immigration enforcement against those immigrants who commit serious criminal offenses.  Targeting immigrants convicted of serious crimes, rather than those who may be in violation of the registration provisions, is the principal priority of federal immigration officers.

**Federal transportation provision**

273.   The INA also establishes criminal penalties for the transporting and harboring of certain non-citizens.  *See* 8 U.S.C. §§ 1324(a)(1)-(2).  Violations of these provisions carry fines and prison terms ranging from five years to life.  *Id.*

274.   The federal courts are engaged in an ongoing process of interpreting the statutory language in 8 U.S.C. § 1324(a) and determining the reach of the federal prohibitions therein.

275.   Section 13 of HB 56 will not be interpreted consistently with 8 U.S.C. § 1324(a) because there are numerous and material differences between the state and federal statutes.  For example, 8 U.S.C. § 1324(a) does not criminalize renting, but Section 13 does.  Section 1324(a)(1)(C) contains First Amendment protections regarding certain religious workers, but Section 13 does not.  And § 1324(a)(1)(A)(iv) outlaws inducing certain aliens to enter the United States, but

Section 13 concerns inducing persons to enter Alabama.

**Federal employment authorization and sanctions system**

276.   The INA contains a comprehensive scheme to regulate the employment of aliens that reflects a careful balance between multiple objectives, including the desire to reduce unauthorized employment, to protect workers against discrimination, and to impose manageable standards on employers and workers.

277.   Congress chose to regulate alien employment in the INA by focusing on employers.  Employers are required to verify the employment authorization of applicants on Form I-9, and employers who knowingly employ unauthorized workers are subject to civil penalties or criminal penalties if the violation is sufficiently severe.  Federal law does not impose fines or criminal penalties on unauthorized workers simply for working without authorization.

278.   Alabama's decision to criminalize unauthorized employment despite Congress's choice of other means to address such conduct directly conflicts with federal law.

**Federal restrictions on arrest authority**

279.   Mere presence inside the United States without federal immigration status is not a criminal offense.  Rather, it is a civil violation under federal immigration law.

280.   State and local law enforcement officers have no general authority to

enforce federal civil immigration law.  Federal law specifically authorizes state officers to assist in immigration enforcement only in narrowly defined circumstances; otherwise, it reserves immigration enforcement authority to the federal government.

281.   Section 1357(g) of Title 8 of the U.S. Code allows the federal government to "enter into a written agreement with a State, or any political subdivision" to carry out "function[s] of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States."  8 U.S.C. § 1357(g).  These agreements are commonly referred to as "287(g) agreements" after the section of the INA in which they are codified.  Such agreements, however, may be entered into only if the federal government determines the state officers are "qualified to perform a function of an immigration officer," *id.*, and the federal government must train and supervise each officer who is authorized under such an agreement.

282.   Currently, only one county in Alabama—the Etowah County Sheriff's Office—and the state Department of Public Safety have agreements with the federal government pursuant to this statutory provision.  *See* U.S. ICE, Fact Sheet: Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act.[4]

---

[4] *Available at* http://www.ice.gov/news/library/factsheets/287g.htm.

283.    The other provisions in federal law authorizing state or local participation in immigration enforcement are also carefully constrained. *See* 8 U.S.C. §§ 1103(a)(10), 1324(c), 1252c.

284.    Congress's intent that state and local officers are generally prohibited from enforcing civil immigration laws is clear both from the statutory scheme and from legislative history.

## The Federal Government's Interests in a Uniform Immigration System and Conducting Foreign Relations

285.    The federal government has a core, constitutionally-protected interest in setting a uniform federal immigration scheme, and in conducting foreign relations with other nations.  State immigration laws interfere with these core interests.

286.    The President of the United States criticized a similar law enacted by the State of Georgia on this basis on April 26, 2011, stating:  "It is a mistake for states to try to do this piecemeal.  We can't have 50 different immigration laws around the country.  Arizona tried this and a federal court already struck them down."  *See* Matthew Bigg, *Obama Criticizes New Georgia Immigration Law*, Reuters, Apr. 26, 2011.

287.    Janet Napolitano, the former governor of Arizona and current U.S. Secretary of Homeland Security, publicly opposed a similar law enacted by the State of Arizona, saying: "The Arizona immigration law will likely hinder federal

law enforcement from carrying out its priorities of detaining and removing dangerous criminal aliens." *Divisive Arizona Immigration Bill Signed Into Law*, CBS/AP, Apr. 23, 2010.[5]

288.   As the U.S. Department of Justice has argued in its own legal challenge to HB 56, state attempts to supplement the federal immigration scheme with a patchwork of state immigration laws "would result in further and significant damage to . . . U.S. foreign relations" and will jeopardize the treatment of "American nationals who are unlawfully present in other countries."  Compl. ¶¶ 36-37, *United States v. Alabama*, Case No. 11 -02746 (N.D. Ala., filed Aug. 1, 2011).  *See also* Compl. ¶ 4, *United States v. Arizona*, Case No. 10-1413 (D. Ariz. filed July 6, 2010) (explaining SB 1070, on which HB 56 was based, would "interfere with vital foreign policy and national security interests by disrupting the United States' relationship with Mexico and other countries.").

289.   Local law enforcement agencies, school districts, and other government agencies across Alabama's sixty-seven counties inevitably will interpret HB 56's vague and expansive provisions differently, leading to a patchwork of enforcement even within Alabama.  This cacophony of enforcement poses a serious threat to the federal government's ability to regulate immigration.

