# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| HISPANIC INTEREST COALITION OF ALABAMA, *et al.* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case Number 5:11-CV-2484-SLB** |
| | ) | |
| ROBERT BENTLEY, in his official capacity as Governor of the State of Alabama; *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on plaintiffs' Motion for Preliminary

Injunction.  (Doc. 37.)[1]  Plaintiffs[2] have sued defendants,[3] alleging that the Beason-Hammon

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

[2]Plaintiffs are (1) Hispanic Interest Coalition of Alabama; (2) AIDS Action Coalition; (3) Huntsville International Help Center; (4) Interpreters and Translators Association of Alabama; (5) Alabama Appleseed Center for Law & Justice, Inc.; (6) Service Employees International Union; (7) Southern Regional Joint Board of Workers United; (8) United Food and Commercial Workers International Union; (9) United Food and Commercial Workers Union Local 1657; (10) DreamActivist.org; (11) Greater Birmingham Ministries; (12) Boat People SOS; (13) Matt Webster;  (14) Maria D. Ceja Zamora; (15) Pamela Long; (16) Juan Pablo Black Romero; (17) Christopher Barton Thau; (18) Ellin Jimmerson; (19) Robert Barber; (20) Daniel Upton; (21) Jeffrey Allen Beck; (22) Michelle Cummings; (23) Esayas Haile; (24) Fiseha Tesfamariam; (25) Jane Doe #1; (26) Jane Doe #2; (27) Jane Doe #3; (28) Jane Doe #4; (29) Jane Doe #5; (30) Jane Doe #6; (31) John Doe #1, a minor, by his legal guardian Matt Webster; (32) John Doe #2; (33) John Doe #3; (34) John Doe #4; (35) John Doe #5; and (36) John Doe #6.

[3]The plaintiffs have sued Robert Bentley, in his official capacity as Governor of the State of Alabama and Luther Strange, in his official capacity as Attorney General of the State

Alabama Taxpayer and Citizen Protection Act, Act No. 2011-535, [hereinafter "H.B. 56"],

is unconstitutional and is preempted by federal immigration law.  They seek a court order

enjoining defendants from enforcing H.B. 56.  As discussed more fully below, "[a]

preliminary injunction is an extraordinary and drastic remedy." *Ne. Fla. Chapter of the*

*Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Florida,* 896 F.2d 1283, 1285 (11th

Cir. 1990) (citations omitted).  Moreover, as the Eleventh Circuit has noted

> When a federal court before trial enjoins the enforcement of a municipal
> ordinance adopted by a duly elected [Legislature], the court overrules the
> decision of the elected representatives of the people and, thus, in a sense
> interferes with the processes of democratic government. Such a step can
> occasionally be justified by the Constitution (itself the highest product of
> democratic processes). Still, ***preliminary injunctions of legislative enactments
> – because they interfere with the democratic process and lack the
> safeguards against abuse or error that come with a full trial on the merits –
> must be granted reluctantly and only upon a clear showing that the
> injunction before trial is definitely demanded by the Constitution and by the
> other strict legal and equitable principles that restrain courts.***

*Id.* (emphasis added).

---

of Alabama.  They also named as defendants Joseph B. Morton, State Superintendent of
Education and Freida Hill, Chancellor of Postsecondary Education, as well as six school
superintendents:  E. Casey Wardynski, Superintendent of the Huntsville City School System;
Jamie Blair, Superintendent of the Vestavia Hills City School System; Randy Fuller,
Superintendent of the Shelby County Public School System; Charles D. Warren,
Superintendent of the DeKalb County Public School System; Barbara W. Thompson,
Superintendent of the Montgomery County Public School System; and Jeffery E. Langham,
Superintendent of the Elmore County Public School System.  They also name Robert L.
Broussard, District Attorney for Madison County.  On September 16, 2011, plaintiffs filed
an Amended Complaint, which substituted Larry E. Cravin, in his official capacity as Interim
State Superintendent of Education, for Morton, who retired on August 31, 2011.  (Doc. 131
¶ 158 n.1.)

Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that plaintiffs' Motion for Preliminary Injunction, (doc. 37), is due to be granted in part and denied in part.

As more fully discussed below, for the reasons set forth in its Memorandum Opinion and Order in *United States v. Alabama*, Case No. 2:11-CV-2746-SLB, docs. 93, 94, the court finds (1) that Sections 10, 12(a), 18, 27, 28, and 30 of H.B. 56 are not preempted by federal law, and (2) that Sections 11(a) and 13 are preempted by federal law. Therefore, plaintiffs' Motion for Preliminary Injunction is moot as to the preemption grounds asserted for enjoining these Sections. The court finds plaintiffs' Motion for Preliminary Injunction seeking to enjoin Section 11(a) on First Amendment grounds is moot because Section 11(a) is enjoined as preempted by federal law. *United States*, docs. 93, 94. Moreover, the court finds that plaintiffs do not have standing to assert their claims against Section 28 of H.B. 56 or their claim that H.B. 56 is preempted in its entirety by federal law. Also, the court finds that plaintiffs have not shown a likelihood of success on their facial challenges to Sections 12, and 18-20 based on the Fourth Amendment; their challenges to Section 10(e), 11(e), and 13(h) based on the Confrontation Clause of the Sixth Amendment; or their challenges to Section 27 and 30 based on 42 U.S.C. § 1981. Therefore, the court will deny their Motion for Preliminary Injunction as to these Sections. However, the court finds that plaintiffs have shown their entitlement to a preliminary injunction enjoining the enforcement of Section 8 as preempted by federal immigration law; enjoining the enforcement of the last sentence of

Sections 10(e), 11(e), and 13(h) based on the Compulsory Process Clause of the Sixth Amendment; and enjoining the enforcement of Section 11 (f) and (g) based on the First Amendment.  Therefore, their Motion for a Preliminary Injunction as to these Sections or parts of Sections will be granted.

## I. <u>PRELIMINARY INJUNCTION STANDARD</u>

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."[4] *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  "A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (internal quotations and citations omitted).  "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)(internal quotations and citations omitted).  In this Circuit –

> In order to prevail on an application for a preliminary injunction, the plaintiff must clearly establish all of the following requirements:
>
> (1) . . . a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

---

[4]"It is always true, by definition, that the status quo is less restrictive than a new regulatory law.  It is always less restrictive to do **nothing** than to do **something**."  *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 684 (2004)(Breyer, J., dissenting)(emphasis in original).

*Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011)(quoting *Am. Civil Liberties Union of Fla., Inc. v. Miami–Dade County Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

## II.  BACKGROUND AND PROCEDURAL HISTORY

### A.  FEDERAL IMMIGRATION LAW

The Third Circuit in *Lozano v. City of Hazleton*, 620 F.3d 170 (3d Cir. 2010), *vacated* 131 S. Ct. 2958 (2011),[5] clearly set forth the current federal law regarding immigration and immigrants:

#### 1.  The Immigration and Nationality Act

The primary body of federal immigration law is contained in the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101–537, enacted in 1952, and amended many times thereafter.  The INA sets forth the criteria by which "aliens," defined as "any person not a citizen or a national of the United States," 8 U.S.C. § 1101(a)(3), may enter, visit, and reside in this country.

Under the INA, there are three primary categories of aliens who may lawfully enter and/or spend time within the United States:    (1)

---

[5]The Supreme Court vacated the *Lozano* judgment and remanded the case to the Third Circuit Court of Appeals for reconsideration in light of *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968 (2011).  *City of Hazleton v. Lozano,* 131 S. Ct. 2958, 2958 (2011).

"nonimmigrants," who are persons admitted for a limited purpose and for a limited amount of time, such as visitors for pleasure, students, diplomats, and temporary workers, see 8 U.S.C. § 1101(a)(15); (2) "immigrants," who are persons admitted as (or after admission, become) lawful permanent residents of the United States based on, *inter alia*, family, employment, or diversity characteristics, *see* 8 U.S.C. § 1151; and (3) "refugees" and "asylees," who are persons admitted to and permitted to stay for some time in the United States because of humanitarian concerns, *see* 8 U.S.C. §§ 1157–58.  Aliens wishing to be legally admitted into the United States must satisfy specific eligibility criteria in one of these categories, and also not be barred by other provisions of federal law that determine inadmissibility.  Congress has determined that non-citizens who, *inter alia*, have certain health conditions, have been convicted of certain crimes, present security concerns, or have been recently removed from the United States, are inadmissible, *see* 8 U.S.C. § 1182, and if detained when attempting to enter or reenter the country, may be subject to expedited removal, *see* 8 U.S.C. § 1225.

Despite the carefully designed system for lawful entry described above, persons lacking lawful immigration status are obviously still present in the United States.  As the Supreme Court explained almost thirty years ago: "[s]heer incapability or lax enforcement of the laws barring entry into this country . . . has resulted in the creation of a substantial 'shadow population' . . . within our borders." *Plyler* [*v. Doe*], 457 U.S. [202,] 218 [(1982)].  Such persons may lack lawful status because they entered the United States illegally, either by failing to register with immigration authorities or by failing to disclose information that would have rendered them inadmissible when they entered.  *See* 8 U.S.C. § 1227.  In addition, aliens who entered legally may thereafter lose lawful status, either by failing to adhere to a condition of admission, or by committing prohibited acts (such as certain criminal offenses) after being admitted.  *See id*.

Persons here unlawfully are subject to removal from the country. Removal proceedings are initiated at the discretion of the Department of Homeland Security ("DHS").  [footnote]  *See Juarez v. Holder*, 599 F.3d 560, 566 (7th Cir. 2010)("[T]he decision when to initiate removal proceedings is committed to the discretion of immigration authorities." (citing *Reno v. Am.-Arab Anti–Discrimination Comm.*, 525 U.S. 471, 489 (1999))).  Although certain aliens are subject to more expedited removal proceedings, for all others, section 240 of the INA sets forth the "sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the

alien has been so admitted, removed from the United States."  8 U.S.C. § 1229a(a)(3).

> [Footnote:]  Prior to 2003, the Immigration and Naturalization Service ("INS"), which operated under the Department of Justice, administrated both immigration services and immigration enforcement.  On March 1, 2003, Congress abolished the INS.  Pursuant to the Homeland Security Act of 2002, Pub.L. No. 107–296, 116 Stat. 2135, that agency's functions were transferred to three separate agencies within the newly created Department of Homeland Security:  U.S. Citizenship and Immigration Services ("USCIS"), which performs immigration and naturalization services, U.S. Immigration and Customs Enforcement ("ICE"), which enforces federal immigration and customs laws, and U.S. Customs and Border Protection ("CBP"), which monitors and secures the country's borders.  Older documents may continue to refer to the pre–2003 administrative structure, and citations to them should be understood in that context.

Under section 240, an alien facing removal is entitled to a hearing before an immigration judge and is provided numerous procedural protections during that hearing, including notice, the opportunity to present and examine evidence, and the opportunity to be represented by counsel (at the alien's expense).  *See* 8 U.S.C. § 1229a.  At the conclusion of a removal hearing, the presiding immigration judge must decide, based on the evidence produced during the hearing, whether the alien is removable, *see* 8 U.S.C. § 1229a(c)(1)(A), and if so, whether s/he should be ordered removed, or should be afforded relief from removal.  Such relief can include postponement of removal, cancellation of removal, or even adjustment of status to that of lawful permanent resident.  *See* 8 U.S.C. §§ 1229a(c)(4), 1229b.

In sum, while any alien who is in the United States unlawfully faces the prospect of removal proceedings being initiated against her/him, whether s/he will actually be ordered removed is never a certainty until all legal proceedings have concluded.  Moreover, even after an order of removal issues, the possibility remains that no country will accept the alien.  Under such circumstances, the Constitution limits the government's authority to detain someone in anticipation of removal if there is no significant likelihood of removal in the reasonably foreseeable future.  *See Zadvydas v. Davis*, 533 U.S. 678, 699 (2001).

The INA, as amended, also prohibits the "harboring" of aliens lacking lawful immigration status. It provides that any person who "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection . . . such alien in any place, including any building or any means or transportation" shall be subject to criminal penalties. 8 U.S.C. § 1324(a)(1)(A)(iii).

For decades, the INA contained no specific prohibition against the employment of aliens lacking legal status. Rather, regulation of the employment of aliens not lawfully present was at most a "peripheral concern." *DeCanas v. Bica*, 424 U.S. 351, 360 (1976). This changed in 1986, when Congress amended the INA through enactment of the Immigration Reform and Control Act ("IRCA"), Pub.L. No. 99–603, 100 Stat. 3359 (codified at 8 U.S.C. §§ 1324a–1324b). IRCA "forcefully made combating the employment of illegal aliens central to the policy of immigration law." *Hoffman Plastic Compounds, Inc. v. National Labor Relations Board*, 535 U.S. 137, 147(2002) (internal quotation marks and alterations omitted).

## 2.  The Immigration Reform and Control Act

IRCA regulates the employment of "unauthorized aliens," a term of art defined by the statute as those aliens neither "lawfully admitted for permanent residence" nor "authorized to be . . . employed by this chapter or by the Attorney General." 8 U.S.C. § 1324a(h)(3). IRCA makes it unlawful to knowingly hire or continue to employ an unauthorized alien, or to hire anyone for employment without complying with the work authorization verification system created by the statute. 8 U.S.C. § 1324a(a)(1)-(2). This verification system, often referred to as the "I–9 process," requires that an employer examine certain documents that establish both identity and employment authorization for new employees. *See* 8 U.S.C. § 1324a(b). The employer must then fill out an I–9 form attesting that s/he reviewed these documents, that they reasonably appear to be genuine, and that to the best of the employer's knowledge, the employee is authorized to work in the United States. *See id*. Although employers are required to verify the work authorization of all ***employees***, Congress did not extend this requirement to independent contractors. *See* 8 U.S.C. § 1324a(a)(1)(making unlawful the knowing "employment" of an unauthorized alien, and the hiring of an employee for "employment" without verifying the employee's work authorization); 8 C.F.R. § 274a.1(f)(specifically excluding "independent

contractors" from the definition of "employee"); 8 C.F.R. § 274a.1(g) (specifically excluding a "person or entity using . . . contract labor" from the definition of "employer").

The I–9 "verification system is critical to the IRCA regime." *Hoffman Plastic Compounds*, 535 U.S. at 147–48. Not only is failure to use the system illegal, but use of the system provides an affirmative defense to a charge of knowingly employing an unauthorized alien. *See* 8 U.S.C. § 1324(a)(3). Thus, employers who use the I–9 process in good faith to verify the work authorization of employees are presumed not to have knowingly employed someone unauthorized to work in this country. In enacting IRCA, Congress required the President to monitor the security and efficacy of this verification system. *See* 8 U.S.C. § 1324a(d). Congress also imposed limits on the President's ability to change it. *Id*.

In addition to relying on the I–9 verification system, IRCA uses public monitoring, prosecution, and sanctions to deter employment of unauthorized aliens. IRCA provides for the creation of procedures through which members of the public may file complaints about potential violations; it authorizes immigration officers to investigate these complaints; and it creates a comprehensive hearing and appeals process through which complaints are evaluated and adjudicated by administrative law judges. *See* 8 U.S.C. § 1324a(e)(1)-(3).

Under IRCA, an employer who knowingly hires an unauthorized alien shall be ordered to cease and desist the violation, and to pay between $250 and $2000 per unauthorized alien for a first offense, between $2000 and $5000 per unauthorized alien for a second offense, and between $3000 and $10,000 per unauthorized alien for a third or greater offense. 8 U.S.C. § 1324a(e)(4). An employer who fails to verify the work authorization of its employees can be ordered to pay between $100 and $1000 for each person whose authorization it failed to authenticate. 8 U.S.C. § 1324a(e)(5). Employers who engage in a "pattern or practice" of hiring unauthorized aliens shall be fined up to $3000 per unauthorized alien, imprisoned for not more than six months, or both. 8 U.S.C. § 1324a(f)(1).

IRCA expressly pre-empts states and localities from imposing additional "civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." 8 U.S.C. § 1324a(h)(2).

Because of its concern that prohibiting the employment of unauthorized aliens might result in employment discrimination against authorized workers who appear to be foreign, Congress included significant anti-discrimination protections in IRCA. *See* 8 U.S.C. § 1324b. [Footnote] The statute provides that, with certain limited exceptions, it is an "unfair immigration-related employment practice" to discriminate in hiring on the basis of national origin or citizenship status. 8 U.S.C. § 1324b(a)(1). Congress put teeth into this provision by creating the office of a "Special Counsel" to investigate and prosecute such offenses, and it required that the President fill that position "with the advice and consent of the Senate." 8 U.S.C. § 1324b(c). Congress also authorized immigration judges to punish those who violate IRCA's anti-discrimination mandate by imposing civil fines equivalent in amount to those imposed for knowingly hiring unauthorized aliens. *Compare* 8 U.S.C. § 1324a(e)(4)(A)(i)-(iii) *with* 8 U.S.C. § 1324b(g)(2)(B)(iv)(I)-(III).

[Footnote:]  8 U.S.C. § 1324b provides in relevant part that:

> [with certain limited exceptions, it] is an unfair immigration-related employment practice for a person or other entity to discriminate against any individual (other than an unauthorized alien, as defined in section 1324a(h)(3) of this title) with respect to the hiring, or recruitment or referral for a fee, of the individual for employment or the discharging of the individual from employment – (A) because of such individual's national origin, or (B) in the case of a protected individual . . . because of such individual's citizenship status.

8 U.S.C. § 1324b(a).  Any person adversely-affected by an unfair immigration-related employment practice "may file a charge respecting such practice or violation."  8 U.S.C. § 1324b(b)(1).

### 3. The Illegal Immigration Reform and Immigrant Responsibility Act

In 1996, Congress again amended the INA by enacting the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (codified as amended in various sections of 8 U.S.C.).  In IIRIRA, Congress directed the Attorney General, and later the

Secretary of Homeland Security, to conduct three "pilot programs of employment eligibility confirmation" in an attempt to improve upon the I-9 process. IIRIRA § 401(a), 110 Stat. 3009-655. Congress mandated that these programs be conducted on a trial basis, for a limited time period, and in a limited number of states. *See* IIRIRA § 401(b)-(c), 110 Stat. 3009-655-66. Two of these trial systems were discontinued in 2003. However, the third – originally known as the "Basic Pilot Program" but since renamed "E-Verify" – was reauthorized and expanded to all fifty states in 2003. *See* Basic Pilot Program Extension and Expansion Act of 2003, Pub.L. No. 108-156, §§ 2, 3, 117 Stat. 1944. It has been reauthorized several times since, and its current authorization will expire, absent congressional action, on September 30, 2012. *See* Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83, § 547, 123 Stat. 2177; Consolidated Security, Disaster Assistance, and Continuing Appropriations Act, 2009, Pub. L. No. 110-329, Div. A, § 143, 122 Stat. 3580.

E-Verify allows an employer to actually authenticate applicable documents rather than merely visually scan them for genuineness. When using E-Verify, an employer enters information from an employee's documents into an internet-based computer program, and that information is then transmitted to the Social Security Administration and/or DHS for authentication. *See* IIRIRA, as amended, § 403(a)(3). These agencies confirm or tentatively nonconfirm whether the employee's documents are authentic, and whether the employee is authorized to work in the United States. *See* IIRIRA, as amended, § 403(a)(4). If a tentative nonconfirmation is issued, the employer must notify the employee, who may contest the result. *See id.* If an employee does not contest the tentative result within the statutorily prescribed period, the tentative nonconfirmation becomes a final nonconfirmation. *See id.* If the employee does contest it, the appropriate agencies undertake additional review and ultimately issue a final decision. *See id.* An employer may not take any adverse action against an employee until it receives a final nonconfirmation. *See id.* However, once a final nonconfirmation is received, an employer is expected to terminate the employee, or face sanctions.