290.   Because the United States' immigration policy is inextricably

---

[5] *Available at* http://www.cbsnews.com/stories/2010/04/23/politics/ main6426125.shtml.

intertwined with foreign relations, Alabama's attempt to regulate immigration

through HB 56 will adversely impact the United States' ability to conduct foreign

relations with other countries.  HB 56 will undermine the ability of the U.S.

government to speak with a single voice about immigration, including

communicating to foreign nations what their nationals can expect when they come

to visit or reside in the United States.  State attempts to interfere with these

inherently federal issues can have severe impacts on foreign relations.

291.   HB 56 has already impaired the United States' foreign relations by

upsetting a key ally.  On the day Governor Bentley signed HB 56 into law, the

Mexican government expressed concern that the law will threaten the "human and

civil rights of Mexicans who live in or visit Alabama," and that it is "[in]consistent

with the vision of shared responsibility, mutual respect and trust under which the

governments of Mexico and the United States have agreed to conduct their

bilateral relations."  Mexican Foreign Affairs Ministry, *The Mexican Government

Regrets the Enactment of HB 56 in Alabama* (June 9, 2011).[6]

292.   Alabama's enactment of HB 56 also undercuts the United States'

stated commitment to its treaty obligations and international human rights law.

The Inter-American Commission on Human Rights ("IACHR")—part of the

Organization of American States, of which the United States is a member—has

---

[6] *Available at* http://www.sre.gob.mx/csocial/contenido/comunicados/2011/jun/cp_200a.html.

announced that it is "troubled by Alabama's HB 56" and that it "strongly urges the United States authorities to use the legal mechanisms that are available to amend these laws and adapt them to international human rights standards for the protection of immigrants."  IACHR, IACHR Expresses Concern over Immigration Law in U.S. State of Alabama (June 24, 2011).[7]

293.   HB 56 also interferes with U.S. foreign relations by calling into question the federal government's ability to ensure compliance with our country's treaty obligations.  In particular, the United States has signed and ratified two international treaties that prohibit racial profiling: the Convention on the Elimination of All Forms of Racial Discrimination ("ICERD"), art. 2(2), 660 U.N.T.S. 195, 218; and the International Covenant on Civil and Political Rights ("ICCPR"), art. 2(2), 999 U.N.T.S. 171, 173.  Those treaties, ratified by the United States, require the U.S. government to combat racial profiling.  By encouraging and authorizing racial profiling, and in light of formal statements of concern by foreign governments (*see* next paragraph), HB 56 interferes with the United States' compliance with its treaty obligations and subjects the United States to international censure.

294.   In response to HB 56 and similar state anti-immigrant laws such as Arizona SB 1070 and Georgia's HB 87, numerous foreign governments have

---

[7] *Available at* http:// www.cidh.oas.org/Comunicados/English/2011/63-11eng.htm.

expressed concern that such laws will cause widespread violations of the United States' treaty obligations, which would harm their nationals living in or visiting the United States. *See, e.g.*, Br. of United Mexican States as Amicus Curie in Supp. of Pls., at 1-2 (Doc. 95); Br. of United Mexican States as Amicus Curiae in Supp. of Pls., *Friendly House v. Whiting*. at 1, Case No. 10-01061, Doc. No. 299 (D. Ariz. filed July 8, 2010); Mot. of the Gov'ts of Argentina, Brazil, Chile, Colombia, Costa Rica, El Salvador, Guatemala, Honduras, Nicaragua and Peru for Leave to Join Br. of the United Mexican States as Amicus Curiae in Supp. of Pls. at 3, *GLAHR v. Deal*, Case No. 11-1804, Doc. No. 54 (N.D. Ga. filed June 15, 2011). These governments have also explained that state immigration laws, if implemented, would negatively impact foreign relations by undermining public opinion in their home countries and by making it impossible for their countries to engage on a sovereign-to-sovereign basis with the United States on important issues such as immigration and trade.

## CLASS ACTION

295.   The Individual Plaintiffs bring this action on behalf of themselves and all other persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2).  The class, as proposed by Plaintiffs, consists of all persons:

a.   who are or will be subject to detention, arrest, or interrogation about their citizenship or immigration status pursuant to the provisions of HB 56; or

b.      who are or will be subject to unlawful detention pursuant to the

provisions of HB 56; or

c.      who are or will be deterred from living, associating, or traveling

with immigrants in Alabama because of the provisions of HB 56; or

d.      who are or will be excluded from state colleges or universities

because of the provisions of HB 56; or

e.      who are or will be deterred from enrolling their children in public

elementary or secondary school because of the provisions of HB 56; or

f.      who are or will be deterred from securing governmental services or

governmental licenses or contracting with governmental agencies because of the

provisions of HB 56; or

g.      who are or will be chilled from soliciting or speaking about work

because of the provisions of HB 56; or

h.      who are or will be chilled from petitioning the government because

of the provisions of HB 56; or

i.      who are or will be impaired from enforcing the rights guaranteed to

them by 42 U.S.C. § 1981 because of the provisions of HB 56; or

j.      who as a result of the criminal sections of HB 56 will be

charged with a crime and will be impaired from receiving a fair criminal trial

on the central element of immigration status because (i) the defendant will

95

not be able to confront witnesses against him or her on the element of

immigration status; and (ii) the defendant will not be able to introduce

evidence in support of himself or herself on the element of immigration

status.

296.   The requirements of Federal Rules of Civil Procedure 23(a) and

23(b)(2) are met here, in that the class is so numerous that joinder of all members

is impracticable.