With only a few exceptions, federal law makes the decision of whether to use E-Verify rather than the default I-9 process entirely voluntary. *See* IIRIRA, as amended, § 402(a). Federal government employers and certain employers previously found guilty of violating IRCA are currently required to use E-Verify; all other employers remain free to use the system of their choice. *See* IIRIRA, as amended, § 402(e). Significantly, in enacting IIRIRA,

11

Congress specifically prohibited the Secretary of Homeland Security from requiring "any person or other entity to participate in [E-Verify]." *See* IIRIRA, as amended, § 402(a). Congress also directed the Secretary to publicize the "voluntary nature" of the program and to ensure that government representatives are available to "inform persons and other entities that seek information about [E-Verify] of [its] voluntary nature." IIRIRA, as amended, § 402(d).

Those employers who elect to use E-Verify and actually do use the system to confirm an employee's authorization to work are entitled to a rebuttable presumption that they did not hire that employee knowing that s/he lacks authorization to work in this country. *See* IIRIRA, as amended, § 402(b)(1). Employers who elect to use E-Verify, but in practice continue to use the I-9 process, are not entitled to the E-Verify rebuttable presumption, but can still claim the I-9 affirmative defense. *See* IIRIRA, as amended, § 402(b)(2).

*Lozano*, 620 F.3d at 196-201 and nn. 21, 24 (emphasis in original; footnotes omitted except where other indicated; parallel Supreme Court citations omitted).

## B. PLAINTIFFS' COMPLAINT

Plaintiffs filed this action against defendants seeking a court order declaring H.B. 56 unconstitutional and requesting that its enforcement be permanently enjoined. Count One of their Complaint alleges, "HB 56 is void in its entirety because it is a regulation of immigration, and therefore usurps powers constitutionally vested in the federal government exclusively." (Doc. 1 ¶ 340.)[6] Also, they allege that H.B. 56 "conflicts with federal laws,

[6]In response to defendants' Motion for a More Definite Statement, (doc. 36), the court ordered plaintiffs to file an Amended Complaint, (doc. 129). Plaintiffs filed their First Amended Complaint on September 16, 2011. (*See* doc. 131.) However, for purposes of deciding plaintiffs' Motion for Preliminary Injunction, (doc. 37), the court will refer to plaintiffs' original Complaint, (doc. 1).

regulations and policies, attempts to legislate in fields occupied by the federal government, imposes  burdens and penalties on legal residents not authorized by and contrary to federal law, and unilaterally imposes burdens on the federal government's resources and processes . . . in violation of the Supremacy Clause." (*Id*. ¶ 341.)

In Count Two of the Complaint plaintiffs allege that H.B. 56 violates the Fourth Amendment  because it "requires officers to seize, detain, and arrest individuals without reasonable suspicion or probable cause to believe a person has engaged in criminal activity in violation of the Fourth Amendment." (*Id*. ¶ 345.)  According to plaintiffs, this Count challenges Sections 12, 18, 19, and 20 of H.B. 56.  (Doc. 104-1 at 5.)[7]

Count Three of the Complaint alleges violations of the Equal Protection Clause of the Fourteenth Amendment.  Plaintiffs contend:

> 349.  HB 56 impermissibly discriminates against non-citizens on the basis of alienage and against various classes of non-citizens on the basis of immigration status and deprives them of the equal protection of the laws within the meaning of the Fourteenth Amendment to the U.S. Constitution.

> 350.  HB 56 authorizes impermissible discrimination by Alabama state and local officers and officials on the basis of race, ethnicity, alienage, national origin, and language.

(Doc. 1 ¶¶ 349-50.)  Plaintiffs contend that Count Three challenges Sections 8, 10, 12, and 28.  (Doc. 104-1 at 5.)

---

[7]References to page numbers in this Memorandum Opinion refer to the page numbers assigned to the document by the court's electronic filing system.

13

Count Four contains claims that H.B. 56 violates plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment – as depriving plaintiffs of their right to procedural due process and as unconstitutionally vague and overbroad.  (Doc. 1 ¶¶ 354-56.) Plaintiffs contend that Count Four challenges Sections 12, 18, 19, and 20 on procedural due process grounds and Sections 10, 12, 13, and 30 on vagueness grounds.  (Doc. 104-1 at 6.)

Count Five alleges that H.B. 56 violates the plaintiffs' First Amendment rights to free speech and to petition the government.  They allege:

> 360.  Section 11 of HB 56 violates the First Amendment right to free speech because it is a content-based restriction on speech relating to work and is impermissibly vague.

> 361.  HB 56 violates the Petition Clause of the First Amendment by depriving persons in Alabama of the right to petition the government through court actions for redress of contract disputes and by prohibiting state officials and agencies from exercising discretion not to engage in immigration enforcement to the fullest extent of the law.

(Doc. 1 ¶¶ 360-61.)  Plaintiffs contend that Count Five challenges Sections 5, 6, 27, and 30 as violating their right to petition and Section 11 as violating their right to free speech.  (Doc. 104-1 at 6.)

In Count Six, plaintiffs allege:

> Section 27 of HB 56 unconstitutionally impairs the obligation of contracts by forbidding courts of the State of Alabama from enforcing "the terms, or otherwise regard as valid, any contract between a party and alien unlawfully present in the United States, within the meaning of HB 56, if the party had direct or constructive knowledge that the alien was unlawfully present in the United States at the time the contract was entered into, and the performance of the contract required the alien to remain unlawfully present in the United States for more than 24 hours after the time the contract was

14

entered into or performance could not reasonably be expected to occur without such remaining.

(Doc. 1 ¶ 365.)

Counts Seven and Eight allege violations of the Sixth Amendment.  Count Seven alleges H.B. 56 violates the Confrontation Clause of the Sixth Amendment by prohibiting defendants in criminal cases under the Act "from confronting the witness who prepared the federal government verification, and the state court is prohibited from considering any evidence except for the federal government verification" as evidence of immigration status, a "central element" of the crime.  (*Id*. ¶¶ 369-71.)  Plaintiffs allege in Count Eight that H.B. 56 violates the Compulsory Process Clause of the Sixth Amendment because "the [criminal] defendant is prohibited from presenting a defense on the issue of whether he or she possesses lawful immigration status." (*Id*. ¶ 375.)  Plaintiffs contend that Counts Seven and Eight raise challenges to Sections 10, 11, and 13.  (Doc. 104-1 at 7-8.)

Count Nine alleges that H.B. 56 violates 42 U.S.C. § 1981 because it "deprives persons classified by Alabama officers and officials as 'alien[s] unlawfully present in the United States' of the rights enumerated in 42 U.S.C. § 1981" to make and enforce contracts. (Doc. 1 ¶¶ 378-79.)  Plaintiffs contend that Count Nine challenges Sections 27 and 30.  (Doc. 104-1 at 8.)

Plaintiffs seek certification of a class consisting of persons:

(a) who are or will be subject to detention, arrest, or interrogation about their citizenship or immigration status pursuant to the provisions of HB 56; or

15

(b)  who are or will be subject to unlawful detention pursuant to the provisions of HB 56; or

(c) who are or will be deterred from living, associating, or traveling with immigrants in Alabama because of the provisions of HB 56; or

(d)  who are or will be excluded from state colleges or universities because of the provisions of HB 56; or

(e) who are or will be deterred from enrolling their children in public elementary or secondary school because of the provisions of HB 56; or

(f) who are or will be deterred from securing governmental services or governmental licenses or contracting with governmental agencies because of the provisions of HB 56; or

(g)  who are or will be chilled from soliciting or speaking about work because of the provisions of HB 56; or

(h) who are or will be chilled from petitioning the government because of the provisions of HB 56; or

(i)  who are or will be impaired from enforcing the rights guaranteed to them by 42 U.S.C. 1981 because of the provisions of HB 56; or

(j) who as a result of the criminal sections of HB 56 will be charged with a crime and will be impaired from receiving a fair criminal trial on the central element of immigration status because (i) the government will not be required to prove the element of immigration status beyond a reasonable doubt; (ii) the defendant will not be able to confront witnesses against him or her on the element of immigration status; and (iii) the defendant will not be able to introduce evidence in support of himself or herself on the element of immigration status.

(Doc. 1 ¶ 318.)

## C.  PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs ask the court to "enjoin[ ] Defendants from enforcing [H.B. 56]," because the Act "is a blatantly unconstitutional state law that regulates immigration and will require Alabama state and local officers to violate core constitutional rights."  (Doc. 37 at 10.) They contend, "The requested injunction is urgently needed to prevent this unconstitutional law from causing irreparable injury to Plaintiffs and countless other individuals."  (*Id*.)

As grounds for their requested injunction, plaintiffs allege that they are likely to succeed on the merits of their claims because:

> 1.  H.B. 56 and/or certain sections therein are preempted by federal immigration law and/or § 1981;
>
> 2.  Sections 12 and 18-20 of H.B. 56 violate the Fourth Amendment;
>
> 3.  Sections 8 and 28 violate the Equal Protection Clause of the Fourteenth Amendment;
>
> 4.  Section 11 violates the First Amendment's protection of free expression; and
>
> 5.  Sections 10(e), 11(e), and 13(h) violate the Confrontation Clause and the Compulsory Process Clause of the Sixth Amendment.

(*See generally* doc. 37.)

Plaintiffs also contend that they will suffer irreparable injury if H.B. 56 is enforced, that the balance of equities favors an injunction, and that an injunction will serve the public's interest.  (*Id*. at 70, 77, 78.)

Defendants oppose the plaintiffs' Motion for Preliminary Injunction on every front.

17

## III.  DISCUSSION

### A.  H.B. 56 IN ITS ENTIRETY

Plaintiffs contend that H.B. 56 "violates the constitutional prohibition on state regulation of immigration because its express purpose and actual function is to control which classes of immigrants can enter and the conditions under which they can remain in Alabama – a brazen usurpation of the federal government's exclusive authority."  (Doc. 37 at 19-20.) They argue, "The text of HB 56 as well as the legislative debates make clear that HB 56 is centrally concerned with immigration, and not with matters of traditional state control," and the purpose of the Act is "to expel undocumented immigrants from the State of Alabama." (*Id.* at 21, 22.)

#### 1.  Standing

Plaintiffs contend that all plaintiffs have standing to challenge H.B. 56 in its entirety. "A federal court has the obligation to review *sua sponte* whether it has subject matter jurisdiction under Article III's case-or-controversy requirement."  *Fla. Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist.*, 647 F.3d 1296, 1302 (11th Cir. 2011)(citing *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1242 (11th Cir. 2003)(citing *Juidice v. Vail*, 430 U.S. 327, 331 (1977))).

> In limiting the judicial power to "Cases" and "Controversies," Article III of the Constitution restricts it to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law.  Except when necessary in the execution of that function, courts have no charter to review and revise legislative and executive action. See *Lujan v. Defenders of Wildlife*,

18

504 U.S. 555, 559-560 (1992); *Los Angeles v. Lyons*, 461 U.S. 95, 111-112 (1983). This limitation "is founded in concern about the proper – and properly limited – role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 500 (1975). See *United States v. Richardson*, 418 U.S. 166, 179 (1974).

The doctrine of standing is one of several doctrines that reflect this fundamental limitation. It requires federal courts to satisfy themselves that "the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction." 422 U.S., at 498-499. He bears the burden of showing that he has standing for each type of relief sought. See *Lyons*, *supra*, at 105.

*Summers v. Earth Island Inst.,* 129 S. Ct. 1142, 1148-49 (2009)(parallel citations omitted).

Therefore, this court must determine, *inter alia*, whether plaintiffs have standing before proceeding.

"'At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for [at this stage a court must] presume that general allegations embrace those specific facts that are necessary to support the claim." *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1286 (11th Cir. 2010) (quoting *Lujan*, 504 U.S. at 561). (internal quotations omitted). "However, in determining subject matter jurisdiction [the court is] permitted to look at all of the evidence presented, including affidavits and testimony relating to a motion for a preliminary injunction." *Fla. Family Policy Council v. Freeman*, 561 F.3d 1246, 1253 (11th Cir. 2009)(citing *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947)). Also, the court notes, "'[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal'; it 'focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated.'"

*Mulhall*, 618 F.3d at 1286 (quoting *Warth*, 422 U.S. at 500 and *Flast v. Cohen*, 392 U.S. 83, 99 (1968))(internal citations omitted).

> To seek injunctive relief, a plaintiff must show that he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.

*Summers*, 129 S. Ct. at 1149 (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)). "[A]n organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009)(quoting *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008)). (internal quotations omitted). Also, "[a]n association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1170 (11th Cir. 2006)(quoting *Friends of the Earth*, 528 U.S. at 181 (2000)). (internal quotations omitted). Every plaintiff need not have standing to assert every claim. The court has jurisdiction over a claim if at least one plaintiff has standing to assert the claim. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977).

20

"While true that 'it is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights,' a plaintiff still must demonstrate 'an actual and well-founded fear that the law will be enforced against [him].'" *Dermer v. Miami-Dade County*, 599 F.3d 1217, 1220 (11th Cir. 2010)(quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) and *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988)).  "[I]n order to establish standing, the plaintiff must show that [1] he has an unambiguous intention [2] at a reasonably foreseeable time [3] to engage in a course of conduct arguably affected with a constitutional interest, but [4] proscribed by a statute or rule, *and* [5] that there is a credible threat of prosecution." *Bloedorn*, 631 F.3d at 1228 (citing *Pittman v. Cole*, 267 F.3d 1269, 1283-84 (11th Cir. 2001)) (numerical alterations added).

"Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate – as opposed to a merely conjectural or hypothetical – threat of *future* injury." *Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994)(citing *Lyons*, 461 U.S. at 102).  "In determining whether an injury is imminent, the law 'requires only that the anticipated injury occur within some fixed period of time in the future.  Immediacy, in this context, means reasonably fixed and specific in time and not too far off.'"  *Bloedorn*, 631 F.3d at 1228 (quoting *Am. Civil Liberties Union of Fla., Inc.*, 557 F.3d  at 1193-94.)

21

"The fairly traceable element explores the causal connection between the challenged conduct and the alleged harm." *Loggerhead Turtle v. County Council of Volusia County*, 148 F.3d 1231, 1247 (11th Cir. 1998)(quoting *Federal Deposit Ins. Corp. v. Morley*, 867 F.2d 1381, 1388 (11th Cir.), *cert. denied*, 493 U.S. 819 (1989)).   To satisfy this element of standing, "The plaintiff must show that he himself is injured by the challenged action of the defendant.   The injury may be indirect, but the complaint must indicate that the injury is indeed fairly traceable to the defendant's acts or omissions." *Vill. of Arlington Heights*, 429 U.S. at 260-61.   "Essentially, 'this requirement focuses on whether the line of causation between the illegal conduct and injury is too attenuated.'" *Loggerhead Turtle*, 148 F.3d at 1247 (quoting *Morley*, 867 F.2d at 1388).

As to redressability, "It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress." *Friends of the Earth*, 528 U.S. at 185-86.

In this case, plaintiffs seek to enjoin H.B. 56 in its entirety as violative of the Supremacy Clause; they allege:

> 340.   HB 56 is void in its entirety because it is a regulation of immigration, and therefore usurps powers constitutionally vested in the federal government exclusively.

> 341.  HB 56 also conflicts with federal laws, regulations and policies, attempts to legislate in fields occupied by the federal government, imposes burdens and penalties on legal residents not authorized by and contrary to

22

federal law, and unilaterally imposes burdens on the federal government's resources and processes, each in violation of the Supremacy Clause.

(Doc. 1 ¶¶ 340-41.)

The court finds that none of the individual plaintiffs have standing to challenge H.B. 56 in its entirety. Although various plaintiffs may meet the requirements of standing as to specific sections of H.B. 56, including the requirement of an injury in fact, the court finds that no one plaintiff has standing to challenge each provision; therefore, no individual plaintiff has standing to challenge H.B. 56 in its entirety. *See CAMP Legal Defense Fund, Inc. v. City of Atlanta*, 451 F3d 1257, 1273 (11th Cir. 2006) (holding in a facial challenge to a city ordinance that injury under one provision is insufficient to confer standing on a plaintiff to challenge all provisions of an allegedly unconstitutional ordinance.)

Moreover, the court finds that these plaintiffs do not have associational standing. "Standing is not dispensed in gross. Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. Federal Election Com'n*, 554 U.S. 724, 734 (2008)(internal quotations and citations omitted). Therefore, a general reference to an injury engendered by H.B. 56 will not satisfy plaintiffs' obligation to show standing. A number of the plaintiff associations allege they have spent time discussing H.B. 56 with their members or those helped by their organizations. Although diversion of resources to fight or counteract a challenged law may be adequate to establish standing, the diversion of resources alleged in this case is only time spent discussing H.B. 56. The Eleventh Circuit has found standing based on an association's diversion of resources

23

when the diversion involved activities designed to counteract or compensate for the effects of the challenged law. *See Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009)("Because it will divert resources from its regular activities to educate voters about the requirement of a photo identification *and* assist voters in obtaining free identification cards, the NAACP established an injury sufficient to confer standing to challenge the statute."); *Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008)("In this case, the diversion of personnel and time to help voters resolve matching problems effectively counteracts what would otherwise be Subsection 6's negation of the organizations' efforts to register voters. The net effect is that the average cost of registering each voter increases, and because plaintiffs cannot bring to bear limitless resources, their noneconomic goals will suffer. Therefore, plaintiffs presently have standing on their own behalf to seek relief."). This court finds that the general allegation that members of an associational plaintiff have spent time discussing H.B. 56 with their constituents, is not a concrete and real injury fairly traceable to H.B. 56 in its entirety.

Therefore, plaintiffs' Motion for a Preliminary Injunction to the extent they seek to enjoin H.B. 56 in its entirety will be denied for lack of standing.

Although a finding of no standing precludes consideration of plaintiffs' claim that H.B. 56 is preempted in its entirety, assuming the court is in error and an individual plaintiff or plaintiff association has standing to challenge H.B. 56 in its entirety, then, for the reasons set forth below, the court finds that plaintiffs have not demonstrated a likelihood of success

on the merits of their claim that H.B. 56, in its entirety, is preempted as a state law regulating immigration.

### 2.  Preemption

Plaintiffs contend that H.B. 56 "violates the constitutional prohibition on state regulation of immigration because its express purpose and actual function is to control which classes of immigrants can enter and the conditions under which they can remain in Alabama – a brazen usurpation of the federal government's exclusive authority."  (Doc. 37 at 19-20.)  Specifically, they contend that H.B. 56 is preempted in its entirety because it is a regulation of immigration and a classification of aliens.

"It is a basic tenet of 'Our Federalism' that where federal and state law conflict, state law must yield."  *Denson v. United States*, 574 F.3d 1318, 1345 (11th Cir. 2009).  The Supremacy Clause of the U.S. Constitution provides that the Constitution, federal laws, and treaties are "the supreme Law of the Land . . ., any Thing in the . . . Laws of any State to the Contrary notwithstanding."  U.S. Const. art VI, cl. 2.  "[T]he Supremacy Clause was designed to ensure that states do not 'retard, impede, burden, or in any manner control' the execution of federal law.  *Denson*, 574 F.3d at 1345 (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819); citing *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824) (Marshall, C.J.)).