297.   There are questions of law and fact common to the proposed class,

including: (1) whether HB 56 is preempted by the U.S. Constitution and federal

law; (2) whether HB 56 violates the Fourth Amendment of the U.S. Constitution;

(3) whether HB 56 violates the Equal Protection Clause of the U.S. Constitution;

(4) whether HB 56 violates the Due Process Clause of the U.S. Constitution; (5)

whether HB 56 violates the First Amendment of the U.S. Constitution; (6) whether

HB 56 violates the Contracts Clause of the U.S. Constitution; (7) whether HB 56

violates the Sixth Amendment of the U.S. Constitution; and (8) whether HB 56

violates rights guaranteed by 42 U.S.C. § 1981.  These questions predominate over

any questions affecting only the Individual Plaintiffs.

298.   The claims of the Individual Plaintiffs are typical of the claims of the

proposed class.

299.   All of the Individual Plaintiffs will fairly and adequately represent the

96

interests of all members of the proposed class because they seek relief on behalf of the class as a whole and have no interests antagonistic to other members of the class.  The Individual Plaintiffs are also represented by *pro bono* counsel, including the ACLU Foundation Immigrants' Rights Project and Racial Justice Program, the National Immigration Law Center, the Southern Poverty Law Center, the ACLU of Alabama Foundation, the Asian Law Caucus, the Asian American Justice Center, the Mexican American Legal Defense and Educational Fund, LatinoJustice PRLDEF, the National Day Laborer Organizing Network, and G. Brian Spears, who collectively have extensive expertise in class action litigation, including litigation regarding the rights of immigrants and constitutional law. Finally, Defendants will act on grounds generally applicable to the class in executing their duties to enforce HB 56, thereby making appropriate final injunctive relief with respect to the class as a whole.

## DECLARATORY AND INJUNCTIVE RELIEF

300.   An actual and substantial controversy exists between Plaintiffs and Defendants as to their respective legal rights and duties.  Plaintiffs contend that they face an imminent threat of harm if HB 56 is enforced, and that this law violates the U.S. Constitution and federal law.  Defendants are obligated to enforce this law unless it is found to be illegal.

301.   In violating Plaintiffs' rights under the U.S. Constitution and federal

law. Defendants will be acting under color of law.

302.   If allowed to go into effect, HB 56 will cause irreparable injury to Plaintiffs.

303.   Plaintiffs have no plain, speedy, and adequate remedy at law against HB 56 other than the relief requested in this Complaint.

304.   In doing the things alleged in this Complaint, Defendants will deny Plaintiffs' rights secured by the U.S. Constitution and federal law.

305.   Defendants' enforcement of HB 56 will constitute an official policy of the state of Alabama.

306.   Plaintiffs are entitled to a declaration that HB 56 is unconstitutional on its face and to an order preliminarily and permanently enjoining its enforcement.

## CAUSES OF ACTION

### COUNT ONE
### SUPREMACY CLAUSE
### ENTIRETY OF HB 56

307.   Count One is brought against Defendants Bentley and Strange by all Plaintiffs.  It is brought with respect to the entirety of HB 56.

308.   Count One is brought against Defendant Broussard by Organizational Plaintiffs HICA, AAC, HIHC, ITAA, Appleseed, SEIU, Joint Board, DreamActivist, and GBM, and by Plaintiffs Jimmerson, Upton, Cummings and

Jane Doe #6.  It is brought with respect to Sections 5, 6, 10, 11, 12, 13, 18, 19, 20, 25, and 30 of HB 56.

309.   Count One is brought against Defendant Hill by all organizational Plaintiffs and by Plaintiffs Haile, Tesfamariam, John Doe #3 and John Doe #4.  It is brought with respect to Section 8 and the related enforcement and implementation provisions of HB 56.

310.   Count One is brought against Defendant Craven by all organizational Plaintiffs and by Plaintiffs Jane Doe #1, Jane Doe #2, Jane Doe #4, Jane Doe #5, Jane Doe #6, John Doe #1 and John Doe #2.  It is brought with respect to Sections 5, 6, and 28 of HB 56.

311.   Count One is brought against Defendant Wardynski by Plaintiff Jane Doe #6.  It is brought with respect to Sections 5, 6, and 28 of HB 56.

312.   Count One is brought against Defendant Blair by Plaintiff Jane Doe #2.  It is brought with respect to Sections 5, 6, and 28 of HB 56.

313.   Count One is brought against Defendant Fuller by Plaintiffs John Doe #1 and Jane Doe #4.  It is brought with respect to Sections 5, 6, and 28 of HB 56.

314.   Count One is brought against Defendant Warren by Plaintiff John Doe #2.  It is brought with respect to Sections 5, 6, and 28 of HB 56.

315.   Count One is brought against Defendant Thompson by Plaintiff Jane Doe #3.  It is brought with respect to Sections 5, 6, and 28 of HB 56.

316.   Count One is brought against Defendant Langham by Plaintiff Jane Doe #5.  It is brought with respect to Sections 5, 6, and 28 of HB 56.

317.   Paragraphs 1-306 are repeated and incorporated as though fully set forth herein.

318.   The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding.

319.   HB 56 is void in its entirety because it is a regulation of immigration, and therefore usurps powers constitutionally vested in the federal government exclusively.