In certain instances, the Constitution itself can preempt state action in a field exclusively reserved for the federal government.  *See DeCanas v. Bica*, 424 U.S. 351, 354-56

25

(1976)("[The constitutional] [p]ower to regulate immigration is unquestionably exclusively a federal power."), *superseded by statute*, Immigration Reform and Control Act, Pub. L. No. 99-605, 100 Stat. 3359, as recognized by *Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968, 1975 (2011). The Supremacy Clause also "vests Congress with the power to preempt state law." *Stephen v. Am. Brands, Inc.*, 825 F.2d 312, 313 (11th Cir. 1987)(per curiam); *see also Gibbons*, 22 U.S. at 211 ("[A]cts of the State Legislatures . . . [that] interfere with, or are contrary to the laws of Congress, made in pursuance of the [C]onstitution" are invalid under the Supremacy Clause.). This court's analysis of preemption claims –

> must be guided by two cornerstones of our pre-emption jurisprudence. First, the purpose of Congress is the ultimate touchstone in every pre-emption case. Second, in all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

*Wyeth v. Levine*, 129 S. Ct. 1187, 1194-95 (2009)(quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996))(internal quotations and citations omitted).

Preemption may be express or implied, *Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88, 98 (1992)(O'Connor, J., plurality opinion), and "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose," *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977). Express preemption occurs when the text of a federal law is explicit about is preemptive effects. *Browning*, 522

26

F.3d at 1167.  Implied preemption falls into two categories:  field preemption and conflict

preemption.  *Gade*, 505 U.S. at 98; *see Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363,

372 (2000); *Browning*, 522 F.3d at 1167.  "Field preemption" exists when

> Congress' intent to supercede state law altogether may be found from a scheme
> of federal regulation so pervasive as to make reasonable the inference that
> Congress left no room to supplement it, because the Act of Congress may
> touch a field in which the federal interest is so dominant that the federal
> system will be assumed to preclude enforcement of state laws on the same
> subject, or because the object sought to be obtained by the federal law and the
> character of obligations imposed by it may reveal the same purpose.

*Pac. Gas and Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190,

203-04 (1983)(internal quotations omitted).  "Conflict preemption" occurs when "compliance

with both federal and state regulations is a physical impossibility," *Fla. Lime & Avocado*

*Growers, Inc. v. Paul*, 373 U.S. 132,142-43 (1963), or when state law "stands as an obstacle

to the accomplishment and execution of the full purposes and objectives of Congress," *Hines*

*v. Davidowitz*, 312 U.S. 52, 67 (1941).  The "categories of [implied] preemption are not

'rigidly distinct,'" and, therefore, "field pre-emption may be understood as a species of

conflict pre-emption."  *Crosby*, 530 U.S. at 373 n.6 (quoting *English v. Gen. Elec. Co.*, 496

U.S. 72, 79 n.5 (1990)).

### a.  Regulation of Immigration

Plaintiffs contend, "HB 56 should be preliminarily enjoined in its entirety because

Plaintiffs are likely to succeed on the merits of their claim that the entire enactment is a state

law attempting to regulate immigration.  .  .  .  To withstand constitutional scrutiny, a state

27

law relating to immigration must primarily address legitimate local concerns and have only a 'purely speculative and indirect impact on immigration.'" (Doc. 37 at 19 [quoting *DeCanas*, 424 U.S. at 355].)

The Supreme Court has "long recognized the preeminent role of the Federal Government with respect to the regulation of aliens within our borders." *Toll v. Moreno*, 458 U.S. 1, 10 (1982). "Federal authority to regulate the status of aliens derives from various sources, including the Federal Government's power '[t]o establish [a] uniform Rule of Naturalization,' U.S. Const., [a]rt. I, § 8, cl. 4[;] its power '[t]o regulate Commerce with foreign Nations', *id.*, cl. 3[;] and its broad authority over foreign affairs." *Toll*, 458 U.S. at 10. "The National Government has 'broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization.'" *Graham v. Richardson*, 403 U.S. 365, 377 (1971)(quoting *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948)).

In *DeCanas*, the Supreme Court held that a California statute that prohibited employers from knowingly employing aliens not entitled to lawful residence in the United States if such employment would have an adverse impact on lawful resident workers was not preempted by federal law. 424 U.S. at 353-54. The Court recognized that the "[p]ower to regulate immigration is unquestionably exclusively a federal power." *Id.* at 354. However, it noted that it had "never held that ***every*** state enactment which in any way deals with aliens

is a ***regulation of immigration*** and thus *per se* pre-empted by this constitutional power,

whether latent or exercised." *Id.* at 355 (emphasis added). A "regulation of immigration,"

the Court explained, "is essentially a determination of who should or should not be admitted

into the country, and the conditions under which a legal entrant may remain." *Id.* Therefore,

"standing alone, the fact that aliens are the subject of a state statute does not render [the state

statute] a regulation of immigration." *Id.*

Therefore, the Court found that the California statute was not a regulation of

immigration. *Id.* at 355-56. To the contrary, the *DeCanas* Court found that California

"sought to strengthen its economy by adopting federal standards in imposing criminal

sanctions against state employers who knowingly employ aliens who have no federal right

to employment within the country." *Id.* at 355. The Court further recognized that "even if

such local regulation has some purely speculative and indirect impact on immigration, it does

not thereby become a constitutionally proscribed regulation of immigration . . . ." *Id.* at 355-

56. The fact that the California statute had adopted federal standards, which saved it from

becoming a "constitutionally proscribed regulation of immigration that Congress itself would

be powerless to authorize or approve," was essential to the Court's decision. *Id.* at 356.

"The importance of this distinction is clear because the Constitution itself prohibits Congress

from authorizing or approving a scheme under which states create their own standards to

assess an alien's immigration status . . . ." *Equal Access Educ. v. Merten,* 305 F. Supp. 2d

585, 602 (E.D. Va. 2004).

Plaintiffs argue that H.B. 56 is a regulation of immigration; they contend:

The text of HB 56 as well as the legislative debates make clear that HB 56 is centrally concerned with immigration, and not with matters of traditional state control. The preamble to HB 56 states that it is a law "[r]elating to illegal immigration" and that its purposes include the regulation of documents that immigrants must carry, the employment of immigrants, the classification of immigrants as "lawfully present" or not, and the punishment of perceived violations of immigration law.

The legislative history also demonstrates that HB 56 is intended to expel undocumented immigrants from the State of Alabama. The original bill arose through a "Joint Interim Patriotic Immigration Commission" created by the Alabama legislature in 2007 to address the "unprecedented influx of non-English speaking legal and illegal immigrants." Ex. 42-I, State of Alabama, Joint Interim Patriotic Immigration Commission Report at 1 (Feb. 13, 2008). The Commission made sweeping recommendations to the Alabama legislature on how to regulate immigration by limiting access to public education, benefits, and medical services, as well as by making law enforcement policies more punitive and employer hiring practices more restrictive – all expressly for the purpose of discouraging illegal immigration. *Id.* at 8-11. One of HB 56's two primary drafters and sponsors, Representative Hammon, stated that the bill was based on the Commission's recommendations. Ex. 42-J, Transcript of April 5, 2011 House Debate on HB 56 ("April 5 Debate") at 24:39-43.

Legislative supporters of HB 56 expressed disagreement with federal immigration policy and their intent that, with HB 56, the State of Alabama would supplant the federal government as the enforcer and regulator of immigration in Alabama. Representative Hammon repeatedly stated that the federal immigration system is "broken" and that "this issue [of immigration enforcement] is now the responsibility of the State of Alabama and not the federal government." April 5 Debate at 1:12-14, 7:35-42, 73:44-74:1, 86:33-35. Other legislative supporters, including Senators Holley and Scofield and Representative Rich, expressed similar views that the State of Alabama should enact a law to regulate immigrants and to expel and deter undocumented immigrants from the State. April 5 Debate at 16:34-43 (Rep. Rich); Ex. 42-K, Transcript of April 21, 2011 Senate Debate on SB 256 at 54:9-24 (Sen. Schofield); 77:23-40 (Sen. Holley). Specifically, as Representative Hammon stated, HB 56 is intended to implement an Alabama

state immigration policy of "attacking *every aspect* of an illegal immigrant's life . . . so they will deport themselves."  April 5 Debate at 9:3-8 (emphasis added).

(Doc. 37 at 21-23 [emphasis in original; footnotes omitted].)

As a matter of historical fact, anti-illegal immigrant sentiment and frustration with federal immigration policies has driven the enactment of H.B. 56.  Nevertheless, any determination of whether H.B. 56 is preempted as a state regulation of immigration must be based on the language of the Act alone and not the motivation for its enactment.

Based on the lanaguage of H.B. 56, the court finds it is not a regulation of immigration as defined in *DeCanas*.  H.B. 56 does not determine "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *DeCanas*, 424 U.S. at 355.  It does not create standards for determining who is and is not in this country legally; rather, it repeatedly defers to federal verification of an alien's lawful presence.[8]  *See*, *e.g.*, H.B. 56 § 3(10)("A person shall be regarded as an alien unlawfully present in the United States only if the person's unlawful immigration status has been verified by the federal government pursuant to 8 U.S.C. § 1373(c)); H.B. 56 § 10(d)("This section does not apply to a person who maintains authorization from the federal government to be present in the United States.").  The fact that H.B. 56 is an act "[r]elating to illegal immigration," H.B. 56, Preamble, does not make it "a constitutionally proscribed regulation of immigration" under *DeCanas*, 424 U.S. at 356.

---

[8]The court notes that § 8 of H.B. 56 does not defer to federal verification.

Therefore, if any plaintiff possessed standing to pursue this claim, the court would find that plaintiffs have not demonstrated a likelihood of success on the merits of their claim that H.B. 56, in its entirety, is preempted as a state law regulating immigration.

### b. Classification of Aliens

Plaintiffs argue, "HB 56 is fundamentally at odds with federal immigration law in its premise that there is a clearly defined category of immigrants who are clearly removable or 'unlawfully present' and who may be subjected to state-law penalties and burdens." (Doc. 37 at 28.) The court notes, "The States enjoy no power with respect to the classification of aliens." *Plyler v. Doe,* 457 U.S. 202, 225 (1982). The power to classify aliens is "committed to the political branches of the Federal Government." *Id.* (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976))(quotations omitted). "Although it is a routine and normally legitimate part of the business of the Federal Government to classify on the basis of alien status, and to take into account the character of the relationship between the alien and this country, only rarely are such matters relevant to legislation by a State." *Id.* (citations and quotations omitted).

Provisions of H.B. 56 employ the phrases "unlawfully present in the United States," "not lawfully present in the United States," and "lawfully present in the United States." *See*, *e.g.*, H.B. 56 §§ 3(10), 5(d), 6(d), 7(b), 8, 10(a), 12(a), 13(a)(4), 27(a), 28(a)(2). Plaintiffs argue that H.B. 56 in its entirety is preempted because it imposes "state-created penalties and burdens – including criminal penalties – by using federal tools that are expressly

32

contraindicated for such purposes." (Doc. 37 at 31.) Specifically, they argue that "verifications under 8 U.S.C. § 1373 [referred to in H.B. 56 § 3(10) and other sections], which are carried out through the database checks by the [Department of Homeland Security's] Law Enforcement Support Center . . . 'do not always provide a definitive answer as to an alien's immigration status,' and will often generate 'no match' notices that cannot be used to conclusively determine status." (*Id.* at 30 [citing doc. 37-42 at 11, 14-15].) Also, the SAVE database, referred to in H.B. 56 § 30(c), was "expressly not designed to make 'a finding of fact or conclusion of law that [an] individual is not lawfully present.'" (*Id.* at 30-31 [citing 65 Fed. Reg. 58301, 58302 (Sept. 28, 2000)].) Plaintiffs argue, "Under federal law, a noncitizen's immigration status is governed by numerous sections of the INA; turns on complex legal questions, myriad individualized factors, and in many cases, the exercise of administrative discretion; is fluid and subject to change over time; and ultimately is decided through an administrative adjudication process subject to federal court review." (Doc. 37 at 29 [citing doc. 37-42 at 89-91].) Therefore, plaintiffs argue that H.B. 56, which relies on verification from the federal government of unlawful presence – despite the fact that the federal immigration system does not have a system for definitively determining unlawful presence – imposes burdens and penalties on aliens and, conflicts with federal immigration law. *Id.* at 31.

The court finds H.B. 56 is not conflict preempted because it relies on federal tools to determine an alien's immigration status. In *Whiting*, the Supreme Court expressly approved

an Arizona statute's deferential approach for determining an alien's status according to federal law  131 S. Ct. 1968.  The Chamber of Commerce had argued that Arizona's licensing law was preempted because it conflicted with the federal system.  *Id.* at 1981.  The Supreme Court disagreed, noting that "Arizona's procedures simply implement the sanctions that Congress expressly allowed Arizona to pursue through licensing laws."  *Id.*  The Court stated that because "Congress specifically preserved such authority for the States, it stands to reason that Congress did not intend to prevent the States from using appropriate tools to exercise that authority."  *Id.*  The Court discussed in detail the approach used in the Arizona statute, under which Arizona gave deference to a federal determination of an alien's immigration status.  The Court stated:

> And here Arizona went the extra mile in ensuring that its law closely tracks IRCA's provisions in all material respects.  The Arizona law begins by adopting the federal definition of who qualifies as an "unauthorized alien." Compare 8 U.S.C. § 1324a(h)(3) (an "unauthorized alien" is an alien not "lawfully admitted for permanent residence" or not otherwise authorized by federal law to be employed) with Ariz. Rev. Stat. Ann. § 23–211(11) (adopting the federal definition of "unauthorized alien"); see [*DeCanas*], 424 U.S., at 363 (parallel citations omitted) (finding no preemption of state law that operates "only with respect to individuals whom the Federal Government has already declared cannot work in this country").

> Not only that, the Arizona law expressly provides that state investigators must verify the work authorization of an allegedly unauthorized alien with the Federal Government, and "shall not attempt to independently make a final determination on whether an alien is authorized to work in the United States." § 23–212(B).  What is more, a state court "shall consider ***only*** the federal government's determination" when deciding "whether an employee is an unauthorized alien." § 23–212(H) (emphasis added).  As a result, there can by definition be no conflict between state and federal law as to worker authorization, either at the investigatory or adjudicatory stage.

*Id.* (emphasis in original; parallel citations and footnote omitted).[9]

Here, Alabama also ensured that its law closely tracked federal law with respect to the determination of an alien's status. *See id.* Like the Arizona law in *Whiting*, H.B. 56 repeatedly defers to a federal determination of whether an "alien [is] unlawfully present in the United States." *See*, *e.g.*, H.B. 56 §§ 3(10), 10(b), 11(b). H.B. 56 expressly and repeatedly provides that "[n]o officer of this state or any political subdivision of this state shall attempt to independently make a final determination of an alien's immigration status." *Id.* § 3(10); *see also id.* §§ 11(b) 12(c). To the extent Alabama has the authority to regulate the areas covered by the provisions of H.B. 56, "it stands to reason that Congress did not intend to prevent . . . [Alabama] from using appropriate tools to exercise that authority." *See Whiting*, 131 S. Ct. at 1981.

For these reasons, assuming plaintiffs have standing to pursue this claim, the court would find that plaintiffs have not demonstrated a likelihood of success on the merits of their

_____

[9]The Supreme Court noted that the Arizona statute gave the employer the opportunity to rebut the federal determination of an alien's unlawful status. *Whiting*, 131 S. Ct. at 1981 n.7 ("After specifying that a state court may consider 'only' the federal determination, the Arizona law goes on to provide that the federal determination is 'a rebuttable presumption of the employee's lawful status.' Arizona explains that this provision does not permit the State to establish unlawful status apart from the federal determination – the provision could hardly do that, given the foregoing. It instead operates to 'ensur[e] that the *employer* has an opportunity to rebut the evidence presented to establish a worker's unlawful status.' Only in that sense is the federal determination a 'rebuttable presumption.' Giving an employer a chance to show that it did not break the state law certainly does not place the Arizona regime in conflict with federal law.")(internal citations omitted). H.B. 56 does not allow an individual to rebut the federal verification of unlawful presence.

claim that H.B. 56 in its entirety is preempted because it creates alien classifications, employs terminology unfamiliar to federal law, or relies on federal tools to determine an alien's immigration status.

Plaintiffs' Motion for a Preliminary Injunction enjoining the implementation of H.B. 56 in its entirety on the grounds that it is preempted as a regulation of immigration or a classification of aliens will be denied.

## B. SECTION 8

Section 8 of H.B. 56 provides:

> An alien who is not lawfully present in the United States shall not be permitted to enroll in or attend any public postsecondary education institution in this state. An alien attending any public postsecondary institution in this state must either possess lawful permanent residence or an appropriate nonimmigrant visa under 8 U.S.C. § 1101, et seq. For the purposes of this section, a public postsecondary education institution officer may seek federal verification of an alien's immigration status with the federal government pursuant to 8 U.S.C. § 1373(c). A public postsecondary education institution officer or official shall not attempt to independently make a final determination of whether an alien is lawfully present in the United States. Except as otherwise provided by law, an alien who is not lawfully present in the United States shall not be eligible for any postsecondary education benefit, including, but not limited to, scholarships, grants, or financial aid.

H.B. 56 § 8. Although the first sentence of Section 8 bars "[a]n alien who is not lawfully present in the United States" from enrolling or attending an Alabama "public postsecondary education institution," the second sentence limits attendance at those institutions to aliens that

"possess lawful permanent residence or an appropriate nonimmigrant visa under 8 U.S.C. § 1101, et seq."[10]  *Id.*

## 1. Standing

Plaintiff Esayas Haile is lawfully present in the United States as a refugee from Eritrea.  (Doc. 1 ¶ 109; doc. 37-23 ¶ 2-3.)  However, because he is classified as a refugee, he has neither a nonimmigrant visa nor status as a lawful permanent resident.  (Doc. 1 ¶ 109; doc. 37-23 ¶ 3.)  He intends to enroll at a state public post-secondary institution – Gadsden State Community College.  (Doc. 1 ¶ 109.)  However, "Section 8 of HB 56 will prohibit Plaintiff Haile from studying at Gadsden State or any similar public postsecondary institution because he is not a lawful permanent resident or a holder of a nonimmigrant visa."  (*Id.*)

The court finds that Haile has standing to assert the claims against Section 8.  His injury is imminent and concrete and it is traceable to H.B. 56 § 8.  By its terms Section 8 would prevent Haile from attending Gadsden State despite the fact that he is lawfully present.  Moreover, it is likely that this injury would be redressed by a favorable judgment.  Therefore, the court finds that Haile has standing to challenge Section 8.

## 2. Preemption

---

[10]"The term 'nonimmigrant visa' means a visa properly issued to an alien as an eligible nonimmigrant by a competent officer as provided in [the INS].  8 U.S.C. § 1101(a)(26).  Eligible nonimmigrants include, *inter alia*, foreign diplomats, students, and vacationers.  *See id.* (a)(15)(A), (B), (F).  Generally, "nonimmigrants" are aliens whose stay in the United States is intended to be temporary.  The terms does not include refugees and asylum seekers.  *Id.* (a)(15)(A)-(V); 8 U.S.C. § 1157; 8 U.S.C. § 1158.

Plaintiffs seek an injunction preventing the implementation of Section 8 of H.B. 56 on the ground that Section 8 creates a state definition of "not lawfully present." (*See* doc. 37 at 28 ["Other provisions of HB 56 include . . . state immigration definitions, such as Section 8 (creating a state definition of 'lawfully present' noncitizens for purposes of eligibility for public higher education that includes only [legal permanent residents] and non-immigrant visa holders) . . . ."].) In other words, they claim that Section 8 creates a state classification of aliens.[11]

The law is well established that "The States enjoy no power with respect to the classification of aliens. This power is 'committed to the political branches of the Federal Government.'" *Plyler*, 457 U.S. at 225 (1982)(citing *Hines*, 312 U.S. 52 (1941); quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)).