320.   HB 56, and particularly Sections 5, 6, 8, 10, 11, 12, 13, 15, 17, 18, 19, 20, 27, 28, 29, and 30, also conflicts with federal laws, regulations and policies, attempts to legislate in fields occupied by the federal government, imposes burdens and penalties on legal residents not authorized by and contrary to federal law, and unilaterally imposes burdens on the federal government's resources and processes, each in violation of the Supremacy Clause.

321.   Plaintiffs move for relief on this claim directly under the Constitution, as an action seeking redress of the deprivation of statutory rights under the color of

state law, and also under 42 U.S.C. § 1983.

## COUNT TWO
## FOURTH AMENDMENT
## HB 56 §§ 12, 18-20

322.    Count Two is brought against Defendants Bentley and Strange by all

Organizational Plaintiffs and by Plaintiffs Zamora, Jane Does ##1-2, Jane Does

##4-6, and John Does ##1-4.

323.    Count Two is brought against Defendant Broussard by Organizational

Plaintiffs HICA, AAC, HIHC, ITAA, Appleseed, SEIU, Joint Board,

DreamActivist, and GBM, and by Plaintiff Jane Doe #6.

324.    Paragraphs 5-54, 61-64, 100-110, and 115-147 (Plaintiffs); 154-156

(Defendants); 173-186 and 235-246 (Key Provisions of HB 56); 279-284

(Comprehensive Federal Immigration System); 295-299 (Class Action

Allegations); and 300-306 (Declaratory and Injunctive Relief Allegations) are

repeated and incorporated as though fully set forth herein.

325.    The Fourth Amendment to the U.S. Constitution prohibits

"unreasonable searches and seizures."  The Fourth Amendment's guarantees are

applied to the States through the Fourteenth Amendment.

326.    Sections 12, 18, 19, and 20 of HB 56 require officers to seize, detain,

arrest, and hold individuals without reasonable suspicion or probable cause to

believe a person has engaged in criminal activity in violation of the Fourth

Amendment.

327.   Plaintiffs move for relief on this claim as an action seeking redress of the deprivation of Constitutional rights under the color of state law, through 42 U.S.C. § 1983.

## COUNT THREE
## FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE
## HB 56 § 10

328.   Count Three is brought against Defendants Bentley and Strange by all Organizational Plaintiffs and by Plaintiffs Jane Does ##1-2, Jane Does ##4-6 and by John Does ##1-4.

329.   Count Three is brought against Defendant Broussard by Plaintiffs by Organizational Plaintiffs HICA, AAC, HIHC, ITAA, Appleseed, SEIU, Joint Board, DreamActivist, and GBM, and by Plaintiff Jane Doe #6.

330.   Paragraphs 5-54, 100-110, and 115-147 (Plaintiffs); 154-156 (Defendants); 173, 188-191 and 235-247 (Key Provisions of HB 56); 295-299 (Class Action Allegations); and 300-306 (Declaratory and Injunctive Relief Allegations) are repeated and incorporated as though fully set forth herein.

331.   The Fourteenth Amendment to the U.S. Constitution provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

332.   Section 10 of HB 56 impermissibly discriminates against non-citizens

on the basis of alienage and against various classes of non-citizens on the basis of immigration status and deprives them of the equal protection of the laws within the meaning of the Fourteenth Amendment to the U.S. Constitution.

333.   Plaintiffs move for relief on this claim as an action seeking redress of the deprivation of Constitutional rights under the color of state law, through 42 U.S.C. § 1983.

**COUNT FOUR**
**FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE**
**HB 56 § 8**

334.   Count Four is brought against Defendants Bentley, Strange and Hill by all Organizational Plaintiffs and by Plaintiffs Haile, Tesfamariam, and John Does ##3-4.

335.   Paragraphs 5-54, 98, 99, and 140-147 (Plaintiffs); 154-156 (Defendants); 173, 192-196 and 235-246 (Key Provisions of HB 56); 295-299 (Class Action Allegations); and 300-306 (Declaratory and Injunctive Relief Allegations) are repeated and incorporated as though fully set forth herein.

336.   The Fourteenth Amendment to the U.S. Constitution provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

337.   Section 8 of HB 56 impermissibly discriminates against non-citizens on the basis of alienage and deprives them of the equal protection of the laws

within the meaning of the Fourteenth Amendment to the U.S. Constitution by

excluding certain categories of aliens from enrolling in or attending public

postsecondary institutions.

338.   Plaintiffs move for relief on this claim as an action seeking redress of

the deprivation of Constitutional rights under the color of state law, through 42

U.S.C. § 1983.

**COUNT FIVE**
**FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE**
**HB 56 § 28**

339.   Count Five is brought against Defendants Bentley, Strange and

Craven by all Organizational Plaintiffs and by Plaintiffs Jane Does ##1-6, and by

John Does ##1-2.

340.   Count Five is brought against Defendant Wardynski by Plaintiff Jane

Doe #6.

341.   Count Five is brought against Defendant Blair by Plaintiff Jane Doe

#2.

342.   Count Five is brought against Defendant Fuller by Plaintiffs John Doe

#1 and Jane Doe #4.

343.   Count Five is brought against Defendant Warren by Plaintiffs Jane

Doe #1 and John Doe #2.

344.   Count Five is brought against Defendant Thompson by Plaintiff Jane

Doe #3.

346.   Count Five is brought against Defendant Langham by Plaintiff Jane Doe #5.

346.   Paragraphs 5-54, 100-139 (Plaintiffs); 154, 155, and 158-159 (Defendants); 173-186, 197-201 and 235-246 (Key Provisions of HB 56); 295-299 (Class Action Allegations); and 300-306 (Declaratory and Injunctive Relief Allegations) are repeated and incorporated as though fully set forth herein.