The first two sentences of Section 8 appear to define "an alien who is not lawfully present" for purposes of enrolling or attending Alabama's postsecondary education institutions –

> An alien who is not lawfully present in the United States shall not be permitted to enroll in or attend any public postsecondary education institution in this state. An alien attending any public postsecondary institution in this state ***must***

---

[11]Plaintiffs correctly note that "Section 8 excludes noncitizens whom the federal government has authorized to remain in the United States but who do not hold [legal permanent resident] status or a 'nonimmigrant visa' - including *inter alia* those whom the federal government has granted asylum, refugee status, Temporary Protected Status because of environmental disaster or armed conflict in their home countries or deferred action." (Doc. 37 at 13.)

either possess lawful permanent residence or an appropriate nonimmigrant visa
under 8 U.S.C. § 1101, et seq.

H.B. 56 § 8 (emphasis added).  The court notes that no other provision of H.B. 56 seeks to

similarly limit the definition of a lawfully-present alien to include only aliens that possess

lawful permanent residence or an appropriate nonimmigrant visa.  Therefore, the court

presumes the Alabama legislature intended to so limit the class of lawfully-present aliens

allowed to attend to Alabama's public postsecondary education institutions.  *See Russello v.*

*United States*, 464 U.S. 16, 23 (1983)("Where Congress includes particular language in one

section of a statute but omits it in another section of the same Act, it is generally ***presumed***

that Congress acts ***intentionally*** and ***purposely*** in the disparate inclusion or exclusion."

(quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972))) (emphasis

added; internal quotations and alterations omitted); *see also Trott v. Brinks, Inc.*, 972 So. 2d

81, 85 (Ala. 2007)("'When the legislature uses certain language in one part of the statute and

different language in another, the court assumes different meanings were ***intended***....  The

use of different terms within related statutes generally implies that different meanings were

***intended***.'  We presume that the use of two different words indicates that the legislature

intended the two words be treated differently."  (quoting 2A Norman Singer, Sᴜᴛʜᴇʀʟᴀɴᴅ

ᴏɴ Sᴛᴀᴛᴜᴛᴇs ᴀɴᴅ Sᴛᴀᴛᴜᴛᴏʀʏ Cᴏɴsᴛʀᴜᴄᴛɪᴏɴ § 46:06, at 194 (6th ed. 2000))) (emphasis

added; internal citation and footnote omitted); *House v. Cullman County*, 593 So. 2d 69, 75

(Ala. 1992)("Indeed, where there is a 'material alteration in the language used in the different

clauses, it is to be inferred' that the alterations were ***not inadvertent***." (quoting *Lehman, Durr*

*& Co. v. Robinson*, 59 Ala. 219, 235 (1877)))(emphasis added).

Defendants contend that this court should defer to their interpretation of Section 8.

They argue:

> As set out in the first sentence of Section 8, the Legislature's focus was on excluding illegal aliens from public postsecondary institutions.  Section 8, doc. 1-2 at 24 ("An alien who is not lawfully present in the United States shall not be permitted to enroll in or attend").  The second sentence then provides that an immigrant student "possess lawful permanent residence or an appropriate nonimmigrant visa under 8 U.S.C. § 1101, *et seq*. . . ."  Section 8, doc. 1-2 at 24.

> If one reads the second sentence as limiting the class of lawfully present aliens who may attend public postsecondary institutions to only those in possession of the specified documents, as the Plaintiffs do, the two sentences are in tension with each other:  the first would recognize that lawfully present aliens may attend public postsecondary institutions, but the second would seek to deny a subclass of those lawfully present aliens the right just recognized.  This is not what the Legislature was doing.

> Instead, the first sentence of Section 8 recognizes that lawfully present aliens may attend public postsecondary institutions and the second sentence requires proof of lawful presence.  Indeed, the reference to 8 U.S.C. § 1101, *et seq*. is a broad one; it encompasses the entire Immigration and Nationality Act (INA).  *Cf.* Plaintiff's Motion for Preliminary Injunction in *United States v. Alabama*, doc. 2 at 15.

> Accordingly, the State Defendants read Section 8 to draw a line to the exclusion only of illegal aliens; Section 8 draws no line among lawfully present aliens.  [Footnote]  This is the way that Section 8 will be implemented

40

by the Alabama Department of Postsecondary Education.[12]  *See* Exhibit 4
(Letter from Chancellor Hill).  . . .

> [Footnote]  It is important that this argument is being made by the
> Alabama Attorney General.  As the chief legal officer of the State, the
> positions the Attorney General takes in litigation are binding on State
> officials.  *Chapman v. Gooden*, 974 So. 2d 972, 988 (Ala. 2007).
> Moreover, "[i]n evaluating a facial challenge to a [S]tate law, a federal
> court must, of course, consider any limiting construction that a [S]tate
> court or enforcement agency has proffered."  *Village of Hoffman
> Estates v. Flipside, Hoffman Estates, Inc.*[,] 455 U.S. 489, 494 n.5
> (1982).  Additionally, of course, certification to the Alabama Supreme
> Court is an option.

(Doc. 82 at 116-17 and n. 50 [footnote added].)

"In evaluating a facial challenge to a state law, a federal court must, of course,

consider any limiting construction that a state court or enforcement agency has proffered."

*Kolender v. Lawson*, 461 U.S. 352, 355 (1983)(quoting *Vill. of Hoffman Estates*, 455 U.S.

at 494 n.5).  Nevertheless, the court should not defer to defendants' limiting construction if

---

[12]Defendant Freida Hill, Chancellor of the Alabama Department of Postsecondary
Education, sent a Memorandum to the presidents of the Alabama community colleges, in
which she wrote:

> The categories of aliens lawfully present in the United States that most
> frequently attend our institutions are lawful permanent residents (sometimes
> called "green card holders") and holders of non-immigrant visas that permit
> study at an institution of postsecondary education.  However, in addition to
> these categories, there are some categories of aliens who are lawfully present
> in the United States who are not lawful permanent residents and who are not
> in possession of a non-immigrant visa.  Aliens in these categories are also
> eligible to enroll in Alabama's postsecondary educational institutions.

(Doc. 82-4 at 2 [underlining in original].)

the language of Section 8 is "plain and its meaning unambiguous." *City of Houston v. Hill*, 482 U.S. 451, 468 (1987).  Indeed, deference to the state's interpretation is only appropriate when the language of the statute at issue leaves room for the state's proposed interpretation. *See Stenberg v. Carhart*, 530 U.S. 914, 945 (2000)("Certification of a question [to the state supreme court] (or abstention) is appropriate only where the statute is 'fairly susceptible' to a narrowing construction." (citing *City of Houston*, 482 U.S. at 468-71)).   The constitutionality of Section 8 does not "turn upon a choice between one or several alternative meanings." *City of Houston*, 482 U.S. at 468 (quoting *Baggett v. Bullitt*, 377 U.S. 360, 378 (1964)).

Defendants propose to enforce Section 8 without regard to the second sentence requiring that "[a]n alien attending any public postsecondary institution in this state must either possess lawful permanent residence or an appropriate nonimmigrant visa under 8 U.S.C. § 1101, et seq." H.B. 56 § 8.  They propose interpreting Section 8 to allow all lawfully-present aliens to enroll in Alabama's postsecondary educational institutions, despite the fact that Section 8 requires lawful permanent status or a nonimmigrant visa in order for an alien to attend an Alabama postsecondary institution. (*See* doc. 82-4 at 2.) This court may "not uphold an unconstitutional statute merely because the Government promised to use it responsibly," especially when the promised responsible use is contrary to the plain and unambiguous language of the statute. *United States v. Stevens*, 130 S. Ct. 1577, 1591 (2010)(citing *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 473 (2001)).  The

42

unambiguous language of Section 8 and the accepted rules of statutory construction do not leave room for the limiting construction that eliminates the second sentence.  *See Smiley v. Citibank*, 517 U.S. 735, 739 (1996)(citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984)); *see also Presley v. Etowah County Comm'n*, 502 U.S. 491, 508-09 (1992); *Trott*, 972 So. 2d at 85.

> When a court reviews an agency's construction [or, in this case, the Alabama Attorney General's interpretation] of the statute which it administers, it is confronted with two questions.  First, always, is the question whether Congress has directly spoken to the precise question at issue.  ***If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress***.  If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation.  Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron*, 467 U.S. at 842-43 (emphasis added); *see also Joiner v. Med. Ctr. E., Inc.*, 709 So. 2d 1209, 1218 (Ala. 1998); *Noonan v. East-West Beltline, Inc.*, 487 So. 2d 237, 239 (Ala. 1986); *Jefferson County v. Dockerty*, 30 So. 2d 469, 474 (Ala. Ct. App. 1947).  Nothing in Alabama or federal law allows the court to adopt defendants' proposed limiting construction of Section 8 – to ignore the second sentence – which is contrary to the plain and unambiguous language of the statute.

Section 8 closes Alabama's public postsecondary institutions to aliens who are not lawfully present in the United States ***and*** to lawfully-present aliens who do not have lawful permanent resident status or a nonimmigration visa.  This "classification" of aliens for

purposes of determining who is eligible to attend Alabama's public postsecondary institutions is preempted as only Congress may classify aliens.   Therefore, Section 8 is preempted.

The court finds plaintiffs have demonstrated a likelihood of success as to their claim that Section 8 is an unconstitutional classification of aliens and is preempted by federal law.[13] The court also finds that plaintiff Haile will suffer an irreparable injury if Alabama is allowed to classify him as "not lawfully present" for purposes of enrolling and/or attending an Alabama public postsecondary education institution.   Moreover, this threatened injury is outweighed by any damage enjoining Section 8 may cause defendants and the injunction of a probably preempted statute is not adverse to public interest.

## C.  SECTION 10

Section 10 provides:

(a)  In addition to any violation of federal law, a person is guilty of willful failure to complete or carry an alien registration document if the person is in violation of 8 U.S.C. § 1304(e) or 8 U.S.C. § 1306(a), and the person is an alien unlawfully present in the United States.

---

[13]As discussed *supra*, Alabama may adopt a definition of "not lawfully present" aliens that follows federal law.  Moreover, the court notes that Alabama may, without conflicting with Congress's classification of aliens, exclude unlawfully-present aliens, as determined by federal law, from enrolling in and attending its public postsecondary educational institutions. *See Equal Access Education v. Merten*, 305 F. Supp. 2d at 601-08.  However, it cannot, without conflicting with federal law, exclude unlawfully-present aliens from its postsecondary institutions if its definition of unlawfully-present aliens conflicts with Congress's definition.

44

(b)  In the enforcement of this section, an alien's immigration status shall be determined by verification of the alien's immigration status with the federal government pursuant to 8 U.S.C. § 1373(c).  A law enforcement officer shall not attempt to independently make a final determination of whether an alien is lawfully present in the United States.

(c)  A law enforcement official or agency of this state or a county, city, or other political subdivision of this state may not consider race, color, or national origin in the enforcement of this section except to the extent permitted by the United States Constitution and the Constitution of Alabama of 1901.

(d)  This section does not apply to a person who maintains authorization from the federal government to be present in the United States.

(e)  Any record that relates to the immigration status of a person is admissible in any court of this state without further foundation or testimony from a custodian of records if the record is certified as authentic by the federal government agency that is responsible for maintaining the record.  A verification of an alien's immigration status received from the federal government pursuant to 8 U.S.C. § 1373(c) shall constitute proof of that alien's status.  A court of this state shall consider only the federal government's verification in determining whether an alien is lawfully present in the United States.

(f)  An alien unlawfully present in the United States who is in violation of this section shall be guilty of a Class C misdemeanor and subject to a fine of not more than one hundred dollars ($100) and not more than 30 days in jail.

(g) A court shall collect the assessments prescribed in subsection (f) and remit 50 percent of the assessments to the general fund of the local government where the person was apprehended to be earmarked for law enforcement purposes, 25 percent of the assessments to the Alabama Department of Homeland Security, and 25 percent of the assessments to the Department of Public Safety.

H.B. 56 § 10.

Section 10(a) of H.B. 56 creates a state-law crime based on an unlawfully-present

alien's "willful failure to complete or carry an alien registration document." H.B. 56 § 10(a).

Subsection (e) defines court procedures for prosecutions of violations under this sections. The procedures set forth in Section 10(e) are identical to Section 11(e) and Section 13(h).

### 1. Standing

The court finds that plaintiff John Doe #1 has standing to challenge Section 10 of H.B. 56 through Count One, based on the Supremacy Clause, and Counts Seven and Eight, based on the Confrontation Clause and the Compulsory Process Clause of the Sixth Amendment. Plaintiff, John Doe #1, is a minor in the process of being adopted by Webster, an American citizen, and he will not be able to apply for registration documents and lawful immigration status until two years after the adoption process is complete. (Doc. 37-31 at 6, doc. 37-13 at 2.3.)  Therefore, he will be considered an  unlawfully-present alien under H.B. 56 and subject to arrest under Section 10(a) for failing to carry registration documents and being an unlawfully-present alien. This injury is real and imminent; fairly traceable to defendants; and would be redressed by an injunction enjoining the enforcement of H.B. 56 § 10(a).

Plaintiffs also challenge § 10(e) on the ground that the procedural rules set forth therein violate the Confrontation Clause and the Compulsory Process Clause of the Sixth Amendment.  Defendants argue that any injury with regard to a violation of plaintiffs' Sixth Amendment rights is too speculative to support a cause of action; they argue:

> Plaintiffs' claims are actually a step removed from the challenges that required a genuine or credible threat.
>
> Here, we deal with layers of speculation.  First, the Plaintiffs speculate that they will be arrested.  Then, they take as a given their view of the Sixth Amendment's requirements and speculate that the State courts, during their

46

prosecution, will improperly reject their views.   Only when these circumstances converge are the Plaintiffs positioned to suffer an infringement of the Sixth Amendment rights.   The mere fact of violating any of the new criminal provisions in Act No. 2011-535 is not enough.  Even adding an arrest for those violations is not enough.   Injury can only befall the Plaintiffs if the State courts wherein their criminal charges are resolved wrongly reject their Sixth Amendment arguments.

(Doc. 82 at 148.)

The court notes that Section 6(b) provides, "All state officials, agencies, and personnel, including, but not limited to, an officer of a court of this state, shall fully comply with and, to the full extent permitted by law, support the enforcement of this act."  Also, the record leaves no doubt (1) John Doe #1 will remain in Alabama after the effective date of H.B. 56, and (2) he will violate Section 10(a) because he will not be allowed to register with the federal government.  Because of his status as a minor and because he is unable to change his unlawfully-present status until two years after his adoption is complete, the court finds his unlawfully-present status is involuntary and he cannot avoid the "future 'exposure to the challenged course of conduct' in which [defendants] allegedly engage[ ]."  *Church v. City of Huntsville,* 30 F.3d 1332, 1338 (11th Cir. 1994)(quoting *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974)).  Because all law enforcement officials must enforce H.B. 56 to its fullest extent, any encounter with law enforcement officials necessarily will result in the prosecution of John Doe #1 for violating Section 10(a).

47

Therefore, the court finds the threat of prosecution for violating Section 10(a) is real and imminent, fairly traceable to defendants; and plaintiffs' allegations based on the Sixth Amendment would be redressed by an injunction enjoining the enforcement of Section 10(e).

Therefore, the court finds that John Doe #1 has standing to bring Counts One, Seven, and Eight, challenging Section 10(a).

**2.  Preemption**

For the reasons set forth in the court's Memorandum Opinion denying the United States's Motion for Preliminary Injunction, *United States v. Alabama*, Case No. 2:11-CV-2746-SLB, doc. 93, seeking to enjoin Section 10(a) on preemption grounds, the court finds plaintiff's Motion for Preliminary Injunction is due to be denied as to Section 10(a).

**3.  Sixth Amendment – Confrontation Clause and Compulsory Process Clause – Sections 10(e), 11(e), and 13(h).**

Plaintiffs contend that Sections 10(e), 11(e), and 13(h) of H.B. 56 violate the Confrontation Clause (accused has the right "to be confronted with the witnesses against him") and the Compulsory Process Clause (accused has the right "to have compulsory process for obtaining witnesses in his favor") of the Sixth Amendment.[14]  They contend:

---

[14]The Sixth Amendment to the United States Constitution provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the

(continued...)

> HB 56 dramatically and unconstitutionally dictates the manner in which evidence is presented and guilt is determined for the new state crimes it creates. For the crimes of failing to register, soliciting work and harboring, transporting, encouraging/inducing, and renting, immigration status or work authorization status is a central element. HB 56 §§ 10(a), 11(a), 13(a)(1)-(4). The law restricts how this fundamental element can be proven, and in the process violates the Confrontation Clause and Compulsory Process Clause of the Sixth Amendment.

(Doc. 37 at 67.)

Pursuant to H.B. 56, the fact of unlawful presence is "determined by verification of the alien's immigration status with the federal government pursuant to 8 U.S.C. § 1373(c)."[15]

H.B. 56 § 10(b); *see also id*. §§ 11(b), (g). The law also provides:

> Any record that relates to the immigration status of a person is admissible in any court of this state without further foundation or testimony from a custodian of records if the record is certified as authentic by the federal government agency that is responsible for maintaining the record. A verification of an alien's immigration status received from the federal government pursuant to 8 U.S.C. § 1373(c) shall constitute proof of that alien's status. A court of this

---

[14](...continued)

> accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his [defense].

U.S. Const., amend. VI.

[15]Section 1373(c) states:

> The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

8 U.S.C. § 1373(c).

state shall consider ***only*** the federal government's verification in determining whether an alien is lawfully present in the United States.

*Id*. § 10(e)(emphasis added); *see also id*. §§, 11(e), and 13(h).

### a. Confrontation Clause

"The Confrontation Clause prohibits the admission of testimonial hearsay unless the declarant is unavailable and there was a prior opportunity for cross-examination." *United States v. Mendez*, 514 F.3d 1035, 1043 (10th Cir. 2008)(citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004)).  Sections 10(e), 11(e), and 13(h) provide that the verification of immigration status from the federal government, if "certified," may be admitted into evidence "without further foundation or testimony from a custodian of records."  H.B. 56 §§ 10(e), 11(e), 13(h).  Plaintiffs contend that this violates the Confrontation Clause.

The courts that have addressed the issue have held that immigration files and records are admissible as public records because such records are "routinely completed by Customs and Border Patrol agents in the course of their non-adversarial duties, not in the course of preparing for a criminal prosecution." *United States v. Caraballo*, 595 F.3d 1214, 1226 (11th Cir. 2010); *see Mendez*, 514 F.3d at 1044 ("The ICE database, containing records of requests for permission to reenter, is a public record.").  Therefore, such files and records are not ***testimonial*** statements subject to a defendant's Confrontation Clause rights.  *Caraballo*, 595 F.3d at 1229 (citing *Davis v. Washington*, 547 U.S. 813, 828, 830 (2006)); *Mendez*, 514 F.3d at 1045 ("We therefore hold the ICE database is not testimonial and not subject to the strictures of the Confrontation Clause.").  Therefore, admission of such certified records and

files without requiring the accused to have the opportunity to cross examine the creator of these records and files does not violate the Confrontation Clause.

However, the Supreme Court has recently noted, in *dicta*, that a person certifying that no record was found is "subject to confrontation." The Court held:

> A clerk could by affidavit ***authenticate*** or provide a copy of an otherwise admissible record, but could not do what the analysts did here: ***create*** a record for the sole purpose of providing evidence against a defendant.

> Far more probative here are those cases in which the prosecution sought to admit into evidence a clerk's certificate attesting to the fact that the clerk had searched for a particular relevant record and failed to find it. . . . [T]he clerk's statement would serve as substantive evidence against the defendant whose guilt depended on the ***nonexistence*** of the record for which the clerk searched . . . . [Under these circumstances], ***the clerk was nonetheless subject to confrontation***.

*Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527, 2539 (2009) (emphasis added; internal footnotes and original emphasis omitted). Circuit courts, following *Melendez-Diaz,* have held that an accused has the right to confront the person who prepares a "CNR" – certificate of nonexistent record – that is used to establish a fact, such as unlawful presence, that is "necessary to convict." *See United States v. Martinez-Rios*, 595 F.3d 581, 583-84, 586 (5th Cir. 2010)(accused had right to confront clerk who prepared CNR that was used to "establish that there is no record indicating that the alien had obtained government consent to reapply for admission – a fact necessary to convict" under 8 U.S.C. § 1326(a)); *see also Gov't of V.I. v. Gumbs*, No. 10-3342, 2011 WL 1667438, *3 (3d Cir. May 4, 2011)("[T]he *Melendez–Diaz* Court analogized the certificates of analysis to CNRs, and as a result, the Second, Fifth,

51

Ninth, and D.C. Circuits have held that the Confrontation Clause applies to CNRs, as the certificates are offered as substantive evidence against a defendant whose guilt depends on the document's accuracy." (citing *United States v. Madarikan*, 356 Fed. Appx. 532 (2d Cir. 2009); *Martinez–Rios*, 595 F.3d 581; *United States v. Orozco–Acosta*, 607 F.3d 1156 (9th Cir. 2010); *Tabaka v. District of Columbia*, 976 A.2d 173 (D.C. 2009))).

Therefore, to the extent Sections 10(e), 11(e), and 13(h) of H.B. 56 are interpreted as allowing a defendant to be convicted based on a CNR without testimony from the clerk or officer preparing the report, these sections violate the Confrontation Clause. However, as defendants argue, no one has been accused under these sections, much less tried. As set forth above, H.B. 56 states that records relating to immigration status are public records and are admissible in a court proceeding if "certified as authentic by the federal government agency that is responsible for maintaining the record." H.B. 56 §§ 10(e), 11(e), 13(h). And, "verification of an alien's immigration status" is "proof of that alien's status." *Id*. §§ 10(e), 11(e), 13(h). Under *Melendez-Diaz*, an accused would have the right to confront the person that prepared a CNR should the federal "verification" be based on such a document. The accused would not have a right to confront the person that prepared a certified document or file pulled from ICE public records.

Nothing in the plain language of Sections 10(e), 11(e), or 13(h) indicates that Alabama courts are required to apply these sections in the manner that violates the Confrontation Clause and Supreme Court caselaw. Should such a constitutional violation

befall a criminal defendant, he may assert an as-applied challenge.  However, at this point, plaintiffs have not shown that they are likely to be able to succeed on their facial challenge to §§ 10(e), 11(e), and 13(h), based on the Confrontation Clause.

Therefore, plaintiffs' Motion for Preliminary Injunction as to Sections 10(e), 11(e), and 13(h), based on the Confrontation Clause will be denied.

### b.  Compulsory Process Clause Claim

Plaintiffs contend that Sections 10(e), 11(e), and 13(h) have the effect of denying people charged with the offenses defined in these statutes the right to present a defense because, as written, these sections prohibit an accused from presenting any evidence in his defense.  These sections require an Alabama court adjudicating an accused charged with an offense under one of these sections to "consider *only* the federal government's verification in determining whether an alien is lawfully present in the United States," which is an essential element of the offenses.  H.B. 56 § 10(e)(emphasis added); *see also id.* §§ 11(e), 13(h).  Alabama limits its opposition to this contention to its position that these plaintiffs have not demonstrated an actionable injury.

The law is clear that a state has violated the Compulsory Process Clause "if it [has] made all defense testimony inadmissible as a matter of procedural law."  *Washington v. Texas*, 388 U.S. 14, 22 (1967).  The plain language of Sections 10(e), 11(e), and 13(h), violates the Compulsory Process Clause of the Sixth Amendment by denying the accused the right to present evidence in his or her defense.

Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, *Chambers v. Mississippi*, [410 U.S. 284 (1973)], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, *Washington v. Texas*, 388 U.S. 14, 23 (1967); *Davis v. Alaska*, 415 U.S. 308 (1974), ***the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense***." *California v. Trombetta*, 467 U.S. [479,] 485 [(1984)]; cf. *Strickland v. Washington*, 466 U.S. 668, 684–685 (1984)("The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment"). We break no new ground in observing that ***an essential component of procedural fairness is an opportunity to be heard***. *In re Oliver*, 333 U.S. 257, 273 (1948); *Grannis v. Ordean*, 234 U.S. 385, 394 (1914). That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and "survive the crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 656 (1984). *See also Washington v. Texas*, *supra*, 388 U.S., at 22–23.

*Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986) (emphasis added; internal parallel citations omitted).

By limiting evidence admissible in a state-court proceeding to "only" the federal government verification of lawful presence, Sections 10(e), 11(e), and 13(h) deny every person accused of violating Sections 10, 11 or 13 of H.B. 56 the constitutionally-protected right to present a defense. By denying accused individuals the opportunity to prove lawful presence, Alabama has denied all individuals charged under these sections with their right to compulsory process.

"In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered."

54

*Village of Hoffman Estates*, 455 U.S. at 494 n.5.  Alabama has not offered a limiting construction.  Its only argument in opposition to plaintiffs' claim is its assertion that plaintiffs cannot establish they have been injured by these Sections.

For the reasons set forth above, the court finds that John Doe #1 has established a threatened injury in fact for which there is no adequate legal remedy.  Section 10(e) and its counterparts, Sections 11(e) and 13(h), require all state courts to deny each person accused under one of these Sections the right to defend against the federal government's verification of unlawfully-present status.  These facts are sufficient to establish irreparable harm.  *See Church*, 30 F.3d at 1338-39.

The court finds that under no set of circumstances can Alabama refuse a criminal defendant accused of violating Sections 10, 11, or 13 of H.B. 56 the right to present evidence of his lawful presence in defense.  Therefore, the court finds that Sections 10(e), 11(e), and 13(h), to the extent they prohibit an accused from presenting evidence to defend against the federal government's verification, violate the Compulsory Process Clause of the United States Constitution.

Based on the foregoing, the court finds that plaintiffs are likely to succeed on the Compulsory Process Clause claim.  John Doe #1 has established a threatened injury to which there is no legal remedy and this injury outweighs any harm to defendants caused by enjoining enforcement of the last sentence in Sections 10(e), 11(e), and 13(h).  Enjoining this

portion of these subsections, which violates the Compulsory Process Clause of the Sixth Amendment, is in the public's interest.

Plaintiffs' Motion for Preliminary Injunction, (doc. 37), will be denied to the extent it seeks to enjoin Sections 10(e), 11(e), and 13(h) of H.B. 56 as violating the Confrontation Clause and will be granted as to their claim based on the Compulsory Process Clause and enforcement of the last sentence in each of these subsections:  "A court of this state shall consider only the federal government's verification in determining an alien is lawfully present in the United States."  H.B. 56 § 10 (e); *see also id*. §§ 11(e) and 13(h).  The last sentence of Sections 10(e), 11(e) and 13(h) will be enjoined pending resolution of this case.

## D.  SECTION 11

Section 11 states:

(a)  It is unlawful for a person who is an unauthorized alien to knowingly apply for work, solicit work in a public or private place, or perform work as an employee or independent contractor in this state.

(b) In the enforcement of this section, an alien's immigration status shall be determined by verification of the alien's immigration status with the federal government pursuant to 8 U.S.C. § 1373(c).  A law enforcement officer shall not attempt to independently make a final determination on whether an alien is authorized to work in the United States.

(c) A law enforcement official or agency of this state or a county, city, or other political subdivision of this state may not consider race, color, or national origin in the enforcement of this section except to the extent permitted by the United States Constitution and the Constitution of Alabama of 1901.

(d) This section does not apply to a person who maintains authorization from the federal government to be employed in the United States.

56

(e) Any record that relates to the employment authorization of a person is admissible in any court of this state without further foundation or testimony from a custodian of records if the record is certified as authentic by the federal government agency that is responsible for maintaining the record. A verification of an alien's immigration status received from the federal government pursuant to 8 U.S.C. § 1373(c) shall constitute proof of that alien's status. A court of this state shall consider only the federal government's verification in determining whether a person is an unauthorized alien.[16]

(f) It is unlawful for an occupant of a motor vehicle that is stopped on a street, roadway, or highway to attempt to hire or hire and pick up passengers for work at a different location if the motor vehicle blocks or impedes the normal movement of traffic.

(g) It is unlawful for a person to enter a motor vehicle that is stopped on a street, roadway or highway in order to be hired by an occupant of the motor vehicle and to be transported to work at a different location if the motor vehicle blocks or impedes the normal movement of traffic.

(h) A person who is in violation of this section shall be guilty of a Class C misdemeanor and subject to a fine of not more than five hundred dollars ($500).

(i) A court shall collect the assessments prescribed in subsection (h) and remit 50 percent of the assessments to the general fund of the local government where the person was apprehended to be earmarked for law enforcement purposes, 25 percent of the assessments to the Alabama Department of Homeland Security, and 25 percent of the assessments to the Department of Public Safety.

(j) The terms of this section shall be interpreted consistently with 8 U.S.C. § 1324a and any applicable federal rules and regulations.

H.B. 56 § 11.

---

[16]For reasons discussed *supra*, the last sentence of § 11(e) is due to be enjoined and will not be further discussed in this section.

H.B. 56 § 11(a) makes it a crime for "a person who is an unauthorized alien to knowingly apply for work, solicit work in a public or private place, or perform work as an employee or independent contractor in this state."  A person is an "unauthorized alien" if he or she does not have "authorization from the federal government to be employed in the United States." *Id*. (d).  For the purposes of enforcing of Section 11, "an alien's immigration status shall be determined by verification of the alien's immigration status with the federal government pursuant to 8 U.S.C. § 1373(c)." *Id*. (b).  Also, Section 11 "shall be interpreted consistently with 8 U.S.C. § 1324a and any applicable federal rules and regulations." *Id*. (j). Subsections (f) and (g) prohibit hiring or being hired by the occupant of vehicle stopped in the road if the vehicle blocks traffic and the intended work is to be performed at a different location. *Id*. (f), (g).  Neither subsection (f) or (g) requires that the individual hired be an unauthorized alien.

### 1.  Standing

#### a.  Section 11(a).

As set forth above, Section 11(a) seeks to criminalize work by unauthorized aliens. Plaintiff Juan Pablo Black Romero, who is in the United States on an F-1 student visa, contends that he will be subject to criminal prosecution under § 11(a) for soliciting work. Specifically, plaintiffs allege:

> 79.  As an F-1 visa holder, Plaintiff Romero is allowed to study in the United States and to get practical work experience (Optional Practical Training or "OPT") directly related to his field of study.  He must apply for an OPT after the completion of the requirements of his Ph.D. program but before

graduation.  He therefore must apply for an Employment Authorization Document ("EAD") from the U.S. immigration service, which can take up to three months to receive.  Federal authorities do not forbid an applicant for an EAD to apply for jobs prior to receiving the EAD.  Plaintiff Romero will begin searching for employment in Alabama for his OPT so that he may start it as soon as he receives his EAD from federal authorities.  If HB 56 is implemented, however, Plaintiff Romero will be subject to criminal prosecution for being an "unauthorized alien" who applies for or solicits work.

(Doc. 1 ¶ 79.)    Romero's injury is real and imminent, fairly traceable to defendants, and would be redressed by an injunction enjoining the enforcement of Section 11(a).  Therefore, the court finds that Romero has standing to challenge Section 11(a) under Counts One, Supremacy Clause, and Count Five, First Amendment.

Also, the court finds that Jane Doe #2 has standing to challenge Section 11(a) under Counts One and Five.  Jane Doe #2 has applied for a "U-visa (a form of federal immigration status for crime victims and witnesses that provides a pathway to permanent residence) based on the fact that she and her child cooperated in the criminal prosecution of a school official who sexually assaulted her child."  (Doc. 1 ¶ 117.)  Until the visa becomes available, Jane Doe #2 is not authorized to work; therefore, under H.B. 56 § 11(a), she may not lawfully "apply for work, solicit work in a public or private place, or perform work as an employee or independent contractor in [Alabama]."   The court finds Jane Doe #2 has alleged an injury that is real and imminent, fairly traceable to defendants, and would be redressed by an injunction enjoining the enforcement of H.B. 56.  Therefore, the court finds that Jane Doe #2 has standing to challenge Section 11(a) under Count One, Supremacy Clause, and Count Five, First Amendment.

59

### b.  Sections 11(f) and (g)

The court finds that John Doe #6 has standing to challenge Section 11(f) and (g) under Count Five.    John Doe #6 works as a day laborer, performing residential landscaping work. (Doc. 1 ¶¶ 163-64.)  He testified, " Potential employers drive by the corner where I wait for work and they stop and pick me up and others if they need help with landscaping tasks around their homes.  . . .  If HB 56 goes into effect, I fear the police will target and even arrest me for seeking day labor work in Hoover."  (Doc. 37-36 ¶¶ 5-6.)

The court finds John Doe #6 has alleged an injury that is real and imminent, fairly traceable to defendants, and would be redressed by an injunction enjoining the enforcement of Section § 11(g).  "Freedom of speech presupposes a willing speaker.  But where a speaker exists, as is the case here, the protection afforded is to the communication, to its source *and* to its recipients both."  *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 756 (1976)(emphasis added).  Therefore, John Doe # 6 has standing to challenge Section 11(f).

The court finds that John Doe #6 has standing to challenge Section 11(f) and (g) under Count Five, First Amendment.

### 2.  Preemption

In its Memorandum Opinion and Order granting the United States's Motion for Preliminary Injunction, the court found that H.B. 56 § 11(a) is preempted and it enjoined enforcement of that section.  *United States v. Alabama*, Case No. 2:11-CV-2746-SLB, docs.

93, 94.  Therefore, plaintiffs' Motion for Preliminary Injunction to the extent it seeks to enjoin Section 11(a) is moot.

### 3.  First Amendment

#### a.  Section 11(a)

Plaintiffs contend, "Section 11 of HB 56 constitutes an impermissible content-based regulation of speech by criminalizing work-related communications in traditional public fora and by criminalizing the solicitation of work by certain noncitizens."  (Doc. 37 at 62-63.) They argue that Section 11(a) "imposes a content-based restriction on speech by criminalizing the application for or solicitation of work in public areas by noncitizens who do not have federal work authorization."  (*Id*. at 65.)

Because the court has already determined that Section 11(a) is due to be enjoined on preemption grounds, it pretermits further discussion of whether this subsection should be enjoined on grounds based on the First Amendment.

#### b.  Section 11(f) and (g)

Plaintiffs challenge subsections (f) and (g) of Section 11 as violative of  the First Amendment's protection of free speech on the ground that they "are content-based regulations of speech because liability attaches only when individuals engage in speech about day labor."  (Doc. 37 at 63 [citing *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1266 (11th Cir. 2005); *Burk v. Augusta-Richmond County*, 365 F.3d 1247, 1254-55 (11th Cir.

61

2004); *S.O.C., Inc. v. County of Clark*, 152 F.3d 1136, 1145 (9th Cir. 1998)].)   These subsections provide:

> (f)  It is unlawful for an occupant of a motor vehicle that is stopped on a street, roadway, or highway ***to attempt to hire or hire and pick up passengers for work at a different location*** if the motor vehicle blocks or impedes the normal movement of traffic.

> (g)  It is unlawful for a person to enter a motor vehicle that is stopped on a street, roadway or highway ***in order to be hired by an occupant of the motor vehicle and to be transported to work at a different location*** if the motor vehicle blocks or impedes the normal movement of traffic.

H.B. 56 § 11(f)-(g)(emphasis added).[17]   Defendants contend that these subsections do not apply "when individuals engage in speech about day labor," but that they apply whenever the vehicle stops "for the purpose of picking up persons for work at another location" and the vehicle "block[s] or impede[s] the normal movement of traffic."  (Doc. 82 at 130 [quoting H.B. 56 § 11(f)-(g)].)  The plain language of the subsections requires (1) hiring or attempt to hire (whether for day labor or not), (2) intent to transport the hired individual to another location for work, and (3) blocking or impeding traffic flow.   The subsections do not limit "hiring" or "attempt to hire" to unauthorized aliens.

### i.  Are subsections (f) and (g) content-based restrictions on speech?

"The Supreme Court has articulated and applied various standards for determining whether a law is content based or content neutral.  'As a general rule, laws that by their terms

---

[17]Section 11(h) provides that persons in violation of Section 11(f) and (g) are guilty of a Class C misdemeanor and subject to a fine of not more than five hundred dollars.

distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based.'" *Solantic,* 410 F.3d at 1259 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 643 (1994)). However, "a content-neutral ordinance is one that 'places no restrictions on . . . either a particular viewpoint or any subject matter that may be discussed.'" *Id*. (quoting *Hill v. Colorado*, 530 U.S. 703, 723 (2000)). Such a law or ordinance has "***nothing*** to do with the content of speech but rather are imposed because of the nature of the regulated conduct." *Burk*, 365 F.3d at 1253 (emphasis added). "[A] content-neutral conduct regulation applies equally to all, and not just to those with a ***particular message or subject matter*** in mind." *Id*. at 1254 (emphasis added). The court finds that subsections (f) and (g) are not content neutral "because [they apply] to a particular subject matter of expression, [solicitation of employment], rather than to particular conduct, such as [blocking or impeding traffic]." *Id*.

### ii. Commercial Speech.

"The First Amendment requires heightened scrutiny whenever the government creates 'a regulation of speech because of disagreement with the message it conveys.'" *Sorrel v. IMS Health, Inc.*, 131 S. Ct. 2653, 2664 (2011) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *see also Burk*, 365 F.3d. at 1255. "In the ordinary case it is all but dispositive to conclude that a law is content-based and, in practice, viewpoint-discriminatory." *Sorrell*, 131 S. Ct. at 2667.

Alabama contends that the speech at issue is commercial speech.  (Doc. 82 at 128.)

Commercial speech is protected by the First Amendment.  *Lorillard Tobacco Co. v. Reilly*,

533 U.S. 525, 553 (2001).  In determining whether particular commercial speech is protected,

the Supreme Court has established a four-part test:

> [1]  [W]hether the expression is protected by the First Amendment.  For
> commercial speech to come within that provision, it at least must concern
> lawful activity and not be misleading.  . . .
>
> [2]  [W]hether the asserted governmental interest is substantial.
>
> If both inquiries [1 and 2] yield positive answers . . .
>
> [3]  [W]hether the regulation directly advances the governmental interest
> asserted, and
>
> [4]  [W]hether it is not more extensive than is necessary to serve that interest.

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980).

## A.  Lawful Activity

Defendants argue that solicitation of work by unlawfully-present aliens is unlawful;

therefore, "the First Amendment is not offended."  (Doc. 82 at 131.)  The court disagrees.

First, as previously explained in the court's Memorandum Opinion in *United States*

*v. Alabama*, Congress has not criminalized unlawfully-present aliens' solicitation of work.

*See United States v. Alabama*, Case No. 5:11-CV-2746-SLB, docs. 93, 94 ("Alabama's

decision, through H.B. 56 § 11(a), to criminalize work - which Congress explicitly chose not

to do through IRCA and the INA – "stands as an obstacle to the accomplishment and

execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67."). As

plaintiffs argue:

> John Doe #5 and John Doe #6 do not engage in illegal activity, as Defendants
> contend. They do engage in day labor activity and they both lack work
> authorization, but this does not violate the federal employer verification
> requirements. *See* 8 U.S.C. § 1324a. Under federal law, an employer must
> verify work authorization of every employee. *Id*. § 1324a(a). Yet "[t]he term
> employee . . . does not mean independent contractors . . . or those engaged in
> casual domestic employment . . . ." 8 C.F.R. § 274a.1(f). "Congress . . .
> intentionally excluded independent contractors from verification obligations."
> *Chamber of Commerce v. Edmondson*, 594 F.3d 742, 769 (10th Cir. 2010).
> The suggestion that by soliciting day labor work John Does #5 and #6 are
> engaging in impermissible activity is in error, for the kind of work performed
> by day laborers is precisely the kind of work meant to be exempt from federal
> employment verification and penalties.