347.   The Fourteenth Amendment to the U.S. Constitution provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

348.   Section 28 of HB 56 impermissibly discriminates against certain classifications of U.S. citizens, and certain classifications of non-citizens, on the basis of alienage and national origin, and deprives them of the equal protection of the laws within the meaning of the Fourteenth Amendment to the U.S. Constitution.

349.   Plaintiffs move for relief on this claim as an action seeking redress of the deprivation of Constitutional rights under the color of state law, also under 42 U.S.C. § 1983.

## COUNT SIX
## FOURTEENTH AMENDMENT DUE PROCESS (PROCEDURAL)
## HB 56 §§ 12, 18-20

350.   Count Six is brought against Defendants Bentley and Strange by all Organizational Plaintiffs and by Plaintiffs Zamora, Jane Does ##1-2, Jane Does ##4-6, and John Does ##1-4.

351.   Count Six is brought against Defendant Broussard by Organizational Plaintiffs HICA, AAC, HIHC, ITAA, Appleseed, SEIU, Joint Board, DreamActivist, and GBM, and by Plaintiff Jane Doe #6.

352.   Paragraphs 5-54, 61-64, 100-110, and 115-147 (Plaintiffs); 154-156 (Defendants); 173-186 and 235-246 (Key Provisions of HB 56); 279-284 (Comprehensive Federal Immigration System); 295-299 (Class Action Allegations); and 300-306 (Declaratory and Injunctive Relief Allegations) are repeated and incorporated as though fully set forth herein.

353.   The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides, in pertinent part, "nor shall any State deprive any person of life, liberty, or property, without due process of law."

354.   Sections 12, 18, 19, and 20 of HB 56 permit Alabama state and local law enforcement officers to deprive persons of their liberty interests without due process of law by subjecting Plaintiffs and putative class members to prolonged detention without any process, in violation of the Fourteenth Amendment Due Process Clause.

355.   Plaintiffs move for relief on this claim as an action seeking redress of

the deprivation of Constitutional rights under the color of state law, through 42

U.S.C. § 1983.

## COUNT SEVEN
## FOURTEENTH AMENDMENT DUE PROCESS (VAGUENESS)
## HB 56 §§ 10, 11, 12, 13, 30

356.   Count Seven is brought against Defendants Bentley and Strange by all

Plaintiffs except Plaintiffs Haile and Tesfamariam.

357.   Count Seven is brought against Defendant Broussard by

Organizational Plaintiffs HICA, AAC, HIHC, ITAA, Appleseed, SEIU, Joint

Board, DreamActivist, and GBM, and by Plaintiffs Jimmerson, Upton, Cummings

and Jane Doe #6.

358.   Paragraphs 5-97, and 100-153 (Plaintiffs); 154-156 (Defendants);

173-186, 188-191, 202-231, and 235-246 (Key Provisions of HB 56); 295-299

(Class Action Allegations); and 300-306 (Declaratory and Injunctive Relief

Allegations) are repeated and incorporated as though fully set forth herein.

359.   The Due Process Clause of the Fourteenth Amendment to the United

States Constitution provides, in pertinent part, "nor shall any State deprive any

person of life, liberty, or property, without due process of law."

360.   Sections 10, 12, 13, and 30 base criminal liability on the undefined

and vague term of "unlawfully present," a concept that has no single definition

under federal law, but rather is defined only for quite specific purposes that are

107

distinct from these provisions of HB 56.

361.    Section 3 of HB 56 states that a person can be considered "unlawfully present" "only if the person's unlawful immigration status has been verified by the federal government pursuant to 8 U.S.C. § 1373(c)," yet Sections 13 and 30 are criminalizing behavior by private parties who are not legally authorized to make a verification request pursuant to 8 U.S.C. § 1373(c), and who for this reason, and because immigration status is otherwise a complex legal determination not readily understood by laypersons, cannot have notice at the time they are required to conform their conduct to the law as to whether a person is "unlawfully present" within the meaning of HB 56.

362.    Section 12 further qualifies the term "unlawfully present" by adding the modifier "reasonable suspicion," which further confuses the meaning of this provision.

363.    Section 30 utilizes the term "business transaction," which is undefined.

364.    Section 11 utilizes the term "work," which is undefined.

365.    Sections 10, 11, 12, 13, 27, and 30 of HB 56 violate the Due Process Clause because these criminal provisions are impermissibly vague and overbroad.

366.    Plaintiffs move for relief on this claim as an action seeking redress of the deprivation of Constitutional rights under the color of state law, through 42

U.S.C. § 1983.

## COUNT EIGHT
## FIRST AMENDMENT FREE SPEECH CLAUSE
## HB 56 § 11

367.   Count Eight is brought by the Organizational Plaintiffs and by

Plaintiffs Romero, Jane Does ##4-5, and John Does ##5-6.

368.   Count Eight is brought against Defendants Bentley, Strange, and

Broussard.

369.   Count Eight is brought against Defendants Bentley and Strange by all

Organizational Plaintiffs and by Plaintiffs Romero, Jane Does ##4-6, and John

Does ##5-6.

370.   Count Eight is brought against Defendant Broussard by

Organizational Plaintiffs HICA, AAC, HIHC, ITAA, Appleseed, SEIU, Joint

Board, DreamActivist, and GBM, and by Plaintiff Jane Doe #6.