(Doc. 109 at 57-58 [footnotes omitted].) H.B. 56 specifically exempts "the occupant of a

household contracting with another person to perform casual domestic labor within the

household" from the definition of "employer." H.B. 56 § 3(5). Although work by an

unlawfully-present alien may not be authorized, it is not sanctionable under federal law as

unlawful activity.

The court has not found, and the parties have not cited to, any decision interpreting

the *Central Hudson*'s requirement – that the speech at issue "concern lawful activity" – to

reach speech concerning some unauthorized activity that the United States has determined

to be unsanctionable. Therefore, the court finds that the solicitation of day labor described

in subsections (f) and (g) by unlawfully-present aliens is a "lawful concern."

### B. Asserted governmental interest

Plaintiffs contend that the government interest at issue in subsections (f) and (g) is traffic safety, which is a recognized substantial government interest.[18]  However, Alabama does not mention traffic safety as its interest at stake in subsections (f) and (g).[19]  It contends

_____

[18]"[S]treets and parks . . . have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)(quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939))(internal quotations omitted).  However, "it is clear that a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650, (1981)(citing *Grayned v. City of Rockford*, 408 U.S. 104, 115 (1972); *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941)); *see Sun-Sentinel Co. v. City of Hollywood*, 274 F. Supp. 2d 1323, 1329-30 (S.D. Fla. 2003)(citing *Ater v. Armstrong*, 961 F.2d 1224, 1229-30 (6th Cir. 1992); *Ass'n of Cmty. Org. for Reform Now v. St. Louis County*, 930 F.2d 591, 593 (8th Cir. 1991); *Int'l Soc'y for Krishna Consciousness of New Orleans, Inc. v. City of Baton Rouge*, 876 F.2d 494, 496-97 (5th Cir. 1989); *ACORN v. City of Phoenix*, 798 F.2d 1260, 1262 (9th Cir. 1986), *overruled in part Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 2011 WL 4336667 (9th Cir. Sept. 16, 2011); *Denver Publ'g Co. v. City of Aurora*, 896 P.2d 306, 309 (Colo. 1995)).

[19]Alabama does not assert any governmental interest in that portion of its brief specifically addressing subsections (f) and (g).  It argues only that the day-labor transactions of John Doe #5 and John Doe #6 are unlawful and, therefore, not protected:

> The Plaintiffs contend that Section 11(f) and Section 11(g) "mak[e] it unlawful for a person in a vehicle to attempt to hire or hire day laborers" and that they "are content-based regulations of speech because liability attaches only when individuals engage in speech about day labor." Doc. 37 at 63.  In fact, neither Section 11(f) nor Section 11(g) refers in any way to day laborers.  Instead, the provisions speak only to motor vehicles that are "stopped on a street, roadway, or highway" for the purpose of picking up persons for work at another location and that "block[] or impede[] the normal movement of traffic."  Sections 11(f) and (g), Doc. 1-2 at 33.  Thus, these provisions are as applicable to prostitutes as they are to the day laborers John Doe #5 and John Doe #6.

(continued...)

66

that Section 11 is "much less about regulating speech than about limiting the conduct of soliciting work which one is not authorized – by federal government dictate – to perform." (Doc. 82 at 138.)  This court may not "supplant the precise interests put forward by the State with other suppositions."  *Edenfield v. Fane*, 507 U.S. 761, 768 (1993).   Therefore, for purposes of deciding plaintiffs' Motion for Preliminary Injunction, this court will assume that "solicitati[on] [of] work which one is not authorized . . . to perform" is the "substantial government interest"  at stake.  (*See* doc. 82 at 138.)

Given the court's discussion in its memorandum Opinion and Order in *United States v. Alabama*, regarding Congress's decision not to sanction the unlawfully-present alien for working, the court finds that Alabama does not have a substantial interest in limiting the solicitation of work by unauthorized aliens.  *See United States v. Alabama*, Case No. 2:11-CV-2746-SLB, docs. 93, 94.  Moreover, in light of the definition of "employer" in H.B. 56,

---

[19](...continued)

The very idea that it would be a violation of the First Amendment to prohibit solicitation of the services of a prostitute is laughable.  At least insofar as applied to immigrants lacking federal authority to work, like John Doe #5 and John Doe #6, doc. 1 at ¶¶ 160, 163, there is no relevant difference here.  That is because the underlying transaction is unlawful, and so the First Amendment is not offended.

Whether the provisions would survive a challenge as content-based restrictions on speech if brought by someone who did not propose an unlawful underlying transaction is a question that does not appear to be presented by this record.  Instead, it appears that Plaintiffs believe that John Doe #5 and John Doe #6 are the individuals with standing to assert this claim.

(Doc. 82 at 130-32 [internal citations and footnotes omitted].)

which excludes anyone who hires domestic casual labor for their home, the Alabama legislature does not seem to consider prohibiting the work of day laborers performing "domestic casual labor," such as the work performed by John Doe #5 and John Doe #6, to be of substantial interest.

Nevertheless, for purposes of deciding plaintiffs' Motion for Preliminary Injunction, the court will assume that Alabama's interest in limiting solicitation of work by unlawfully-present aliens is substantial.

### c. Directly advances the governmental interest asserted

In order "to uphold a restriction on commercial speech" set forth in subsection (f) and (g), Alabama has "the burden of justifying it." *Edenfield*, 507 U.S. 761, 770 (1993) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 71 n. 20 (1983)). "This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that ***the harms it recites are real*** and that ***its restriction will in fact alleviate them to a material degree***." *Id*. at 770-71 (emphasis added). In opposition to plaintiffs' Motion for Preliminary Injunction, defendants do not offer evidence to support either an allegation that the harms are real or that enforcement of subsections (f) and (g) will alleviate the harm.

The court notes that the subsections are not limited to solicitations by unlawfully-present aliens, the alleged harm Alabama sought to address. Moreover, only individuals engaged in the solicitation of day labor – those hired or hiring on the street for work at

68

another location – are affected by subsections (f) and (g).   Any other solicitation, even if it stops or impedes traffic, is not actionable under subsections (f) and (g).  Also, the subsections do not purport to target only the solicitation of unlawful transactions, the alleged harm Alabama sought to address.

The court finds that the record does not demonstrate that unlawfully-present aliens being hired as day laborers on Alabama streets is a real harm that subsections (f) and (g) will alleviate.

### D.  More extensive than is necessary to serve that interest

Alabama's stated purpose for Section 11 is to prohibit unlawfully present aliens from working.  However, subsections (f) and (g) do not limit their application to transactions that include an unlawfully-present alien.  Indeed, they prohibit all solicitations for day labor that stop or impede traffic.  "In previous cases addressing this final prong of the *Central Hudson* test, [the Supreme Court has] made clear that if the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, the Government must do so."  *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 371 (2002).  Alabama has chosen to bar all solicitations for day labor to achieve its interest in barring unlawfully- present aliens from soliciting day labor; this restriction of speech is excessive.

For the foregoing reasons the court finds that plaintiffs have established that they are likely to succeed on the merits with regard to Count Five of their Complaint.

69

The court notes that plaintiff John Doe #6 will suffer irreparable harm if he is not allowed to solicit work as a day laborer.  Moreover, this threatened injury outweighs any damage delaying the enforcement of Sections 11 (f) and (g) may cause defendants.  Also, enjoining the enforcement of Sections 11 (f) and (g) is not adverse to the public interest.

Plaintiffs' Motion for Preliminary Injunction, seeking to enjoin Sections 11 (f) and (g) of H.B. 56 will be granted and enforcement of these subsections will be enjoined pending resolution of this case.

## E.  SECTION 12

Section 12 of H.B. 56 provides:

(a)  Upon any lawful stop, detention, or arrest made by a state, county, or municipal law enforcement officer of this state in the enforcement of any state law or ordinance of any political subdivision thereof, where reasonable suspicion exists that the person is an alien who is unlawfully present in the United States, a reasonable attempt shall be made, when practicable, to determine the citizenship and immigration status of the person, except if the determination may hinder or obstruct an investigation.  Such determination shall be made by contacting the federal government pursuant to 8 U.S.C. § 1373(c) and relying upon any verification provided by the federal government.

(b)  Any alien who is arrested and booked into custody shall have his or her immigration status determined pursuant to 8 U.S.C. § 1373(c).  The alien's immigration status shall be verified by contacting the federal government pursuant to 8 U.S.C. § 1373(c) within 24 hours of the time of the alien's arrest.  If for any reason federal verification pursuant to 8 U.S.C. § 1373(c) is delayed beyond the time that the alien would otherwise be released from custody, the alien shall be released from custody.

(c)  A law enforcement officer shall not attempt to independently make a final determination of whether an alien is lawfully present in the United States.  A law enforcement officer may not consider race, color, or national origin in implementing the requirements of this section except to the extent

permitted by the United States Constitution or the Constitution of Alabama of 1901.

(d)  A person is presumed to not be an alien who is unlawfully present in the United States if the person provides to the law enforcement officer any of the following:

(1)  A valid, unexpired Alabama driver's license.

(2)  A valid, unexpired Alabama nondriver identification card.

(3)  A valid tribal enrollment card or other form of tribal identification bearing a photograph or other biometric identifier.

(4)  Any valid United States federal or state government issued identification document bearing a photograph or other biometric identifier, if issued by an entity that requires proof of lawful presence in the United States before issuance.

(5)  A foreign passport with an unexpired United States Visa and a corresponding stamp or notation by the United States Department of Homeland Security indicating the bearer's admission to the United States.

(6)  A foreign passport issued by a visa waiver country with the corresponding entry stamp and unexpired duration of stay annotation or an I-94W form by the United States Department of Homeland Security indicating the bearer's admission to the United States.

(e)  If an alien is determined by the federal government to be an alien who is unlawfully present in the United States pursuant to 8 U.S.C. § 1373(c), the law enforcement agency shall cooperate in the transfer of the alien to the custody of the federal government, if the federal government so requests.

H.B. 56 § 12.

### 1.  Standing

The court finds that plaintiff Jane Doe #2 has standing to challenge Section 12 of H.B. 56 through Count One, Supremacy Clause, and Count Two, Fourth Amendment – Unreasonable Search and Seizure.  Jane Doe #2 alleges that she does not have an Alabama driver's license.  (Doc. 37-26 ¶ 2.)  Nevertheless, she contends that she must drive to work and to take her children to school.  (*Id.* ¶ 14.)  She contends, "if HB 56 is implemented, [she] will be subject to unlawful interrogation and detention by law enforcement officials based on her Latina appearance and lack of state-approved identity documents."  (Doc. 1 ¶ 118.) This threat of injury is real and imminent, fairly traceable to the Act, and would be redressed by an injunction enjoining the enforcement of H.B. 56.  Therefore, the court finds that Jane Doe #2 has standing to challenge Section 12 of H.B. 56 in Counts One and Two.

### 2.  Preemption

In its Memorandum Opinion and Order granting the United States's Motion for Preliminary Injunction, the court found that H.B. 56 Section 12 is not preempted by federal law.  *United States v. Alabama*, Case No. 2:11-CV-2746-SLB, docs. 93, 94.  For the same reasons, the court will deny plaintiffs' Motion for Preliminary Injunction to the extent it seeks to enjoin Section 12 on preemption grounds..

### 3.  Fourth Amendment

Plaintiffs allege that Section 12 of H.B. 56 "requires officers to seize, detain, and arrest individuals without reasonable suspicion or probable cause to believe a person has

engaged in criminal activity in violation of the Fourth Amendment." (Doc. 1 ¶ 345.) Plaintiffs bear a substantial burden in mounting their pre-enforcement facial challenge to Section 12 on the basis that it violates their right to be free from unreasonable searches and seizures protected by the Fourth Amendment of the United States Constitution. A "facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Because the Supreme Court has not recognized an overbreadth doctrine outside the context of the First Amendment, the fact that H.B. 56 "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *Id.*

Plaintiffs claim that Section 12 violates the Fourth Amendment's prohibition against unreasonable searches and seizures by "mandat[ing] the prolonged detention or arrest of individuals based only on perceived violation of federal civil immigration law." (Doc. 37 at 49-50.) They challenge only subsections (a) and (e) of Section 12.

Section 12 sets out a procedure under which state and local law enforcement officers are required to check the immigration or citizenship status of an individual upon a lawful stop, detention, or arrest "where reasonable suspicion exists that the person is an alien who is unlawfully present in the United States," but only "when practicable." H.B. 56 § 12(a). Officers are not required to check the individual's immigration status "if the determination may hinder or obstruct an investigation." *Id.* "If an alien is determined . . . to be an alien

73

who is unlawfully present . . . , the law enforcement agency shall cooperate in the transfer of the alien to the custody of the federal government, if the federal government so requests." *Id.* (e).

### a. Section 12(a)

Plaintiffs contend, "because unlawful presence is a federal civil violation and not a crime, this scheme [outlined in section 12(a)] violates the Fourth Amendment by requiring seizures without suspicion of or probable cause to believe that a person is engaging in criminal activity." (Doc. 37 at 52 [internal citation omitted].)

Under 8 U.S.C. § 1357, federal immigration officers are authorized to conduct warrantless interrogations and certain detentions based on a reasonable belief that the alien is illegally in the United States. *See* § 1357(a) (authorizing warrantless interrogations of "any alien or person believed to be an alien as to his right to be or to remain in the United States"); *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 884-85 (1975) (listing factors that could, if observed, give federal INS officer reasonable suspicion that a person is unlawfully in the United States). The court agrees with plaintiffs that state law enforcement officers do not have the inherent authority to stop and arrest an individual for mere unlawful presence, which is a civil immigration violation. *See Arizona*, 641 F.3d at 362; *see also United States v. Urrieta*, 520 F.3d 569, 574 (6th Cir. 2008) (noting that "local law enforcement officers cannot enforce completed violations of civil immigration law (i.e., illegal presence) unless specifically authorized to do so by the Attorney General").

74

Plaintiffs claim Section 12(a) will result in prolonged detention during police stops in violation of the Fourth Amendment. Section 12(a) requires only that the law enforcement officer make a "reasonable attempt . . . when practicable" to verify the individual's immigration or citizenship status. H.B. 56 § 12(a). If an officer initiates a verification inquiry but does not receive a response within a reasonable time, the officer is, under the plain language of Section 12(a), entitled to terminate the inquiry. Defendants contend that if an individual is pulled over for a traffic violation, and if "the only way to check the driver's immigration status is to prolong the stop 'beyond the time reasonably required to' write the ticket in violation of the Fourth Amendment, . . . then it is not ***reasonable***, under Act No. 2011-535, to attempt to ascertain the driver's immigration status," and, therefore, the Act would not require the officer to make an immigration status verification in such a circumstance. (Doc. 82 at 98 [emphasis in original].) Certainly, if as defendants contend, officers will not conduct immigration inquiries when doing so will take longer than the time necessary to complete the original purpose of the stop, then implementation of Section 12(a) will not violate the Fourth Amendment. *See Muehler*, 544 U.S. at 101 ("[A] lawful seizure 'can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.'" (*quoting Illinois v. Caballes*, 543 U.S. 405, 407 (2005))).

For purposes a deciding a pre-enforcement facial challenge, a finding that some legitimate application of the statute is constitutional ends the court's inquiry. *Stevens*, 130 S. Ct. at 1587 ("To succeed in a typical facial attack [on other than First Amendment

grounds], [a plaintiff] would have to establish 'that no set of circumstances exists under which [the challenged statute] would be valid,' *United States v. Salerno*, 481 U.S. 739, 745 (1987), or that the statute lacks any 'plainly legitimate sweep,' *Washington v. Glucksberg*, 521 U.S. 702, 740, n.7 (1997)(STEVENS, J., concurring in judgments)(internal quotation marks omitted).")(parallel citations omitted).  As noted above, if as defendants contend, officers will not conduct immigration inquiries when doing so will take longer than the time necessary to complete the original purpose of the stop, then implementation of Section 12(a) will not violate the Fourth Amendment.  The court also finds that some situations will support a prolonged detention during which time immigration status may be ascertained. Therefore, plaintiffs' pre-enforcement facial challenge to Section 12(a) will not succeed.

Nevertheless, the court notes that Section 12(a) may result in lawsuits based on the application of Section 12(a) by officers who are not trained to discern suspicion of unlawful presence without consideration of the person's race, color, or national origin.  At oral argument, defendants asserted that ICE agents are trained to recognize those who are not lawfully present based on facts other than an individual's race or ethnic characteristics.  This training takes four weeks and covers subjects including "immigration law, intercultural relations, and how to use DHS databases to help positively identify criminals and immigration violators." (Doc. 37-37 ¶ 6.) However, state and local law enforcement officers have not received such training and nothing in the record indicates that they will be trained

76

on such techniques before H.B. 56 goes into effect.[20]  (*See id*. ¶ 20; doc. 37-38 ¶ 10;  2-10 ¶ 5.)  At oral argument  defendants conceded that Alabama law enforcement officers had not been trained to avoid racial profiling in determining whether there is a reasonable suspicion of unlawful presence.  Without such training and without reasonable guidelines and in light of H.B. 56 § 6(b)'s requirement of enforcement to the fullest extent, Section 12(a) may well be applied in a discriminatory manner and in a manner that constitutes an unreasonable seizure.  (*See* doc. 37-37 ¶ 21; doc. 37-38 ¶ 11; *see also United States v. Alabama*, Case No. 2:11-CV-2746, doc. 2-5 ¶ 11.)   Any such unlawful actions must await an as-applied challenge; the court cannot strike down Section 12(a) on a facial challenge if some application will be constitutional.

---

[20]Sheriff Todd Entrekin of Etowah County testified:

I am concerned about how to train our Deputies to enforce this law.  Our Deputies are comfortable establishing the existence of reasonable suspicion as to criminal conduct generally, but with the exception of our 287(g) "deputies" [who have been trained by DHS], no one else is trained or familiar with reasonable suspicion as to immigration status.  I know this is not a trivial process because I had to send out 278(g) deputies through a four-week training before they could be certified on the 287(g) process.  Now I am being asked to train all deputies to perform the same tasks, but this is impossible for me to do.  Our patrol deputies have never received training on federal immigration law, and I am concerned that any training provided by the State regarding the meaning of the federal immigration laws, or the new state immigration law, will not equip our deputies with the necessary knowledge and expertise that would allow them to reasonably suspect when someone is in the country unlawfully.

(Doc. 37-37 ¶ 20.)

### b. Section 12(e)

Section 12(e) of H.B. 56 states: "If an alien is determined by the federal government to be an alien who is unlawfully present in the United States pursuant to 8 U.S.C. § 1373(c), the law enforcement agency shall cooperate in the transfer of the alien to the custody of the federal government, if the federal government so requests." H.B. 56 § 12(e).  Plaintiffs argue that Section 12(e) "violates the Fourth Amendment by requiring law enforcement to take custody of individuals" when they receive federal verification that the individual is an alien that is not lawfully present.  (Doc. 37 at 52-53.)  They contend that, because there is no time limit in Section 12(e), "individuals will be effectively arrested without probable cause of any criminal wrongdoing."  (*Id.* at 53.)  Defendants respond that Section 12(e) does not direct any law enforcement officer to take custody of anyone, but rather "presumes that the person [who is determined to be an alien unlawfully present by the federal government] is already lawfully in custody and directs cooperation with the federal government."  (Doc. 82 at 99.)

The court agrees with defendants' construction of Section 12(e).  Under a logical reading of Section 12(e), a state or local law enforcement officer will have custody of an individual at the time that individual is "determined by the federal government to be an alien who is unlawfully present in the United States pursuant to 8 U.S.C. § 1373(c)."  H.B. 56 § 12(e).  Plaintiffs cite no authority for their assertion that state or local law enforcement agencies may not transport such a lawfully-detained person in their custody.  And, regardless

of whether the individual is already in law enforcement custody, the individual will only be transferred if the federal government requests.