371.   Paragraphs 5-54, 71-72, 115-126, and 148-153 (Plaintiffs); 154-156

(Defendants); 173, 212-220 and 235-247 (Key Provisions of HB 56); 295-299

(Class Action Allegations); and 300-306 (Declaratory and Injunctive Relief

Allegations) are repeated and incorporated as though fully set forth herein.

372.   The First Amendment to the U.S. Constitution provides that

"Congress shall make no law . . . abridging the freedom of speech . . . or the right

of the people peaceably to assemble . . . ."  The First Amendment's guarantees are

applied to the States through the Fourteenth Amendment.

373.   Sections 11(a), (f), and (g) of HB 56 violate the First Amendment right to free speech because it is a content-based restriction on speech relating to work and is impermissibly vague.

374.   Plaintiffs move for relief on this claim as an action seeking redress of the deprivation of Constitutional rights under the color of state law, through 42 U.S.C. § 1983.

## COUNT NINE
## FIRST AMENDMENT PETITION CLAUSE
## HB 56 §§ 5, 6, 27, 30

375.   Count Nine is brought against Defendants Bentley and Strange by all Organizational Plaintiffs and by Plaintiffs Barber, Upton, Beck, Cummings, Jane Does ##1-2, Jane Does ##4-6, and John Does ##1-4.

376.   Count Nine is brought against Defendant Broussard by Organizational Plaintiffs HICA, AAC, HIHC, ITAA, Appleseed, SEIU, Joint Board, DreamActivist, and GBM, and by Plaintiffs Upton, Cummings and Jane Doe #6.

377.   Paragraphs 5-54, 81-97, 100-110, and 115-147 (Plaintiffs); 154-156 (Defendants); 173, 221-231 and 235-247 (Key Provisions of HB 56); 295-299 (Class Action Allegations); and 300-306 (Declaratory and Injunctive Relief Allegations) are repeated and incorporated as though fully set forth herein.

378.   The First Amendment to the U.S. Constitution provides that

"Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  The First Amendment's guarantees are applied to the States through the Fourteenth Amendment.

379.   Section 27 of HB 56 violates the Petition Clause of the First Amendment by depriving Plaintiffs and putative class members the right to petition the government through court actions for redress of contract disputes.

380.   Section 30 of HB 56 violates the Petition Clause of the First Amendment by depriving Plaintiffs and putative class members the right to petition the government through any business transaction.

381.   Sections 5 and 6 of HB 56 violate the Petition Clause of the First Amendment by depriving Plaintiffs and putative class members the right to petition the government by mandating state officials, including officers of the court, to fully enforce federal immigration laws and HB 56.

382.   Plaintiffs move for relief on this claim as an action seeking redress of the deprivation of Constitutional rights under the color of state law, through 42 U.S.C. § 1983.

**COUNT TEN**
**CONTRACTS CLAUSE**
**HB 56 §§ 27, 30**

383.   Count Ten is brought against Defendants Bentley and Strange by all

Organizational Plaintiffs and by Plaintiffs Barber, Upton, Beck, Cummings, Jane

Does ##1-2, Jane Does ##4-6, and by John Does ##1-4.

384.   Count Ten is brought against Defendant Broussard by Organizational

Plaintiffs HICA, AAC, HIHC, ITAA, Appleseed, SEIU, Joint Board,

DreamActivist, and GBM, and by Plaintiffs Upton, Cummings and Jane Doe #6.

385.   Paragraphs 5-54, 81-97, 100-110, 115-147 (Plaintiffs); 154-156

(Defendants); 173, 221-231 and 235-247 (Key Provisions of HB 56); 295-299

(Class Action Allegations); and 300-306 (Declaratory and Injunctive Relief

Allegations) are repeated and incorporated as though fully set forth herein.

386.   The Contracts Clause, Article I, Section 10 of the U.S. Constitution,

provides, in pertinent part, that "No State shall . . .  pass any . . . Law impairing the

Obligation of Contracts."

387.   Section 27 of HB 56 unconstitutionally impairs the obligation of

contracts by forbidding courts of the State of Alabama from enforcing "the terms,

or otherwise regard as valid, any contract between a party and alien unlawfully

present in the United States, within the meaning of HB 56, if the party had direct or

constructive knowledge that the alien was unlawfully present in the United States

at the time the contract was entered into, and the performance of the contract

required the alien to remain unlawfully present in the United States for more than

24 hours after the time the contract was entered into or performance could not

reasonably be expected to occur without such remaining."

388.    Section 30 of HB 56 unconstitutionally impairs the obligation of

contracts by criminalizing the act of "enter[ing] into or attempt[ing] to enter into a

business transaction with the state or a political subdivision of the state . . . ."

389.    Plaintiffs move for relief on this claim as an action seeking redress of

the deprivation of Constitutional rights under the color of state law, through 42

U.S.C. § 1983.

**COUNT ELEVEN**
**42 U.S.C. § 1981**
**HB 56 §§ 27, 30**

390.    Count Eleven is brought against Defendants Bentley and Strange by

all Organizational Plaintiffs and by Plaintiffs Barber, Upton, Beck, Cummings,

Jane Does ##1, 2, 4, 5, 6, and John Does ##1-4.

391.    Count One is brought against Defendant Broussard by Organizational

Plaintiffs HICA, AAC, HIHC, ITAA, Appleseed, SEIU, Joint Board,

DreamActivist, and GBM, and by Plaintiffs Upton, Cummings and Jane Doe #6.