Even if the court did not accept defendants' limiting construction, it must find that at least some of the aliens determined to unlawfully present will be "arrested and booked" on probable cause at the time the federal government requests their transfer. *See* H.B. 56 § 12(b). Therefore, some applications of Section 12(e) will be constitutional. Plaintiff's facial challenge to Section 12(e) is not likely to succeed. *See Stevens*, 130 S. Ct. at 1587.

For these reasons, plaintiffs' Motion for Preliminary Injunction on their claim that Section 12(a) violates the Fourth Amendment will be denied.

## F.  SECTION 13

Section 13 provides:

> (a)  It shall be unlawful for a person to do any of the following:
>
> (1)  Conceal, harbor, or shield or attempt to conceal, harbor, or shield or conspire to conceal, harbor, or shield an alien from detection in any place in this state, including any building or any means of transportation, if the person knows or recklessly disregards the fact that the alien has come to, has entered, or remains in the United States in violation of federal law.
>
> (2)  Encourage or induce an alien to come to or reside in this state if the person knows or recklessly disregards the fact that such coming to, entering, or residing in the United States is or will be in violation of federal law.
>
> (3)  Transport, or attempt to transport, or conspire to transport in this state an alien in furtherance of the unlawful presence of the alien in the United States,  knowingly, or in reckless disregard of the fact, that the alien has come to, entered, or remained in the United States in

violation of federal law.  Conspiracy to be so transported shall be a violation of this subdivision.

(4)  Harbor an alien unlawfully present in the United States by entering into a rental agreement, as defined by Section 35-9A-141 of the Code of Alabama 1975, with an alien to provide accommodations, if the person knows or recklessly disregards the fact that the alien is unlawfully present in the United States.

(b)  Any person violating the provisions of this section is guilty of a Class A misdemeanor for each unlawfully present alien, the illegal presence of which in the United States and the State of Alabama, he or she is facilitating or is attempting to facilitate.

(c)  A person violating the provisions of this section is guilty of a Class C felony when the violation involves 10 or more aliens, the illegal presence of which in the United States and the State of Alabama, he or she is facilitating or is attempting to facilitate.

(d)  Notwithstanding any other law, a law enforcement agency may securely transport an alien whom the agency has received verification from the federal government pursuant to 8 U.S.C. § 1373(c) is unlawfully present in the United States and who is in the agency's custody to a state approved facility, to a federal facility in this state, or to any other point of transfer into federal custody that is outside the jurisdiction of the law enforcement agency.  A law enforcement agency shall obtain judicial or executive authorization from the Governor before securely transporting an alien who is unlawfully present in the United States to a point of transfer that is outside this state.

(e)  Notwithstanding any other law, any person acting in his or her official capacity as a first responder or protective services provider may harbor, shelter, move, or  transport an alien unlawfully present in the United States pursuant to state law.

(f)  Any conveyance, including any vessel, vehicle, or aircraft, that has been or is being used in the commission of a violation of this section, and the gross proceeds of such a violation, shall be subject to civil forfeiture under the procedures of Section 20-2-93 of the Code of Alabama 1975.

(g)  In the enforcement of this section, an alien's immigration status shall be determined by verification of the alien's immigration status with the federal government pursuant to 8 U.S.C. § 1373(c).  A law enforcement officer shall not attempt to independently make a final determination of whether an alien is lawfully present in the United States.

(h)  Any record that relates to the immigration status of a person is admissible in any court of this state without further foundation or testimony from a custodian of records if the record is certified as authentic by the federal government agency that is responsible for maintaining the record.   A verification of an alien's immigration status received from the federal government pursuant to 8 U.S.C. § 1373(c) shall constitute proof of that alien's status.   A court of this state shall consider only the federal government's verification in determining whether an alien is lawfully present in the United States.

H.B. 56 § 13.

## 1.  Standing

The court finds plaintiff Webster has standing to raise the challenge Section 13 of H.B. 56 in Count One, Supremacy Clause, of plaintiffs' Complaint.  Webster is the guardian of two children who are not lawfully present.  (Doc. 1 ¶¶ 63-64.)  As a result of his guardianship, Webster alleges, "If HB 56 is implemented, I will be considered a criminal for harboring, encouraging and transporting my own sons to do basic activities a father would do with his sons."  (Doc. 37-13 ¶ 6.)   This injury is real and imminent, fairly traceable to defendants, and would be redressed by an injunction enjoining the enforcement of Section 13 of H.B. 56.  Therefore, the court finds that Webster has standing to challenge Section 13 of H.B. 56 in Count One.

The court also notes that plaintiffs Jeffrey Allen Beck and Michele Cummings allege that they regularly rent to immigrants they believe are not lawfully present and they intend to do so after H.B. 56 takes effect.  (Doc. 1 ¶¶ 102, 107.)  They contend that they will lose revenue and be subjected to criminal prosecution when Section 13 of H.B. 56 takes effect. (*Id*. ¶¶ 104, 108.)  These injuries are real and imminent, fairly traceable to defendants, and would be redressed by an injunction enjoining the enforcement of Section 13 of H.B. 56. Therefore, the court finds that Beck and Cummings have standing to challenge Section 13 of H.B. 56 in Count One.

### 2.  Preemption

In its Memorandum Opinion and Order granting the United States's Motion for Preliminary Injunction, the court found that Section 13 of H.B. 56 is preempted and it enjoined enforcement of that section.  *See United States v. Alabama*, Case No. 2:11-CV-2746-SLB, docs. 93, 94.  Therefore, plaintiffs' Motion for Preliminary Injunction to the extent it seeks to enjoin Section 13 is moot.[21]

### G.  SECTIONS 18, 19, AND 20

Section 18 provides:

Section 32-6-9, Code of Alabama 1975, is amended to read as follows:

---

[21]In Count Four of plaintiffs' Complaint they raise a claim based on the Due Process Clause of the Fourteenth Amendment, which includes a challenge to Section 13.  (Doc. 1 ¶ 356; doc. 104-1 at 6.)  However, their Motion for Preliminary Injunction does not raise this claim; therefore, it is not addressed in this Memorandum Opinion.

"§32-6-9.

"(a)  Every licensee shall have his or her license in his or her immediate possession at all times when driving a motor vehicle and shall display the same, upon demand of a judge of any court, a peace officer or a state trooper. However, no person charged with violating this section shall be convicted if he or she produces in court or the office of the arresting officer a driver's license theretofore issued to him or her and valid at the time of his or her arrest.

"(b) Notwithstanding the provisions of Section 32-1-4, if a law officer arrests a person for a violation of this section and the officer is unable to determine by any other means that the person has a valid driver's license, the officer shall transport the person to the nearest or most accessible magistrate.

"(c) A reasonable effort shall be made to determine the citizenship of the person and if an alien, whether the alien is lawfully present in the United States by verification with the federal government pursuant to 8 U.S.C. § 1373(c).  An officer shall not attempt to independently make a final determination of whether an alien is lawfully present in the United States.

["](d) A verification inquiry, pursuant to 8 U.S.C. § 1373(c), shall be made within 48 hours to the Law Enforcement Support Center of the United States Department of Homeland Security or other office or agency designated for that purpose by the federal government.  If the person is determined to be an alien unlawfully present in the United States, the person shall be considered a flight risk and shall be detained until prosecution or until handed over to federal immigration authorities."

H.B. 56 § 18 (underlining in original).

Section 19 provides:

(a)  When a person is charged with a crime for which bail is required, or is confined for any period in a state, county, or municipal jail, a reasonable effort shall be made to determine if the person is an alien unlawfully present in the United States by verification with the federal government pursuant to 8 U.S.C. § 1373(c).

(b)  A verification inquiry, pursuant to 8 U.S.C. § 1373(c), shall be made within 48 hours to the Law Enforcement Support Center of the United States Department of Homeland Security or other office or agency designated for that purpose by the federal government.  If the person is determined to be an alien unlawfully present in the United States, the person shall be considered a flight risk and shall be detained until prosecution or until handed over to federal immigration authorities.

H.B. 56 § 19.

Section 20 provides:

If an alien who is unlawfully present in the United States is convicted of a violation of state or local law and is within 30 days of release or has paid any fine as required by operation of law, the agency responsible for his or her incarceration shall notify the United States Bureau of Immigration and Customs Enforcement and the Alabama Department of Homeland Security, pursuant to 8 U.S.C. § 1373.  The Alabama Department of Homeland Security shall assist in the coordination of the transfer of the prisoner to the appropriate federal immigration authorities; however, the Alabama Department of Corrections shall maintain custody during any transfer of the individual.

H.B. 56 § 20.

Sections 18 and 19 of H.B. 56 not only authorize but mandate detention of unlawfully present aliens "until prosecution or until handed over to federal immigration authorities." H.B. 56 §§ 18(d), 19(b).  Section 20 also mandates continued detention of individuals who have been convicted of state law and are within 30 days of release or have "paid any fine" by stating that the Alabama Department of Homeland Security "shall assist in the coordination of the transfer of the prisoner to the appropriate federal immigration authorities" and that the Alabama Department of Corrections "shall maintain custody during any transfer of the individual."  *Id*. § 20.  The language of Section 20 implies that aliens may be detained

past the point they would otherwise have been released solely on the basis of their immigration status.

## 1. Standing

For the reasons set forth above in the court's discussion of Section 12, the court finds that Jane Doe #2 has standing to assert this challenge to Sections 18 and 19, which mandate detention of unlawfully-present aliens stopped for driving without a driver's license and/or confined for any period in jail.  Because Section 18 allows for verification of lawful presence up to 48 hours after the stop, Section 19 also applies to any detention under Section 18 because Section 19 mandates detention and verification of immigration status for any person "confined for any period of time in a state, county, or municipal jail." *Id*. §§ 18, 19(a). Because Jane Doe # 2 has alleged that she will continue to drive without a driver's license, the court finds the threat that she will be detained pursuant to Section 18 or Section 19 is concrete and imminent, fairly traceable to Sections 18 and 19, and would be redressed by an injunction enjoining the enforcement of the Act.

Plaintiffs also challenge Section 20, which applies to unlawfully-present aliens that have been "convicted of a violation of state or local law."  At this stage of the proceedings, the court finds the fact that one or more of the plaintiffs will be subject to Section 20 based on a criminal conviction is "several steps removed from the threat of prosecution" for violations of H.B. 56.  *Osterweil v. Edmonson*, 424 Fed. Appx. 342, 344 (5th Cir. 2011); *see also Stanko v. United States*, No. 95-35289, 1995 WL 499524, at *1 (9th Cir. Aug. 22,

1995)("Although we do not insist that an individual break the law in order to test the constitutionality of a statute, the plaintiff lacks standing when the future harm is hypothetical or based upon a chain of speculative contingencies, particularly a chain that includes the violation of an unchallenged law") (internal quotations, alterations, and citations omitted)).

The court finds that plaintiffs have not established a real and concrete threat of injury arising from the enforcement of Section 20; therefore, plaintiffs lack standing to challenge Section 20 of H.B. 56.

### 2. Preemption

In its Memorandum Opinion and Order granting the United States's Motion for Preliminary Injunction, the court found that Section 18 of H.B. 56 is not preempted. *United States v. Alabama*, Case No. 2:11-CV-2746-SLB, docs. 93, 94. Moreover, the same reasoning that supports the court's rejection of the preemption argument with regard to Section 18 applies with equal strength to Section 19. For the same reasons, the court will deny plaintiffs' Motion for Preliminary Injunction to the extent it seeks to enjoin Sections 18 and 19.

### 3. Fourth Amendment

Plaintiffs allege that Sections 18 and 19 of H.B. 56 violate the Fourth Amendment "because they require Alabama jails to maintain custody of a person solely because an immigration status check is pending and absent any lawful basis for detention." (Doc. 37 at 54-55.) In order to determine whether Sections 18 and 19 violate the Fourth Amendment the

court must decide:   (1) whether state and local law enforcement officers may send immigration inquiries and notifications to the federal government under the circumstances described in Sections 18 and 19; and (2) whether state law enforcement officers can detain an individual found to be an unlawfully-present alien "until prosecution or until handed over to federal immigration authorities", as mandated by Sections 18(d) and 19(b).

First, the court finds no constitutional issue with regard to the verification requirements in Sections 18 and 19.   The act of verifying an individual's citizenship status by contacting the federal government, as required by Sections 18 and 19, does not, without more, constitute a seizure.   These sections do not explicitly require that the arrested individual be detained or otherwise restricted during the verification inquiry. *See* H.B. 56 Sections 18, 19(a).   Therefore, Sections 18 and 19(a), standing alone, do not violate the Fourth Amendment. *See Terry*, 392 U.S. at 20 n.16 ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.").

The court finds that plaintiffs have not shown that they are likely to succeed on the merits of their Fourth Amendment pre-enforcement facial challenge to Sections 18 and 19(a). Therefore,  their Motion to enjoin those subsections will be denied.

The first sentence of Ala. Code § 32-6-9(d), as amended by H.B. 56 § 18,[22] and the first sentence of Sections 19(b), which both require that verification inquiries be made within 48 hours, are also valid for this same reason.  Those sentences, standing alone, do not state that the individual must be unlawfully detained while the verification inquiries are conducted. Plaintiffs contend that under § 32-6-9(d), as amended by H.B. 56 § 18, "[i]ndividuals who would normally be released from custody (because, for example, charges against them were dismissed) will face continued detention based *solely* on suspicion of federal civil immigration violations." (Doc. 37 at 54 [emphasis in original].)  Likewise, plaintiffs contend that Section 19(b) mandates the continued detention of anyone who has been confined for any period in a state, county, or municipal jail, "regardless of whether the lawful basis for their original custody has ended."  (*Id*.)  Defendants contend that "the Court should read [§ 32-6-9(d), as amended by H.B. 56 § 18,] to implicitly include the phrase 'whichever is sooner' at the very end, such that a person will only be detained pending prosecution or, in the event that the federal government seeks custody before then, 'until handed over to federal immigration authorities.'" (Doc. 82 at 105.)

Under the plain language of sections 18(d) and 19(b), state law enforcement shall detain unlawfully-present aliens until prosecution or until handed over to federal immigration

---

[22]Plaintiffs refer to "Section 18(d)," (doc. 37 at 54); however, Section 18 does not have subsections.  Rather, as set forth above, Section 18 is amending Ala. Code § 32-6-9, which does have subsections.  In this Memorandum Opinion, the court will refer to plaintiffs' Sections 18(d) as Ala. Code § 32-6-9(d), as amended by H.B. 56 § 18.

authorities, regardless of whether the aliens would have been released from custody for the underlying offense. Therefore, as plaintiffs argue, these sections require law enforcement officials to maintain custody of arrestees solely on the basis of unlawful presence, a federal civil immigration violation. Under § 32-6-9(d), as amended by H.B. 56 § 18, and H.B. 56 § 19, state law enforcement officials will maintain custody of some individuals after they would have been released from custody – in other words, past the point detention is permitted under the Fourth Amendment. *See United States v. Soto-Cervantes*, 138 F.3d 1319, 1322 (10th Cir.1998) ("[R]easonable suspicion must exist at all stages of the detention, although it need not be based on the same facts throughout.").

However. the specific determination of a constitutional violation of the Fourth Amendment can only be determined based on the specific facts surrounding the detention. *See Ornelas*, 517 U.S. at 695-96. Unquestionably some individual will be lawfully detained under Ala. Code § 32-6-9, as amended by H.B. 56 § 18, or H.B. 56 § 19. Therefore, plaintiffs' challenge to these laws must await an as-applied challenge. The court finds plaintiffs' Fourth Amendment challenge to Ala. Code § 32-6-9, as amended by H.B. 56 § 18, and H.B. 56 § 19, is not likely to succeed on the merits.

Based on the foregoing, plaintiffs' Motion for Preliminary Injunction as to Ala. Code § 32-6-9, as amended by H.B. 56 § 18, and H.B. 56 §§ 19 and 20 will be denied.

89

## H.  SECTION 27

Section 27 provides:

(a)  No court of this state shall enforce the terms of, or otherwise regard as valid, any contract between a party and an alien unlawfully present in the United States, if the party had direct or constructive knowledge that the alien was unlawfully present in the United States at the time the contract was entered into, and the performance of the contract required the alien to remain unlawfully present in the United States for more than 24 hours after the time the contract was entered into or performance could not reasonably be expected to occur without such remaining.

(b)  This section shall not apply to a contract for lodging for one night, a contract for the purchase of food to be consumed by the alien, a contract for medical services, or a contract for transportation of the alien that is intended to facilitate the alien's return to his or her country of origin.

(c)  This section shall not apply to a contract authorized by federal law.

(d)  In proceedings of the court, the determination of whether an alien is unlawfully present in the United States shall be made by the federal government, pursuant to 8 U.S.C. § 1373(c).  The court shall consider only the federal government's determination when deciding whether an alien is unlawfully present in the United States.  The court may take judicial notice of any verification of an individual's immigration status previously provided by the federal government and may request the federal government to provide further automated or testimonial verification.

H.B. 56 § 27.

In essence, Section 27 strips an unlawfully-present alien of the capacity to contract except in certain circumstances – *i.e.* the contract could be performed in less than 24 hours. H.B. 56 § 27(a).  Section 27(b) excepts from the operation of subsection (a) certain contracts based on the subject matter of the agreement – *i.e.* "lodging for one night, a contract for the purchase of food to be consumed by the alien, a contract for medical services, or a contract

for transportation of the alien that is intended to facilitate the alien's return to his or her country of origin." Capacity to contract is typically understood as established by state law. *See United States v. Yazell*, 382 U.S. 341, 343, 352-53 (1966).

## 1. Standing

The court finds plaintiffs Robert Barber and Daniel Upton have standing to challenge Section 27 though Count One, Supremacy Clause, and plaintiff Jane Doe #5 has standing to challenge Section 27 through Count 9, § 1981. Both Barber and Upton allege that they represent unlawfully-present aliens and, if Section 27 takes effect, they will not be able to make or enforce contracts for their services. (Doc. 1 ¶¶ 96, 100.) Jane Doe # 5, who is not lawfully present, alleges that she will not be able to obtain "basic necessities," a home, transportation, and a cell phone if Section 27 takes effect. (*Id.* ¶ 134.) These injuries are real and imminent, fairly traceable to defendants, and would be redressed by an injunction enjoining the enforcement of Section 27 of H.B. 56. Therefore, the court finds Barber, Upton, and Jane Doe #5 have standing to challenge Section 27 of H.B. 56 in Count One and Count Nine.

## 2. Preemption

In its Memorandum Opinion and Order granting the United States's Motion for Preliminary Injunction, the court found that H.B. 56 § 27 is not preempted by federal immigration law. *United States v. Alabama*, Case No. 2:11-CV-2746, docs. 93, 94. For the

same reasons, the court will deny plaintiffs' Motion for Preliminary Injunction to the extent it seeks to enjoin Section 27 on the ground of preemption.

**3.  Section 1981**

Plaintiffs argue that Section 27 is also preempted by 42 U.S.C. § 1981.  Section 1981 provides:

> (a)  Statement of equal rights
>
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> (b)  "Make and enforce contracts" defined
>
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
>
> (c)  Protection against impairment
>
> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.  Section 1981 protects an individual's right to contract from discrimination on the basis of alienage.  *See id.* (a)("All persons within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security

of persons and property as is enjoyed by white citizens."); *see also Takahashi*, 334 U.S. at

419; *Anderson v. Conboy*, 156 F.3d 167, 180 (2d Cir. 1998).   However, Section 1981 does

not protect a person from discrimination on the basis of unlawful presence.  *Anderson*, 156

F.3d at 180 ("If an employer refuses to hire a person because that person is in the country

illegally, that employer is discriminating on the basis not of alienage but of noncompliance

with federal law.").   The court finds that Section 1981 does not conflict with the language

or intent of Section 27, which prohibits the enforcement of certain contracts between a party

and "an alien unlawfully present in the United States."  H.B. 56 § 27(a).