392.    Paragraphs 5-54, 81-97, 100-110, and 115-147 (Plaintiffs); 154-156

(Defendants); 173, 221-231 and 235-247 (Key Provisions of HB 56); 295-299

(Class Action Allegations); and 300-306 (Declaratory and Injunctive Relief

Allegations) are repeated and incorporated as though fully set forth herein.

393.    Section 1981 of Title 42 of the United States Codes provides, in

113

pertinent part:

(a) Statement of equal rights
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
(b) "Make and enforce contracts" defined
For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

394.   Sections 27 and 30 of HB 56 deprives Plaintiffs and putative class members classified by Alabama officers and officials as "alien[s] unlawfully present in the United States" of the rights enumerated in 42 U.S.C. § 1981.

395.   Plaintiffs move for relief on this claim as an action seeking redress of the deprivation of statutory rights under the color of state law, through 42 U.S.C. § 1983.

## COUNT TWELVE
## SIXTH AMENDMENT CONFRONTATION CLAUSE
## HB 56 §§ 10, 11, 13

396.   Count Twelve is brought against Defendants Bentley and Strange by all Organizational Plaintiffs and by Plaintiffs Webster, Long, Romero Thau, Jimmerson, Barber, Upton, Beck, Cummings, Jane Does ##1-6, and John Does ##1-6.

397.   Count Twelve is brought against Defendant Broussard by Organizational Plaintiffs HICA, AAC, HIHC, ITAA, Appleseed, SEIU, Joint Board, DreamActivist, and GBM, and by Plaintiffs Jimmerson, Upton, Cummings and Jane Doe #6.

398.   Paragraphs 5-54, 55-60, 65-97, and 100-153 (Plaintiffs); 154-156 (Defendants); 173, 232-247 (Key Provisions of HB 56); 295-299 (Class Action Allegations); and 300-306 (Declaratory and Injunctive Relief Allegations) are repeated and incorporated as though fully set forth herein.

399.   The Confrontation Clause, U.S. Const. amend. VI, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."

400.   HB 56 creates new state crimes that contain as a central element the determination of a person's immigration status.

401.   Sections 10, 11, and 13 require that immigration status be determined by one exclusive means only:  a verification from the federal government.  HB 56 explicitly prohibits consideration of any other evidence on this element.

402.   Sections 10, 11, and 13 violate the Confrontation Clause because the defendant is prohibited from confronting the witness who prepared the federal government verification, and the state court is prohibited from considering any evidence except for the federal government verification.

403.   Plaintiffs move for relief on this claim as an action seeking redress of the deprivation of Constitutional rights under the color of state law, through 42 U.S.C. § 1983.

## COUNT THIRTEEN
## SIXTH AMENDMENT COMPULSORY PROCESS CLAUSE
## HB 56 §§ 10, 11, 13

404.   Count Thirteen is brought against Defendants Bentley and Strange by all Organizational Plaintiffs and by Plaintiffs Webster, Long, Romero Thau, Jimmerson, Barber, Upton, Beck, Cummings, Jane Does ##1-6, and John Does ##1-6.

405.   Count Thirteen is brought against Defendant  Broussard by Organizational Plaintiffs HICA, AAC, HIHC, ITAA, Appleseed, SEIU, Joint Board, DreamActivist, and GBM, and by Plaintiffs Jimmerson, Upton, Cummings and Jane Doe #6.

406.   Paragraphs 5-54, 55-60, 65-97, and 100-153 (Plaintiffs); 154-156 (Defendants); 173, 232-247 (Key Provisions of HB 56); 295-299 (Class Action Allegations); and 300-306 (Declaratory and Injunctive Relief Allegations) are repeated and incorporated as though fully set forth herein.

407.   The Compulsory Process Clause, U.S. Const. amend. VI, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor."

408.   Sections 10, 11, and 13 of HB 56 violate the Compulsory Process Clause because the defendant is prohibited from presenting a defense on the issue of whether he or she possesses lawful immigration status.

409.   Plaintiffs move for relief on this claim as an action seeking redress of the deprivation of Constitutional rights under the color of state law, through 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing facts and arguments, Plaintiffs request that the Court:

a.  Assume jurisdiction over this matter;

b.  Declare that HB 56 is unconstitutional in its entirety as a regulation of immigration and that Sections 5, 6, 8, 10, 11, 12, 13, 15, 17, 18, 19, 20, 27, 28, 29, and 30 unconstitutionally conflict with federal law;

c.  Declare that Sections 12, 18, 19, and 20 violate the Fourth Amendment;

d.  Declare that Sections 8, 10, and 28 violate the Equal Protection Clause;

e.  Declare that Sections 10, 11, 12, 13, 18, 19, 20, and 30 violate the Due Process Clause;

f.  Declare that Sections 5, 6, 11, 27, and 30 violate the First Amendment;

g.  Declare that Sections 27 and 30 violate the Contracts Clause;

h.  Declare that Sections 27 and 30 violate 42 U.S.C. § 1981;

i.   Declare that Sections 10, 11, and 13 violate the Sixth Amendment;

j.   Enjoin Defendants from enforcing HB 56;

k.   Grant Plaintiffs' costs of suit, and reasonable attorneys' fees and other

expenses pursuant to 28 U.S.C. § 1988; and

l.   Grant such other relief as the Court may deem appropriate.