It may well be that some individuals who appear to be of foreign birth will experience

discrimination based on Section 27.  However, such cases cannot be remedied by a facial

challenge to H.B. 56 § 27.

Based on the foregoing, plaintiffs' Motion for Preliminary Injunction as to Section 27

of H.B. 56 will be denied.

## I.  SECTION 28

Section 28 of H.B. 56 states:

> (a)(1) Every public elementary and secondary school in this state, at the
> time of enrollment in kindergarten or any grade in such school, shall determine
> whether the student enrolling in public school was born outside the jurisdiction
> of the United States or is the child of an alien not lawfully present in the
> United States and qualifies for assignment to an English as Second Language
> class or other remedial program.

> (2)  The public school, when making the determination required by
> subdivision (1), shall rely upon presentation of the student's original birth
> certificate, or a certified copy thereof.

(3)  If, upon review of the student's birth certificate, it is determined that the student was born outside the jurisdiction of the United States or is the child of an alien not lawfully present in the United States, or where such certificate is not available for any reason, the parent, guardian, or legal custodian of the student shall notify the school within 30 days of the date of the student's enrollment of the actual citizenship or immigration status of the student under federal law.

(4)  Notification shall consist of both of the following:

a.  The presentation for inspection, to a school official designated for such purpose by the school district in which the child is enrolled, of official documentation establishing the citizenship and, in the case of an alien, the immigration status of the student, or alternatively by submission of a notarized copy of such documentation to such official.

b.  Attestation by the parent, guardian, or legal custodian, under penalty of perjury, that the document states the true identity of the child.  If the student or his or her  parent, guardian, or legal representative possesses no such documentation but nevertheless maintains that the student is either a United States citizen or an alien lawfully present in the United States, the parent, guardian, or legal representative of the student may sign a declaration so stating, under penalty of perjury.

(5)  If no such documentation or declaration is presented, the school official shall presume for the purposes of reporting under this section that the student is an alien unlawfully present in the United States.

(b)  Each school district in this state shall collect and compile data as required by this section.

(c)  Each school district shall submit to the State Board of Education an annual report listing all data obtained pursuant to this section.

(d)(1)  The State Board of Education shall compile and submit an annual public report to the Legislature.

94

(2)   The report shall provide data, aggregated by public school, regarding the numbers of United States citizens, of lawfully present aliens by immigration classification, and of aliens believed to be unlawfully present in the United States enrolled at all primary and secondary public schools in this state.  The report shall also provide the number of students in each category participating in English as a Second Language Programs enrolled at such schools.

(3)   The report shall analyze and identify the effects upon the standard or quality of education provided to students who are citizens of the United States residing in Alabama that may have occurred, or are expected to occur in the future, as a consequence of the enrollment of students who are aliens not lawfully present in the United States.

(4)   The report shall analyze and itemize the fiscal costs to the state and political subdivisions thereof of providing educational instruction, computers, textbooks and other supplies, free or discounted school meals, and extracurricular activities to students who are aliens not lawfully present in the United States.

(5)   The State Board of Education shall prepare and issue objective baseline criteria for identifying and assessing the other educational impacts on the quality of education provided to students who are citizens of the United States, due to the enrollment of aliens who are not lawfully present in the United [S]tates, in addition to the statistical data on citizenship and immigration status and English as a Second Language enrollment required by this act.  The State Board of Education may contract with reputable scholars and research institutions to identify and validate such criteria.  The State Board of Education shall assess such educational impacts and include such assessments in its reports to the Legislature.

(e)   Public disclosure by any person of information obtained pursuant to this section which personally identifies any student shall be unlawful, except for purposes permitted pursuant to 8 U.S.C. §§ 1373 and 1644.  Any person intending to make a public disclosure of information that is classified as confidential under this section, on the ground that such disclosure constitutes a use permitted by federal law, shall first apply to the Attorney General and receive a waiver of confidentiality from the requirements of this subsection.

(f)   A student whose personal identity has been negligently or intentionally disclosed in violation of this section shall be deemed to have suffered an invasion of the student's right to privacy.  The student shall have a civil remedy for such violation against the agency or person that has made the unauthorized disclosure.

(g)  The State Board of Education shall construe all provisions of this section in conformity with federal law.

(h)  This section shall be enforced without regard to race, religion, gender, ethnicity, or national origin.

H.B. 56 § 28.  Section 28 requires all children enrolling in a public elementary or secondary school to provide their birth certificate to a school official.  H.B. 56 § 28(a)(1)-(2).  According to subsections (a)(2) and (3), school officials must rely on the birth certificate to determine "whether the student was born outside the jurisdiction of the United States or is the child of an alien not lawfully present in the United States."  *Id*. (a)(2)-(3).  Information about the immigration status of a parent is not reflected on Alabama birth certificates.  Alabama requires "date, time, and location of birth; name of child; sex; plurality and birth order if not single; mother's information such as name, residence, and date and place of birth; father's information as provided in Code of Ala. 1975, § 22-9A-7(f); attendant's information; and information for legal purposes such as certificate number and date filed."  Ala. Admin. Code r. 420-7-1-.03(2)(a)1.; *see also* Ala. Code § 22-9A-7(f)(Information concerning the father is included on the birth certificate based on the mother's marital status and whether paternity has been legally determined.).  Other information about the parents, "such as race, ethnicity, and education," is collected for "statistical research and public health purposes,"

96

but such information is not included on the birth certificate.  Ala. Admin. Code r. 420-7-1-.03 (2)(a)2.  Nothing in the record indicates that immigration status is reflected on the birth certificates from other states or countries.  For purposes of determining the reach of Section 28, the court assumes that school officials will not seek to determine the immigration status of parents beyond examination of the child's birth certificate and that such information is not included on the birth certificate. Therefore, Section 28 does not compel school officials to determine the immigration status of a parent of a student.

If the birth certificate shows the child was "born outside the jurisdiction of the United States" or if the birth "certificate is not available for any reason, "the parent, guardian, or legal custodian of the student shall notify the school within 30 days of the date of the student's enrollment of the actual citizenship or immigration status of the student under federal law."[23]  H.B. 56 § 28(a)(3).  This "notification" requires the person responsible for the child to "present[ ] for inspection . . . official documentation establishing the citizenship and, in the case of an alien, the immigration status of the student," and a declaration or affidavit swearing that the official documents "state[ ] the true identity of the child." *Id*. (a)(4).  If the parent or other person responsible for the child does not have documentation establishing citizenship or lawful presence, he or she "may sign a declaration . . . stating" that the child is a citizen or is otherwise lawfully present. *Id*. (a)(4)(b).  From this information,

---

[23]Although subsection (a)(1) refers to the immigration status of a student's parents, subsection (a)(4) does not require notification or collection of information regarding a parent's immigration status.

the school creates a report listing the number of students that are citizens, lawfully-present aliens and presumed unlawfully-present aliens.[24] *Id*. (b), (c).  The number of unlawfully-present alien children includes any student not submitting the required documentation.  *Id*. (a)(5).  Section 28 states that it "shall be enforced without regard to national origin."  *Id*. (h).  Section 28(5) requires all children unable to present a birth certificate showing that he or she was born in the United States or whose parent, guardian, or legal custodian does not submit the documentation or declaration required by Section 28(3) and (4) be  presumed unlawfully present for reporting purposes.  Therefore, for reporting purposes, children will be presumed unlawfully present aliens who are neither aliens not unlawfully present.

Defendants have presented evidence that "enrollment" only occurs when a child enters the Alabama school system.  (Doc. 82-3 at 3.)  It does not include registration, which occurs at the beginning of each school year.  (*Id*.)

The court finds that plaintiffs do not have standing to challenge Section 28.

The only plaintiff with children likely to enter the Alabama school system for the first time in the foreseeable future is Jane Doe #3, who has three children under the age of six.  (Doc. 1 ¶ 122.)  However, her children are United States citizens.  (*Id*.)  Their father and the

---

[24]Also, Sections 28(a)(1) and (d)(2) require schools to determine and report the number of students participating in English as a Second Language [ESL] Programs.  This information is already collected and reported under federal law.  *See*, *e.g.*, 20 U.S.C. § 6968.  Plaintiffs do not challenge the collection and reporting of the number of ESL students, which, the court notes, is not synonymous with a student's national origin or immigration status.

husband of Jane Doe #3 is unlawfully present, but nothing in the record indicates that this fact is shown on the face of the birth certificates of their children. (*Id.*) Therefore, although Jane Doe # 3 has alleged that she is "fearful that if HB 56 takes effect, school officials will report her husband's immigration status to federal officials because he will be required to provide information on his immigration status when enrolling their children in public school," (*id.* ¶ 124), this fear is not well founded, *see* H.B. 56 § 28(a)(1)-(3); Ala. Admin. Code r. 420-7-1-.03(2)(a)1.

Other individual plaintiffs have school age children[25] and John Doe #1 is a minor enrolled in Alabama public schools. However, because John Doe # 1 and the other plaintiffs' children are already enrolled in school, Section 28 will not apply to them. (*See* doc. 82-3 at 3.) Therefore, these plaintiffs do not have a real and concrete threat of injury fairly traceable to the enforcement of H.B. 56 § 28.

Of the plaintiff associations and organizations, only two – DreamActivist.org and Greater Birmingham Ministries – mention any injury to themselves or their members arising from H.B. 56 § 28. (*See* doc. 1 ¶¶ 46-58.) Plaintiffs allege that "younger members [of

---

[25]Webster is adopting John Doe # 1 and his brother; both children are already enrolled in public school. (Doc. 1 ¶¶ 143, 144.) Jane Doe #1 and John Doe #2 have a 17 year old son who is undocumented and a 9-year-old daughter who is a United States citizen. (*Id.* ¶¶ 111, 147.) Plaintiff Jane Doe #2 is considering home-schooling her children because she is afraid school officials will report her undocumented status to federal immigration officials. (*Id.* ¶ 120.) Jane Doe #4 is the mother of three children who presumably are in school as their mother has been in the country for eleven years. (*Id.* ¶ 126.) Jane Doe #5 has a 13-year-old son and she is afraid school officials will try to determine her immigration status. (*Id.* ¶¶ 131, 135.)

DreamActivist.org] will be afraid to enroll in public elementary or secondary school because they will have to disclose their or their parents' immigration status in order to enroll."  (*Id.* ¶ 50; doc. 37-10 ¶ 8(h).)  They also allege:

> Undocumented individuals from GBM [Greater Birmingham Ministries] congregations have also expressed concern that their children may not be able to attend school if they have to register with their child's public school under HB 56.  These members fear that their immigration status will be sent to the federal government and lead them to being detained and possibly deported under HB 56.

(Doc. 1 ¶ 56, *see also* doc. 37-11 ¶ 11.)  Also, plaintiffs have submitted the declaration of the Executive Director of the Hispanic Interest Coalition of Alabama, in which she states, "Many of the drop-in visitors seek information about the new law's provision regarding K-12 education.  Our constituents and members are fearful of enrolling their children in school and we must address these concerns constantly."  (Doc. 37-2 ¶ 15.)

The organizations do not identify any member or constituent who is an alien or parent of an alien required to follow the procedures set forth in Section 28(a)(4).  Therefore, these organizations do not have standing based on the standing of their members or constituents. *See Summers*, 129 S. Ct. at 1149, 1151-52.

Moreover, the court finds that these plaintiffs do not have associational standing. "Standing is not dispensed in gross.  Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)(internal quotations and citations omitted).  Therefore, a general reference to an injury engendered by H.B. 56 will not satisfy plaintiffs' obligation

to show standing.  Plaintiffs allege that HICA has spent time discussing Section 28 with its members and constituents.  Although diversion of resources to fight or counteract a challenged law may be adequate to establish standing, the diversion of HICA resources alleged in this case is only time spent *discussing* Section 28.  The Eleventh Circuit has found standing based on an association's diversion of resources when the diversion involved activities designed to counteract or compensate for the effects of the challenged law.  *See Billups*, 554 F.3d at 1350.  ("Because it will divert resources from its regular activities to educate voters about the requirement of a photo identification and assist voters in obtaining free identification cards, the NAACP established an injury sufficient to confer standing to challenge the statute."); *Browning*, 522 F.3d at 1166.  ("In this case, the diversion of personnel and time to help voters resolve matching problems effectively counteracts what would otherwise be Subsection 6's negation of the organizations' efforts to register voters. The net effect is that the average cost of registering each voter increases, and because plaintiffs cannot bring to bear limitless resources, their noneconomic goals will suffer. Therefore, plaintiffs presently have standing on their own behalf to seek relief.").  This court finds that the general allegation that HICA has spent time discussing the law, without alleging that any of these discussions involved enrollment of an alien, is not a concrete and real injury fairly traceable to Section 28.

Therefore, plaintiffs' Motion for a Preliminary Injunction to the extent they seek to enjoin Section 28 will be denied for lack of standing.

## J.  SECTION 30

Section 30 provides:

(a)  For the purposes of this section, "business transaction" includes any transaction between a person and the state or a political subdivision of the state, including, but not limited to, applying for or renewing a motor vehicle license plate, applying for or renewing a driver's license or nondriver identification card, or applying for or renewing a business license.  "Business transaction" does not include applying for a marriage license.

(b)  An alien not lawfully present in the United States shall not enter into or attempt to enter into a business transaction with the state or a political subdivision of the state and no person shall enter into a business transaction or attempt to enter into a business transaction on behalf of an alien not lawfully present in the United States.

(c)  Any person entering into a business transaction or attempting to enter into a business transaction with this state or a political subdivision of this state shall be required to demonstrate his or her United States citizenship, or if he or she is an alien, his or her lawful presence in the United States to the person conducting the business transaction on behalf of this state or a political subdivision of this state.  United States citizenship shall be demonstrated by presentation of one of the documents listed in Section 29(k).[26]  An alien's

---

[26]These documents are:

(1)  The applicant's driver's license or nondriver's identification card issued by the division of motor vehicles or the equivalent governmental agency of another state within the United States if the agency indicates on the applicant's driver's license or nondriver's identification card that the person has provided satisfactory proof of United States citizenship.

(2)  The applicant's birth certificate that verifies United States citizenship to the satisfaction of the county election officer or Secretary of State.

(3)  Pertinent pages of the applicant's United States valid or expired

(continued...)

---

[26](...continued)

passport identifying the applicant and the applicant's passport number, or presentation to the county election officer of the applicant's United States passport.

(4)   The applicant's United States naturalization documents or the number of the certificate of naturalization. If only the number of the certificate of naturalization is provided, the applicant shall not be included in the registration rolls until the number of the certificate of naturalization is verified with the United States Bureau of Citizenship and Immigration Services by the county election officer or the Secretary of State, pursuant to 8 U.S.C. § 1373(c).

(5)   Other documents or methods of proof of United States citizenship issued by the federal government pursuant to the Immigration and Nationality Act of 1952, and amendments thereto.

(6)   The applicant's Bureau of Indian Affairs card number, tribal treaty card number, or tribal enrollment number.

(7)   The applicant's consular report of birth abroad of a citizen of the United States of America.

(8)   The applicant's certificate of citizenship issued by the United States Citizenship and Immigration Services.

(9)   The applicant's certification of report of birth issued by the United States Department of State.

(10)   The applicant's American Indian card, with KIC classification, issued by the United States Department of Homeland Security.

(11)   The applicant's final adoption decree showing the applicant's name and United States birthplace.

(12)   The applicant's official United States military record of service showing the applicant's place of birth in the United States.

(continued...)

lawful presence in the United States shall be demonstrated by this state's or a political subdivision of this state's verification of the alien's lawful presence through the Systematic Alien Verification for Entitlements program operated by the Department of Homeland Security, or by other verification with the Department of Homeland Security pursuant to 8 U.S.C. § 1373(c).

(d)  A violation of this section is a Class C felony.

(e)  An agency of this state or a county, city, town, or other political subdivision of this state may not consider race, color, or national origin in the enforcement of this section except to the extent permitted by the United States Constitution or the Constitution of Alabama of 1901.

(f)  In the enforcement of this section, an alien's immigration status shall be determined by verification of the alien's immigration status with the federal government pursuant to 8 U.S.C. § 1373(c).  An official of this state or political subdivision of this state shall not attempt to independently make a final determination of whether an alien is lawfully present in the United States.

H.B. 56 § 30 (footnote added).

## 1.  Standing

The court finds plaintiff Maria D. Ceja Zamora has standing to challenge Section 30

through Count One, Supremacy Clause, and through Count 9, Section 1981.  Zamora alleges

that she was not allowed to renew her Alabama driver's license, despite the fact that she had

a Social Security number and an employment authorization document.  (Doc. 1 ¶¶ 69-70.)

---

[26](...continued)
(13)  An extract from a United States hospital record of birth created at the time of the applicant's birth indicating the applicant's place of birth in the United States.

HB 56 § 29(k).

She testified that it is essential that she drive.  (Doc. 37-14 ¶ 6.)  However, Section 30 of H.B. 56, which  would prohibit her from obtaining a driver's license or to register a vehicle, prevents her from lawfully driving.  The court finds this injury is real and imminent, fairly traceable to the Act, and would be redressed by an injunction enjoining the enforcement of Section 30 of H.B. 56.  Therefore, the court finds Zamora has standing to challenge Section 30 of H.B. 56 in Count One and Count Nine.

### 2. Preemption

In its Memorandum Opinion and Order granting the United States's Motion for Preliminary Injunction, in *United States v. Alabama,* Case No. 2:11-CV-2746-SLB, docs. 93, 94, the court found that Section 30 of H.B. 56 is not preempted by federal law.  For the same reasons, the court will deny plaintiffs' Motion for Preliminary Injunction to the extent it seeks to enjoin Section 30 on the ground that it is preempted by federal immigration laws.

### 3. Section 1981

As set forth above, Section 1981 protects an individual's right to contract from discrimination on the basis of alienage.  42 U.S.C. § 1981(a); *see also Takahashi*, 334 U.S. at 419; *Anderson v. Conboy*, 156 F.3d at 180.  However, Section 1981 does not protect any person from discrimination on the basis of illegal presence.  *See Anderson*, 156 F.3d at 180.

The court finds that Section 1981 does not conflict with the language or intent of Section 30, which prohibits state and local government from engaging in certain "business transactions" with "an alien not lawfully present in the United States."  H.B. 56 § 30(b).

Although some individuals who appear to be of foreign birth may experience discrimination, such cases must await an as-applied challenge.

Based on the foregoing, plaintiffs' Motion for Preliminary Injunction as to Section 30 of H.B. 56 will be denied.

**CONCLUSION**

For the foregoing reasons, the court is of the opinion –

1.  Plaintiffs have shown that they are entitled to an injunction preliminarily enjoining the last sentence of Section 10(e), 11(e), and 13(h); and Section 11(f) and (g);

2.  Plaintiffs' request for an injunction preliminarily enjoining Section 11(a) and Section 13 of H.B. 56 is moot based on the court's Memorandum Opinion and Order in *United States v. Alabama*, Case No. 2:11-CV-2746-SLB, docs. 93, 94; and

3.  Plaintiffs have not shown that they are entitled to an injunction preliminarily enjoining H.B. 56 in its entirety, or the remainder of Section 10, Section 12, Sections 18-10, Section 27, Section 28, and Section 30.

An Order granting in part and denying plaintiffs' Motion for Preliminary Injunction, (doc. 37), and enjoining enforcement of the last sentence of Sections 10(e), 11(e), and 13(h), as well as Section 11(f) and (g), will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 28th day of September, 2011.

*Sharon Lovelace Blackburn*
_____
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE

106