Dated:  September 16, 2011                    Respectfully submitted,

                                              s/ Samuel Brooke

                                              *On behalf of Attorneys for Plaintiffs*

Mary Bauer (ASB-1181-R76B)              Andre Segura*
Andrew H. Turner (ASB-8682-W84T)        Elora Mukherjee*
Samuel Brooke (ASB-1172-L60B)           Omar C. Jadwat*
SOUTHERN POVERTY LAW                    Lee Gelernt*
CENTER                                  Michael K. T. Tan*
400 Washington Ave.                     AMERICAN CIVIL LIBERTIES
Montgomery, Alabama 36104               UNION FOUNDATION
T: (404) 956-8200                       125 Broad Street, 18th Floor
*mary.bauer@splcenter.org*              New York, New York 10004
*andrew.turner@splcenter.org*           T: (212) 549-2660
*samuel.brooke@splcenter.org*           *asegura@aclu.org*
                                        *ojadwat@aclu.org*
Cecilia D. Wang*                        *lgelernt@aclu.org*
Katherine Desormeau*                    *mtan@aclu.org*
Kenneth J. Sugarman*                    *emukherjee@aclu.org*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION                        Linton Joaquin*
IMMIGRANTS' RIGHTS PROJECT              Karen C. Tumlin*
39 Drumm Street                         Shiu-Ming Cheer*
San Francisco, California 94111         Melissa S. Keaney*
T: (415) 343-0775                       NATIONAL IMMIGRATION LAW
*cwang@aclu.org*                        CENTER
*kdesormeau@aclu.org*                   3435 Wilshire Boulevard, Suite 2850
*irp_ks@aclu.org*                       Los Angeles, California 90010

Michelle R. Lapointe *
Naomi Tsu *
Daniel Werner *
SOUTHERN POVERTY LAW
CENTER
233 Peachtree St., NE, Suite 2150
Atlanta, Georgia  30303
T: (404) 521-6700
*naomi.tsu@splcenter.org*
*michelle.lapointe@splcenter.org*
*daniel.werner@splcenter.org*

Sin Yen Ling*
ASIAN LAW CAUCUS
55 Columbus Avenue
San Francisco, California 94111
T: (415) 896-1701 x 110
*sinyenL@asianlawcaucus.org*

Erin E. Oshiro*
ASIAN AMERICAN JUSTICE
CENTER, MEMBER OF THE ASIAN
AMERICAN CENTER FOR
ADVANCING JUSTICE
1140 Connecticut Ave., NW
Suite 1200
Washington, DC 20036
T: (202) 296-2300
*eoshiro@advancingequality.org*

Foster S. Maer*
Ghita Schwarz*
Diana S. Sen*
LATINOJUSTICE PRLDEF
99 Hudson St., 14th Floor
New York, New York 10013
T: (212) 219-3360
*fmaer@latinojustice.org*
*gschwarz@latinojustice.org*

T: (213) 639-3900
*joaquin@nilc.org*
*tumlin@nilc.org*
*cheer@nilc.org*
*keaney@nilc.org*

Tanya Broder*
NATIONAL IMMIGRATION LAW
CENTER
405 14th Street, Suite 1400
Oakland, California 94612
T: (510) 663-8282
*broder@nilc.org*

Ben Bruner (ASB-BRU-001)
THE BRUNER LAW FIRM
1904 Berryhill Road
Montgomery, Alabama 36117
T: (334) 201 0835
*brunerlawfirm@gmail.com*

Freddy Rubio (ASB-5403-D62R)
Cooperating Attorney, ACLU of
Alabama Foundation
Rubio Law Firm, P.C.
438 Carr Avenue, Suite 1
Birmingham, Alabama 35209
T: 205-443-7858
*frubio@rubiofirm.com*

Herman Watson, Jr. (ASB-6781-O74H)
Eric J. Artrip (ASB-9673-I68E)
Rebekah Keith McKinney (ASB-3137-
T64J)
Watson, McKinney & Artrip, LLP
203 Greene Street
P.O. Box 18368
Huntsville, Alabama 35804
T: (256) 536-7423
*watson@watsonmckinney.com*

dsen@latinojustice.org

G. Brian Spears*
1126 Ponce de Leon Ave., N.E.
Atlanta, Georgia 30306
T: (404) 872-7086
bspears@mindspring.com

Chris Newman*
Jessica Karp*
NATIONAL DAY LABORER
ORGANIZING NETWORK
675 S. park View St., Suite B
Los Angeles, California 90057
T: (213) 380-2785
newman@ndlon.org
jkarp@ndlon.org


Allison Neal (ASB 3377-I72N)
AMERICAN CIVIL LIBERTIES
UNION OF ALABAMA
FOUNDATION
207 Montgomery St., Suite 910
Montgomery, Alabama  36104
T: (334) 265-2754 x 203
aneal@aclualabama.org

mckinney@watsonmckinney.com
artrip@watsonmckinney.com

Victor Viramontes*
Martha L. Gomez*
MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL
FUND
634 S. Spring Street, 11th Floor
Los Angeles, California 90014
T: (213) 629-2512 x 133
vviramontes@maldef.org
mgomez@maldef.org

Nina Perales*
MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL
FUND
110 Broadway, Suite 300
San Antonio, Texas 78205
T: (210) 224-55476 x 206
nperales@maldef.org

Amy Pedersen*
MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL
FUND
1016 16th Street NW, Suite 100
Washington, DC 20036
T: (202) 293-2828 x 12
apedersen@maldef.org

* admitted *pro hac vice*.

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

  s/ Samuel Brooke